REDACTED

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

|  |  |  |
|---|---|---|
| **SHANA SANDLER**, | ) ) ) | |
| *Plaintiff* | ) ) | |
| v. | ) ) ) | Case No. 1:07-cv-00029 |
| **MIA CALCAGNI** *et al*, | ) ) ) | |
| *Defendants* | ) ) | |

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

Plaintiff Shana Sandler moves pursuant to Rule 56 of the Federal Rules of Civil Procedure for an order of partial summary judgment against Defendant Booksurge, LLC ("Booksurge"), determining that Booksurge is the publisher of the book *"Help Us Get Mia"* and, as the publisher, is liable for any defamatory statements or invasions of privacy contained in the book, to the extent this Court subsequently determines such statements or invasions to exist. The basis for this Motion is that there are no genuine issues of material fact and Plaintiff is entitled to judgment as a matter of law for the reasons provided in the incorporated memorandum of law.

### INTRODUCTION

Plaintiff Shana Sandler sued Booksurge, LLC in connection with the publication of the book *"Help Us Get Mia"* and the defamatory statements and invasions of privacy contained in the monograph. Ms. Sandler has asserted claims against Booksurge for libel, libel per se, false light and private facts invasions of privacy, and punitive damages. Seeking to avoid liability for

its role in the publication of *"Help Us Get Mia,"* Booksurge has suggested that it is not the "publisher" of the book, subject to liability for the defamatory statements and invasions of privacy contained in the book. Booksurge suggests it is merely the "printer" of the book and within the limited class of "secondary publishers" or "distributors" – such as libraries and distributors – who may not know the content of the published matter and can only be held liable for it if the individual or entity knew or had reason to know the book contained defamatory material. Booksurge's argument is belied by its active role in producing the book *"Help Us Get Mia."*

## BACKGROUND

Shana Sandler is a resident of High Point, North Carolina. Plaintiff's Statement of Material Facts ("PSMF") at ¶ 1. Prior to living in North Carolina, Ms. Sandler attended Maranacook Community High School in Readfield, Maine and graduated from Winthrop High School in Winthrop, Maine. *Id.* at ¶ 2. Booksurge is a book manufacturer located in Charleston, South Carolina. *Id.* at ¶ 3. In 2006, Booksurge produced a book entitled *"Help Us Get Mia"* which purports to depict Ms. Sandler and to chronicle several events in her life during her time as a student at Winthrop High School, including her interactions with Defendant Mia Calcagni. *Id.* at ¶¶ 4, 10. That book contains a number of false and defamatory statements and invasions of privacy concerning Ms. Sandler. *Id.* at ¶ 5.

Although the book credits "Emet Gabar" as its author, the agreement to produce the book was made between Booksurge and Defendant Ralph Calcagni in the form of an "Author Publishing Agreement." *Id.* at ¶ 6. That agreement reserved to Booksurge the right – in its sole discretion – to decline acceptance to the work for publication but, once accepted, granted Booksurge a non-exclusive license to publish the book in print. *Id.* at ¶¶ 7-8. And that is exactly

what Booksurge did. The copyright page of *"Help Us Get Mia"* identifies that the book was "published by Booksurge, LLC" in 2006. *Id.* at ¶ 10.

Booksurge's role went beyond merely printing the book; it included marketing and distributing the book through various channels, REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED. *Id. at* ¶ 9, 11-12. Booksurge also marketed the book through book distributors and retailers. *Id.* at ¶ 11.

Booksurge was a vital publisher during this period. In 2007 alone, it grew its list of publications from 120,000 titles to 480,000 titles – an increase of 360,000 titles in just one year. *Id.* at ¶ 14. It did this, in part, by actively soliciting new titles to add to its list of publications. *Id.* at ¶ 13. REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED, Booksurge had unparalleled access to and dominance in the literary marketplace. *Id.* at ¶ 12, 14.

Booksurge produces its books without regard for their content; it does not review or screen manuscripts prior to publication. *Id.* at ¶ 15. Save issues of formatting, Booksurge is willing to publish all manuscripts submitted to it. *Id.* at ¶ 18. In the case of *"Help Us Get Mia,"* Booksurge made no efforts to review or screen the content of the book before publishing it. *Id.* at ¶ 16. Booksurge also took no efforts to check any of the facts or attempt to verify any of the information contained in *"Help Us Get Mia."* *Id.* at ¶ 17.

<h4 style="text-align:center">SUMMARY JUDGMENT STANDARD</h4>

Summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Material, for the purposes of summary judgment, means that a contested fact has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant. <u>Navarro v. Pfizer Corp</u>., 261 F.3d 90, 93-94 (1st Cir. 2001). "Genuine" means that

the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party. *Id*. Summary judgment is designed to secure the swift and inexpensive conclusion to claims that lack a factual basis. Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).

**ARGUMENT**

1. **BOOKSURGE IS THE "PUBLISHER" OF *"HELP US GET MIA"* AND IS LIABLE FOR ANY DEFAMATORY CONTENT CONTAINED IN THE BOOK**

Booksurge has attempted to avoid liability for any defamatory statements in *"Help Us Get Mia"* by suggesting that it was not the "publisher" of the book and falls within the limited class of individuals recognized as "secondary publishers" or "distributors" who are subject to liability for defamatory statements only if they knew or had reason to know the book contained defamatory material.

   *a.* **Booksurge is the Publisher of *"Help Us Get Mia"***

In the defamation context, "publisher" has broad meaning and includes "any person who automatically republishes or distributes" defamatory material. Batzel v. Smith, 351 F.3d 904, 907 (9th Cir. 2003) (*citing* W. Page Keeton et al, *Prosser and Keeton on the Law of Torts* § 113 (5th ed. 1984). The Restatement (Second) of Torts defines what constitutes publication to include "its communication intentionally or by a negligent act to one other than the person defamed." RESTATEMENT (SECOND) OF TORTS § 577(1) (1977); Heselton v. Wilder, 496 A.2d 1063, 1067 (Me. 1997) (*citing* RESTATEMENT (SECOND) OF TORTS § 577); Hartigan v. Hall-Dale Manor, 2005 Me. Super. LEXIS 28, *9; *See generally*, Lester v. Powers, 596 A.2d 65, 69 (Me.

4

1991) (following the Restatement's approach in the tort of defamation). Hardly novel, other courts have adopted similar approaches to define "publication" for the purposes of defamation.[1]

While publication requires some form of communication, not all publishers are treated equally for the purposes of defamation. Explicit in the Restatement formulation of publication is an intentional or negligent communication to a third person. RESTATEMENT (SECOND) OF TORTS § 577(1). For the purposes of defamation, therefore, there are "primary publishers" and "secondary publishers" or distributors, disseminators or transmitters. *See, e.g.,* Grace v. Ebay Inc., 16 Cal. Rptr. 3d 192, 198 (Cal. Ct. App. 2004); Dworkin v. Hustler Magazine, Inc., 611 F. Supp. 781, 785 (D. Wyo. 1985); Hart v. Bennett, 672 N.W.2d 306, 318 (Wis. Ct. App. 2003). A "primary publisher" such as a publishing company "is presumed to know the content of the published material, has the ability to control the content of the publication, and therefore generally is held liable for the defamatory statement." *Id.*, *citing* Prosser & Keeton, Torts § 113 (5th ed. 1984). By contrast, a "secondary publisher" or distributor, such as a news vendor or library, "may or may not know the content of the published matter and therefore can be held liable only if the distributor knew or had reason to know that the material was defamatory." *Id.*; *see also* Barrett v. Rosenthal, 146 P.3d 510, 513 (Ca. 2006).

This is the approach of the RESTATEMENT (SECOND) OF TORTS to "primary publishers" and distributors. Under the Restatement, "one who only delivers or transmits defamatory matter published by a third person is without liability if, but only if, he knows or has reason to know of

---

[1] *See, e.g.,* Condit v. Dunne, 317 F.Supp. 2d 344, 354 n.1 ("'Publication' refers not only to written comments, but to any 'communication to some third person who understands the defamatory meaning of the statement and its application to the person to whom the reference is made.'") (*quoting* Smith v. Maldonado, 85 Cal. Rptr. 2d 397, 402 (Cal. Ct. App. 1999)); Anderson v. New York Telephone Co., 320 N.E.2d 647, 649 (NY 1974) ("[i]n order to be deemed to have published a libel a defendant must have had a direct hand in disseminating the material whether authored by another or not."); Piper v. Mize, 2003 Tenn. App. LEXIS 429, *19 (Tenn. Ct. App. 2003) ([Publication] "is a term of art meaning the communication of a defamatory matter to a third person). At its most basic level, "publication" requires only some communicative act to a third person. *See, e.g.,* Cole v. Chandler, 2000 ME 104, ¶ 5, 752 A.2d 1189, 1193.

its defamatory character." RESTATEMENT (SECOND) OF TORTS § 581. The Restatement explains the meaning of "delivers or transmits" to refer to "the transfer of possession of the physical embodiment of the defamatory matter," including selling, renting, giving or otherwise transferring a book, paper or magazine containing defamation published by a third person. RESTATEMENT (SECOND) OF TORTS § 581, *comment b.* The policy behind distinguishing between these two classes of publishers is that primary publishers, including authors and publishing houses, know or can find out whether a statement in a work produced by him is defamatory, while distributors generally do not possess such ability. *Id.*, *comment c.*

An example of the distinction between a "primary publisher" and a distributor is provided by Piper v. Mize, a Tennessee Court of Appeals case involving the publication of a newspaper known as *The Rattler*. This was the situation: the October 5, 2000 issue of *The Rattler* contained an article entitled "Sex Scandals Still Rock City Hall," which stated that the mayor was "caught in the act" with the "vivacious and ever spunky Ms. Lori Turner," a municipal employee, by his wife who, upon discovering the situation, "clobbered him with a nine iron." Piper, 2003 WL 21338696 (Tenn. Ct. App. 2003). The mayor sued a number of defendants for defamation, including Curtis Mize. Mize had no connection with the newspaper but simply allowed it to be distributed from his store counter, along with other free publications. *Id*. He was a vocal opponent of the Mayor's administration and made little secret of his sympathies with the writer of *The Rattler*. On these facts, the court held that Mize was not responsible as a publisher:

> We are not dealing, in this appeal, with a publisher of a newspaper or magazine where mass distribution would authorize a finding that the publication was read and understood by some third party within the context of Restatement (Second) of Torts section 563, but rather with a very limited posting of the October 5, 2000 issue of *The Rattler*, by one who had no part in the writing, publishing, editing or actively disseminating the scandal sheet.

*Id*.

A further distinction is made for defamation purposes between primary and secondary publishers and entities that make available equipment that another may use himself for general communication purposes. This was the situation in <u>Anderson v. New York Telephone Co.</u>, a New York case involving a defamation claim against a telephone company. In 1969, Donald Jackson, sponsor of the organization "Let Freedom Ring," broadcast weekly radio shows over radio stations in Western New York. During his broadcasts, Jackson urged his listeners to call two telephone numbers. Anyone calling these numbers heard statements about the plaintiff, the Presiding Bishop of the Church of God in Christ in Western New York, involving "all sorts of scurrilous activities, not the least of which was illegitimately fathering children by women and girls in the church." 320 N.E.2d 647, 648 (NY 1974). Jackson's telephones were attached to equipment leased to Jackson by the defendant New York Telephone Company. Unable to secure an injunction against the defendant, plaintiff brought a defamation action. *Id*. Although the telephone company provided the telephones, the court found that it did not "publish" the statements about the plaintiff. *Id*. In upholding the decision, the New York Court of Appeals explained that:

> It could not be said, for example, that International Business Machines, Inc., even if it had notice, would be liable were one of its leased typewriters used to publish a libel. Neither would it be said that the Xerox Corporation, even if it had notice, could be held responsible were one of its leased photocopy machines used to multiply a libel many times.

*Id.* at 649.

Booksurge is a primary publisher, imputed with knowledge of the content of the books it publishes and subject to the rule that one who publishes defamatory content is subject to liability as if it had authored the statements itself. One of the most compelling indicia of Booksurge's role is provided on the copyright page of *"Help Us Get Mia"*: "Published by Booksurge, LLC."

7

PSFM ¶ 10.  Booksurge's status as a "primary publisher" is further supported by its role in the publication of this book.  Booksurge actively solicits new titles through its sales department – and this book was no exception.  Booksurge representative Roy Francia sold to Ralph and Maureen Calcagni the publishing process for *"Help Us Get Mia"* and spoke with them a number of times on the telephone concerning the production of their book.  PSMF ¶ 19.  The "Author Publishing Agreement" between Defendant Ralph Calcagni and Booksurge – which allowed Booksurge to publish this book – granted Booksurge a non-exclusive license to publish *"Help Us Get Mia."*  PSFM ¶ 7.  Notice how Booksurge characterizes and holds itself out during this process: it did not enter a "printing agreement" with Ralph Calcagni, it entered an agreement which it called an "Author Publishing Agreement."  PSMF ¶ 6.  And the nature of that agreement is entirely consistent with Booksurge's role: that agreement also reserved to Booksurge the right to decline to accept a submission for publication.  PSFM ¶ 8.  If Booksurge were a mere printer, as it now seeks to cloak itself, it would not reserve such an important right – the right to presumably control the content of what it publishes.

Booksurge's role went beyond printing.  It included distribution – placing the book in various channels of the literary marketplace.  PSMF ¶ 9, 11-12.  Booksurge made this fact explicit in the "Author Publishing Agreement."  PSFM ¶ 9.  It provided advance notice that, through the non-exclusive publishing license it acquired, it intended to market *"Help Us Get Mia"* on its website and to make the books available for distribution in various channels.  *Id.*

In a move of self-deprecation, Booksurge has suggested that it is a printer or otherwise within the class of so-called "secondary publishers" or distributors.  That claim is belied by Booksurge's active role in the publishing process.  Unlike the plaintiff in <u>Piper v. Mize</u>, who merely allowed a copy of the October 5, 2000 issue of *The Rattler* to be distributed from his

counter and played no role in "writing, publishing, editing or actively disseminating the scandal sheet," we are dealing here with a party who played a part in actively publishing and disseminating *"Help Us Get Mia."* 2003 WL 21338696. Even if Booksurge claims it is just a distributor for the works of others, it still had an active role and considerable presence in the distribution. A publisher who brings 360,000 new volumes to the marketplace in a single year REDACTED REDACTED REDACTED REDACTED REDACTED brings a significant market force that provides for unparalleled access to, and dominance in, the literary marketplace. PSFM ¶ 12, 14. Booksurge is not a mom-and-pop printing operation with a few photocopiers hoping its titles get noticed in the marketplace; it is a significant leader in its field, both in publishing and in using its size to provide access and to distribute its books in the marketplace.

     Nor can Booksurge claim it falls within the class of participants which allow others to use its technology for general communication purposes. Shana Sandler is not suing the manufacturer of Booksurge's printing press or the software company Booksurge utilizes in its book production. Those entities would fall within the class recognized in <u>Anderson v. New England Telephone Co.</u>, 320 N.E. 647 (NY 1974). Booksurge is not, for example, a commercial copy center who allows others to come in and use its equipment for general communication purposes, to pay a fee corresponding to its use, leave and never have any further contact. Booksurge actively solicits new titles – an effort that appears to have paid off handsomely and allowed it to grow its inventory of titles three-fold in just one year. PSMF ¶¶ 13 – 14. Booksurge's role goes beyond merely allowing one to use its equipment: Booksurge is active in taking that product and bringing it to the marketplace of ideas. *Id.* at ¶¶ 9, 11-12. A copy center's relationship with its customers, by contrast, is terminated upon the tender of the fee for the use of the equipment.

Booksurge would have this Court believe that it is not a "primary publisher," despite its claim in the very first pages of *"Help Us Get Mia,"* and would bifurcate its role and claim that in producing books, it is like a commercial copy center, and in distributing the book, it is within the class of secondary publishers or distributors. However, the sum of the parts here equals the whole. The roles Booksurge would carve out for itself are part of the core constitutive elements of being a publisher: producing the work and bringing it to market. It is hard to see how these roles could be separated if only for the purpose of avoiding liability.

Booksurge is the publisher of *"Help Us Get Mia."* It actively solicited the work and worked with the authors in its production. PSMF ¶ 19. It used its "Author Publishing Agreement," through which it acquired a non-exclusive license to publish the work. *Id.* at ¶ 7. It had the right to refuse the submission, but chose to publish the work. *Id.* at ¶ 8, 10. Once published, it took the opportunity to notify any reader of the work that it was "published by Booksurge, LLC." *Id*. at ¶ 10. Once published, it used its presence in the marketplace to distribute the book to retailers, distributors and internet vendors. *Id.* at ¶ 9, 11.

### b. As the Publisher, Booksurge is Liable for Any Defamatory Statements

Defamation consists of "(a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting to at least negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." <u>Cole v. Chandler</u>, 2000 ME 104, ¶ 5, 752 A.2d 1189, 1193 (*citing* <u>Lester v. Powers</u>, 596 A.2d 65, 69 (Me. 1991), *citing* Restatement (Second) of Torts § 558 (1977)). A defamation claim requires a statement – an assertion of fact, explicit or implied, and not merely an opinion, provided the opinion does not imply the existence of undisclosed defamatory facts. *See* <u>Lightfoot v. Matthews</u>, 587 A.2d 462 (Me.

1991); True v. Ladner, 513 A.2d 257, 261-62 (Me. 1986); Caron v. Bangor Publishing Co., 470 A.2d 782, 784 (Me. 1984).  The statement must be false.  Picard v. Brennan, 307 A.2d 833, 836 (Me. 1973).  It must also be "of and concerning" the plaintiff.  Lester, 596 A.2d at 68 (citing RESTATEMENT (SECOND) OF TORTS § 613(1)(c)).

Anyone who republishes defamatory matter is subject to liability as if he had published it originally.  Elms v. Crane, 107 A. 852, 854 (Me. 1919) (*quoting* Davis v. Starrett, 55 A. 516, 519 (Me. 1903); *see also* Garrett v. Tandy Corp., 2003 WL 21250679 (D. Me 2003) ("courts have recognized liability for damages flowing from the foreseeable republication (apart from voluntary self-publication)").  "On the quaint homespun logic that 'talebearers are as bad as talemakers,' each repetition of a defamatory statement by a new person constitutes a new publication, rendering the repeater liable for that new publication . . . The law deems the repeater to 'adopt as his own' the defamatory statement.  R. Smolla, *Law of Defamation*, § 4:87, at 4-136.3-136.4 (2d ed. 1001).  Every repetition of the publication is a publication in itself and liability cannot be avoided by stating the source.  Flowers v. Carville, 310 F.3d 1118, 1128 (10th Cir. 2002).  The reason for this rule is that "republication of false facts threatens the target's reputation as much as the original publication."  Condit v. Dunne, 317 F.Supp. 2d 344, 363 (S.D.N.Y. 2004).

This position is consistent with both the RESTATEMENT (SECOND) OF TORTS and the majority of other jurisdictions.  RESTATEMENT (SECOND) OF TORTS § 578 provides "[e]xcept as to those who only deliver or transmit defamation published by a third person, one who repeats or otherwise republishes defamatory matter is subject to liability as if he had originally published it."  Other jurisdictions have adopted this general rule.[2]

---

[2] *See, e.g.,* Flowers v. Carville, 310 F.3d 1118, 1128 (10th Cir. 2002) ("a person who repeats a defamatory statement is generally as liable as the one who first utters it"); Taj Mahal Travel, Inc. v. Delta Airlines, Inc., 164 F.3d 186, (3rd

As the publisher of *"Help Us Get Mia,"* Booksurge's liability automatically attaches to the extent that the book contains any defamatory statements. Once Booksurge's publisher status is established, liability cannot be avoided. Accordingly, and as more fully stated above, Booksurge is the publisher of *"Help Us Get Mia"* and therefore subject to liability to the extent the book contains defamation as if it made the statements originally.

### 2. BOOKSURGE IS LIABLE FOR ANY INVASIONS OF PRIVACY CONTAINED IN *"HELP US GET MIA"*

As the publisher of *"Help Us Get Mia,"* Booksurge is liable for any invasions of privacy contained in the book. Unlike the distinctions made between publishers for the purposes of defamation liability, there is no such recognized distinction that applies to invasions of privacy.

Maine recognizes four kinds of interests, the invasion of which may give rise to a claim for breach of another person's right to privacy. Adopting the approach of the RESTATEMENT (SECOND) OF TORTS §§ 652A – E (1977), the Maine Law Court has held that the right of privacy is invaded by: (a) unreasonable intrusion upon the seclusion of another; (b) appropriation of the other's name or likeness; (c) unreasonable publicity given to the other's private life; or (d) publicity that unreasonably places the other in a false light before the public. Nelson v. Maine Times, 373 A.2d 1221, 1223 (Me. 1977); Estate of Berthiaume v. Pratt, 365 A.2d 792, 794 (Me. 1976); *see also* Veilleux v. National Broadcasting Co., 206 F.2d 92, 98 – 99 (1st Cir. 2000).

---

Cir. 1998) ("one who republishes libelous matter is subject to liability as if he had published it originally") (*citing* Rogers v. Courier Post Co., 66 A.2d 869, 873 (N.J. 1949)); Schiavone Construction Co. v. Time, Inc., 735 F.2d 94, 96 (3rd Cir. 1984) ("In New Jersey, one who republishes defamatory matter is generally subject to liability as if he or she had originally published it"); Catalano v. Pechous, 419 N.E.2d 350, 361 (Ill. 1980); Dixson v. Newsweek, Inc., 562 F.2d 626, 631 (10th Cir. 1977) ("the republication of false defamatory statements is as much a tort as the original publication"); Cepeda v. Cowles Magazines and Broadcasting, Inc., 328 F.2d 861, 871 (9th Cir. 1964) (one cannot escape liability by showing that he was merely repeating the defamatory language used by another person); Hart v. Bennett, 672 N.W.2d 306, 318 (Wis. Ct. App. 2003) ("One who repeats or otherwise republishes defamatory matter is subject to liability as if he had originally published it") (*citing* RESTATEMENT (SECOND) OF TORTS § 578); Ringler Assocs. v. Md. Casualty Co., 80 Cal. App. 4th 1165, 1180 (Cal. Ct. App. 2000) ("Reprinting or recirculating a libelous writing has the same effect as the original publication"); McCracken v. Gainesville Tribune, Inc., 246 S.E.2d 360, 362 (Ga. Ct. App. 1978); (Newspapers may be held liable for defamation "even though the source of the communication is quoted, for the law holds that '[t]alebearers are as bad as talemakers.'").

Booksurge invaded two of those protected interests – unreasonable publicity to another's private life ("private facts") and publicity that unreasonably places another in a false light before the public ("false light").

### *a.* **Private Facts**

Under Maine law, one who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter publicized is of a kind that (a) would be highly offensive to a reasonable person and (b) is not of legitimate concern to the public. Nelson, 373 A.2d at 1225 (*quoting* RESTATEMENT (SECOND) OF TORTS § 652D). "Publicity" differs from the use of the term "publication" as that term is used in connection with liability for defamation. "Publicity means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." RESTATEMENT (SECOND) OF TORTS § 652D, *comment a* (1977); *see also* Cole, 2000 ME 104, ¶ 17, 752 A.2d at 1197.

Booksurge is legally liable for invasion of privacy by the unreasonable publicity it gave to Shana Sandler's private life. The damages flowing from such invasion is to be determined by the jury at trial. Booksurge "publicized" private facts in *"Help Us Get Mia"* – it communicated that information to the public at large. There is no distinction for this purpose between the author of the book and Booksurge; the parties jointly publicized private, truthful, but highly offensive facts about Shana Sandler in *"Help Us Get Mia."*

This is not an issue that is clarified by any distinction among the roles of the Defendants in producing the monograph. Booksurge is the publisher of *"Help Us Get Mia."* In publishing this book, Booksurge publicized private, truthful facts about Shana Sandler. There is no shortage of cases holding media defendants liable for the invasions of privacy they publicized but were

"authored" by another. *See, e.g.,* Veilleux v. National Broadcasting Co., 206 F.3d 92 (1st Cir. 2000); Nelson v. Maine Times, 373 A.2d 1221 (Me. 1977).

To the extent that Plaintiff can establish at trial the other elements of her "private facts" invasion of privacy claim, Booksurge, as the publisher of the book, is liable for Plaintiff's damages.

### b. False Light

One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability for invasion of privacy, if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other was placed. Nelson, 373 A.2d at 1223-24, *citing* RESTATEMENT (SECOND) OF TORTS § 652E (1977); *see also* Cole v. Chandler, 2000 ME 104, ¶ 17, 752 A.2d 1189, 1197. "Publicity" as used in this section has the same meaning as publicity for private facts.

As the publisher of *"Help Us Get Mia,"* Booksurge is liable for any publicity that unreasonably places Shana Sandler in a false light before the public – to the extent the book contains such an invasion of privacy. As with the liability for invasion of privacy through the disclosure of truthful private facts discussed above, there is no legal distinction as to the liability between the author of *"Help Us Get Mia"* and the publisher of that book, Booksurge. To the extent there is "publicity" generated by the publication and distribution of the book that unreasonably places Shana Sandler in a false light before the public, both Booksurge and the author(s) of *"Help Us Get Mia"* are equally liable. Both would have "publicized" information that placed Shana Sandler in a false light.

Accordingly, as the publisher of *"Help Us Get Mia,"* Booksurge is liable for any invasions of privacy contained in the book. To the extent Plaintiff can establish the other elements of her false light claim at trial, Booksurge is legally liable for her damages.

### CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court enter an order of partial summary judgment determining that Booksurge is the publisher of "Help Us Get Mia," and, as the book's publisher, is liable for any defamatory statements and invasions of privacy contained in the monograph. All other issues as to liability and damages shall be left for determination at trial.

Dated at Bangor, Maine, this 5th day of March, 2008.

          PLAINTIFF, Shana Sandler,

          By:   */s/ Bernard J. Kubetz*
                Bernard J. Kubetz, Esq.
                Michael R. Clisham, Esq.
                EATON PEABODY
                P. O. Box 1210
                80 Exchange Street
                Bangor, Maine 04402-1210
                (207) 947-0111
                bkubetz@eatonpeabody.com

**CERTIFICATE OF SERVICE**

I, Bernard J. Kubetz, hereby certify that on March 5, 2008, I electronically filed the foregoing Plaintiff's Motion for Partial Summary Judgment with the Clerk of the United States District Court using the CM/ECF system, which will send notification of such filing to the following:

Bruce Mallonee, Esq.
Rudman & Winchell, LLC
84 Harlow Street
P. O. Box 1401
Bangor, Maine 04402-1401
bmallonee@rudman-winchell.com

Steven P. Wright, Esq.
Kirkpatrick & Lockhart Preston Gates Ellis LLP
State Street Financial Center
One Lincoln Street
Boston, Massachusetts 02111-2950
steven.wright@klgates.com

Matthew J. Segal, Esq.
Stephen A. Smith, Esq.
Kirkpatrick & Lockhart Preston Gates Ellis LLP
925 Fourth Avenue, Suite 2900
Seattle, Washington 98104-1158
matthew.segal@klgates.com

J. William Druary, Jr., Esq.
Marden, Dubord, Bernier & Stevens
44 Elm Street
P. O. Box 708
Waterville, Maine 04903-0708
bdruary@mardendubord.com

Harold J. Friedman, Esq.
Friedman, Gaythwaite Wolf & Leavitt
Six City Center
P. O. Box 4726
Portland, Maine 04112-4726
hfriedman@FGWL-law.com

                                            */s/ Bernard J. Kubetz*_____
                                            Bernard J. Kubetz