UNITED STATES DISTRICT COURT
DISTRICT OF MAINE AT BANGOR

| | |
|---|---|
| SHANA SANDLER, )<br>)<br>Plaintiff )<br>)<br>v. )<br>)<br>MIA CALCAGNI, )<br>RALPH CALCAGNI, )<br>MAUREEN CALCAGNI, )<br>PETER MARS, )<br>and )<br>BOOKSURGE, LLC, )<br>)<br>Defendants. )<br>) | Case No. 1:07-CV-00029-GZS |

### BOOKSURGE, LLC'S MOTION FOR SUMMARY JUDGMENT
### ON ALL CLAIMS OF PLAINTIFF SHANA SANDLER
### AND INCORPORATED MEMORANDUM OF LAW

Defendant BookSurge, LLC ("BookSurge") moves for summary judgment

pursuant to Federal Rule of Civil Procedure 56 and Local Rules 7 and 56, as there are no

genuine issues of material fact and BookSurge is entitled to judgment as a matter of law

on all claims.

### I.     INTRODUCTION AND SUMMARY OF ARGUMENT

A dispute between two high school cheerleaders, Shana Sandler and Mia

Calcagni, has escalated into this lawsuit.[1]  Defendants Ralph and Maureen Calcagni and

Peter Mars wrote a book (*Help Us Get Mia*) about this rivalry and subsequent school and

police investigations into the girls' conduct.  BookSurge, a "print on demand" company,

converted the PDF manuscript into book format.  Ms. Sandler now sues, claiming

---

[1] Shana Sandler is referred to as "Ms. Sandler" throughout this brief.  There are three
Calcagni parties, but Mia Calcagni is referred to as "Ms. Calcagni."

1

Dockets.Justia.com

intentional infliction of emotional distress, libel, libel per se, false light invasion of privacy, private facts invasion of privacy, and punitive damages.

BookSurge moves for summary judgment on *multiple alternative grounds*. First, the First Amendment bars holding every entity involved in bringing a book to market liable for the book's content. Because Ms. Sandler cannot demonstrate that BookSurge acted negligently—let alone with actual malice—when it printed *Help Us Get Mia*, all her claims against BookSurge fail. Second, BookSurge's conduct is privileged because *Help Us Get Mia* addresses issues of public concern, and BookSurge did not abuse the privilege by acting with actual malice. Third, Ms. Sandler cannot prove the alleged defamatory statements are false or susceptible to defamatory meaning. Fourth, Ms. Sandler cannot satisfy the "special harm" requirement for libel claims under Maine law because she has no pecuniary or economic damages. Fifth, Maine law prohibits Ms. Sandler, a libel plaintiff, from claiming a false light invasion of privacy tort when she cannot prove the essential elements of libel. Sixth, all of the statements that allegedly reveal private facts either involve public facts or facts that would not be highly offensive to a reasonable person. Finally, Ms. Sandler's claims for punitive damages against BookSurge fail to satisfy the substantial requirement that the plaintiff prove common law malice by clear and convincing evidence.

On each of these grounds, summary judgment is proper at this time.

## II.    FACTS

Ms. Calcagni and Ms. Sandler were classmates and cheerleaders at Winthrop High School in Winthrop, Maine. BookSurge, LLC's Statement of Material Facts ("BSMF") ¶¶ 3, 4, 6, 21. Although Ms. Sandler lived in nearby Readfield, in the

Maranacook School District, she moved to Winthrop High School in her sophomore year under a superintendents' agreement. BSMF ¶ 22.

Although Ms. Calcagni was a year behind Ms. Sandler in school, the girls became friends on the Winthrop High cheerleading squad. BSMF ¶ 23. But their friendship began to sour. BSMF ¶ 24. Ms. Calcagni and her friends spread rumors about why Ms. Sandler transferred from Maranacook High School to Winthrop—suggesting that Ms. Sandler was teased at Maranacook ████████████████████████████ for allegedly masturbating. BSMF ¶ 25.[2] Ms. Calcagni and her friends also apparently used various epithets referring to Ms. Sandler's Jewish heritage. BSMF ¶ 26. At the same time, Ms. Sandler spread rumors that Ms. Calcagni was pregnant. BSMF ¶ 27. The parents of Ms. Sandler and Ms. Calcagni contacted the school administration regarding the harassment. BSMF ¶¶ 27, 28, 29, 30, 32, 35. Eventually, the Calcagnis and the Sandlers also contacted the police, and the police issued anti-harassment/restraining orders to both Ms. Calcagni and Ms. Sandler. BSMF ¶ 31.

The dispute between Ms. Calcagni and Ms. Sandler escalated when Ms. Calcagni concocted a plan to paint swastikas on road signs near Ms. Sandler's house. BSMF ¶ 45.

---

[2] In light of a request filed by Plaintiff's counsel on March 7, 2008, the Court and counsel for the parties conferred on March 11, 2008, regarding whether certain pleadings or exhibits, other than those previously and properly designated as confidential under the protective order in this case, should be sealed or redacted. Counsel for BookSurge has followed a conservative approach to redaction to comply with the Court's wishes and, where possible, the wishes stated by Plaintiff's counsel. In so doing, however, BookSurge takes no position as to the merits of whether the the documents are or are not confidential under Maine and federal law. Counsel for BookSurge also provided all proposed redactions and sealed documents to Ms. Sandler's counsel on the afternoon of March 13, 2008, inviting review and comment on the proposed redactions. Counsel for BookSurge received no feedback from Ms. Sandler's counsel by 1PM Eastern Time on March 17, 2008, when it began the final process of filing its motions for summary judgment and supporting documentation.

Over Veterans Day weekend 2003, Ms. Calcagni and her friend Shannon Thayer-Adams spray painted swastikas on the road signs while driving around with Marissa Cundy, Annette Krumbach, Tyler Beck, Drew Scott, and Daniel Buckley. BSMF ¶¶ 43, 44, 46, 47.

All of the students in the car that night, through written voluntary police statements or interviews with officers, accused Ms. Calcagni and Thayer-Adams of painting the signs. BSMF ¶ 49.



Ms. Calcagni, in turn, accused Michelle Perry of painting the swastikas. BSMF ¶ 52. Eventually, Ms. Calcagni and Thayer-Adams were charged with criminal mischief. BSMF ¶ 54.

In the meantime, the Calcagnis had withdrawn Ms. Calcagni from school and complained to school officials that Ms. Sandler's continued harassment of Ms. Calcagni made it impossible for Ms. Calcagni to return. BSMF ¶ 32. Although the school district left the investigation of the swastika incident to the police, it assigned Affirmative Action Officer Pat Larson to investigate the continuing conflict between the girls, and the high school eventually suspended both girls. BSMF ¶¶ 33, 34, 35. the Calcagnis filed a complaint with the U.S. Department of Education's Office of Civil Rights ("OCR") in Boston. BSMF ¶ 39. The Calcagnis contended that the school district

failed to protect their daughter from the sexually harassing pregnancy rumors spread by Ms. Sandler, and that the school district fabricated the accusations that Ms. Calcagni started masturbation rumors about Ms. Sandler. BSMF ¶ 40. OCR investigated and eventually released findings that confirmed that Ms. Calcagni suffered harassment through Ms. Sandler's pregnancy statements, but concluded that the school district had not fabricated the masturbation statements and had responded to the pregnancy statements appropriately. BSMF ¶¶ 41, 42.

While the police investigations, criminal prosecution, school district and OCR investigations were proceeding, the Maine Attorney General's office investigated and eventually charged Ms. Calcagni with a civil hate crime. BSMF ¶¶ 57 – 60. Ultimately, Ms. Calcagni was tried and convicted of criminal mischief, and she agreed to a consent decree in the civil hate crime case. BSMF ¶¶ 55, 61. An appeal of the criminal conviction was unsuccessful. BSMF ¶ 56.

The various school district, criminal, and civil investigations received media attention and were the subject of discussions among residents of Winthrop and the surrounding communities. *See* BSMF ¶ 63. However, the Calcagnis wanted to tell their side of the story. BSMF ¶ 65. They hired a local author, defendant Peter Mars, in April 2005 to help them write a book based on the documents they had collected from the various school, police, and attorney general investigations and court proceedings involving their daughter. BSMF ¶ 66. The Calcagnis and Mars produced a manuscript titled *Help Us Get Mia*, most of which was a compilation of excerpts from the police reports, trial transcripts, and other official records. BSMF ¶ 67. Once *Help Us Get Mia* was written, the Calcagnis decided to self-publish the book through BookSurge, a print-

on-demand ("P.O.D.") company.  BSMF ¶ 68.  BookSurge prints books for self-publishing authors and offers no fact-checking or similar editing services.  BSMF ¶ 69.  Ralph Calcagni purchased the "Author's Express PDF" service from BookSurge and uploaded a PDF version of the manuscript to BookSurge's website.  BSMF ¶¶ 70 – 74.  At the time, BookSurge charged $99 for the Author's Express PDF service.  BSMF ¶¶ 75 – 76.

The bound version of the book was available in September 2006, and the Calcagnis purchased 760 copies.  BSMF ¶¶ 80, 84.  Ralph Calcagni sold the book to bookstores in Winthrop and surrounding communities through a Bangor distributor, Magazines, Inc.  BSMF ¶¶ 85 – 86.  In addition, the book was available for sale through the Amazon.com and BookSurge websites, and approximately 80 copies were purchased on-line.  BSMF ¶¶ 81 – 83, 87.  No other copies of the book were produced or sold.  BSMF ¶ 88.

Ms. Sandler filed this lawsuit against Ralph, Maureen, and Mia Calcagni, Mars, and BookSurge in February 2007, claiming intentional infliction of emotional distress against Ms. Calcagni, and claiming libel,[3] libel per se, false light invasion of privacy, private facts invasion of privacy, and punitive damages against all of the defendants.  BSMF ¶ 95.  Initially, Ms. Sandler listed 45 statements that were either libelous or an invasion of privacy.  BSMF ¶ 96.  Ms. Sandler recently reduced her list of allegedly "actionable" statements from 45 to 12.  BSMF ¶ 97.

---

[3] Maine common law refers to the torts of "libel" and "libel per se" for written defamatory statements.  *Cohen v. Bowdoin*, 288 A.2d 106, 111 n.7 (Me. 1972).  This memorandum uses the words "libel" and "defamation" interchangeably, and many Maine cases and cases from other jurisdictions use the word defamation instead of libel.  *See Lester v. Powers*, 596 A.2d 65, 69 (Me. 1991).

## III.    ARGUMENT

Summary judgment is favored in libel cases because First Amendment freedoms must be protected from the chill of pending lawsuits. *See Lane v. Random House, Inc.*, 985 F. Supp. 141, 150 (D.D.C. 1995) (citing *Washington Post Co. v. Keogh*, 365 F.2d 965, 968 (D.C. Cir. 1966)). Accordingly, libel plaintiffs face daunting burdens to overcome summary judgment motions by libel defendants, including the requirement that certain elements be proven with convincingly clear evidence at the summary judgment stage. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986).

**A.      All of Ms. Sandler's Claims Fail Because BookSurge Lacked the Requisite Fault.**

Liability is not imposed lightly in the realm of First Amendment expression. In rejecting the premise of strict liability for printing, selling or distributing allegedly defamatory material, the U.S. Supreme Court has assured that states' libel laws do not unduly restrict the flow of constitutionally protected expression. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 347 (1974). Consistent with these constitutional requirements, Maine law rejects strict liability for entities printing or publishing a book that allegedly defames or invades privacy. *See Levinsky's, Inc. v. Wal-Mart Stores, Inc.*, 127 F.3d 122, 128 (1st Cir. 1997).[4] Thus, each of Ms. Sandler's claims requires Ms. Sandler to prove

---

[4] Although Restatement (Second) of Torts § 652D does not expressly include fault among the elements of the private facts invasion of privacy tort (*see Nelson v. Maine Times*, 373 A.2d 1221, 1225 (Me. 1977)), the discussion of truthful facts cannot constitutionally impose strict liability any more than alleged libelous statements. *Veilleux v. Nat'l Broad. Co.*, 206 F.3d 92, 132 (1st Cir. 2000) ("The constitutional validity of the unreasonable publication tort is unclear. To date, the Supreme Court has declined to decide whether truthful publications may *ever* be subjected to civil or criminal liability consistently with the First and Fourteenth Amendments, or to put it another way, whether the State may ever define and protect an area of privacy free from unwanted publicity in the press. . ." (internal quotations and citations omitted) (emphasis in original).

that BookSurge was at least negligent, and some claims require a showing of actual malice. *Veilleux*, 206 F.3d at 107, 134. Because Ms. Sandler cannot establish at least negligence, much less actual malice, all her claims should be dismissed on this ground alone.

### 1. BookSurge Had No Duty to Fact-Check *Help Us Get Mia.*

Whether or not BookSurge is labeled a "printer," "publisher," "distributor," or "bookseller," its liability depends on whether it had <u>any duty</u> to read and review *Help Us Get Mia* for factual accuracy. *Levinsky's*, 127 F.3d at 128 & n.4; *Maynard v. Port Publ'ns, Inc.*, 297 N.W.2d 500, 506-07 (Wis. 1980); *Misut v. Mooney*, 475 N.Y.S.2d 233 (N.Y. Sup. Ct. 1984).[5] BookSurge did nothing more than print, bind, and sell *Help Us Get Mia*. BSMF ¶¶ 14 – 16, 18 – 20, 69, 70-74, 81-83, 87, 89-90. Numerous courts have held that printers, bookstores and distributors do not have a duty to review and fact-check the publications they print and sell. For example, in *Misut*, the court concluded that even where a "contract printer" of a newspaper reviewed publications for "nudity, profanity, or vulgarity," the printer had no duty to fact-check and, therefore, no liability: "[T]he Court does not view the duty of a printer to be inclusive of an obligation to confirm facts, check sources and to thereby be responsible for the truth of printed statements. To do so would establish the printer as a censor. It would be impractical in economic terms and

---

[5] Under modern defamation law, the essential question is not how a party is labeled, but whether the party acted with the requisite level of fault required by the constitution. *See, e.g., Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 347 (1974) (holding that "liability without fault" cannot be imposed on "a publisher or broadcaster of defamatory falsehood"); *Auvil v. CBS 60 Minutes*, 800 F. Supp. 928, 931 (E.D. Wash.1992) ("Accordingly, it will be assumed for purposes of disposition that the local affiliates did republish within the meaning of *Herron*. At the same time, however, there is no liability for any defamation absent fault."); *Cubby, Inc. v. Compuserve, Inc.*, 776 F. Supp. 135, 140-41 (S.D.N.Y. 1991).

undesirable in social terms." 475 N.Y.S.2d at 233, 235-36 (footnote omitted); *see also Maynard*, 297 N.W.2d 506-07 ("For fault to exist the defendant must know or have reason to know of the libel. . . . Port, as a contract printer, had no reason to know.").

These principles apply to BookSurge. BookSurge's authors and customers pay BookSurge for printing and binding services over the internet. BSMF ¶ 14. In 2007 alone, BookSurge <u>added more than 350,000 book titles</u>. BSMF ¶ 17. BookSurge <u>does not review any submissions for content</u>. BSMF ¶¶ 18, 69, 89 – 90.[6] As explained by Ralph Calcagni in his deposition, he did not contract with BookSurge for any fact checking or editorial services, and he did not expect BookSurge to provide any. BSMF ¶ 77.

Nor would such an expectation have been reasonable. Unlike traditional book publishers such as Random House, BookSurge is paid by self-publishing authors to print and bind PDF-formatted manuscripts using "print on demand" ("P.O.D.") technology. BSMF ¶¶ 14 – 16. P.O.D. generally refers to digital methods that allow printing and binding of a complete book in a very short period of time and in small lots. *Id.*

Ralph Calcagni's experience with BookSurge is illustrative. BSMF ¶ 70. Ralph Calcagni purchased a package from BookSurge known as "Author's Express PDF." BSMF ¶ 70. Under the "Author's Express PDF" package, the author uploads a completed copy of his or her work in "PDF" file format on the BookSurge website,[7] and

---

[6] In the event that a BookSurge author or customer wishes to purchase technical editing services, these services are limited to a review of grammar and are outsourced and performed by another, unaffiliated entity. BSMF ¶¶ 19 – 20.

[7] "PDF" is an acronym for "Portable Document Format." Unlike Word, the PDF format does not permit editing of text or content.

BookSurge prints the file in a "book" format. BSMF ¶¶ 71 – 74.[8] The total cost was $1499, but this included 250 copies of the book—the actual printing cost was $99. BSMF ¶¶ 75 – 76.

In *Maynard*, the Wisconsin Supreme Court concluded that changes in printing technology altered the duties of a contract printer to review the content of the publications it printed:

> Port [Publications] prints from photographic negatives which have already been set in type and laid out on a page. To perform its operations, Port does not need to read the material or check its content in any way before it is printed. Contact with the content of a newspaper it prints is negligible. It is appropriate that this court acknowledge this changing technology and its effect on the responsibilities and duties of a contract printer . . . .

297 N.W.2d at 507. Similarly, the impact of the internet and P.O.D. technology on the world of publishing changes old assumptions about who assumes a duty of fact-checking sufficient to impose libel liability. BookSurge cannot be expected to review the enormous volume of uploaded printing submissions it receives for potentially defamatory material where it has "no knowledge of the content of the material it prints." *Id.* at 501; *see also Lunney*, 723 N.E.2d at 542; *Cubby*, 776 F. Supp. at 140   Because BookSurge had no duty to fact-check *Help Us Get Mia*, Ms. Sandler cannot prove an essential

---

[8] Ralph Calcagni opted to make *Help Us Get Mia* available for sale on Amazon.com's and BookSurge's websites. BSMF ¶¶ 81 – 83. The mere selling or distribution of a book, however, cannot serve as grounds for strict liability any more than the printing of a book. *See Cubby*, 776 F. Supp. at 139 ("The requirement that a distributor must have knowledge of the contents of a publication before liability can be imposed for distributing that publication is deeply rooted in the First Amendment . . ."). Nor does making third-party content available over the internet give rise to liability. *See id.* at 140-41; *Lunney v. Prodigy Servs. Co.*, 723 N.E.2d 539, 542 (N.Y. 1999). Indeed, to the extent plaintiff contends that BookSurge is liable because, through its internet service, it acts as a "publisher" of third party content, such a claim would be further barred by the Communications Decency Act. 47 U.S.C. § 230 (c)(1), (f)(2); *see also, e.g., Corbis,*

element of her claims—fault—and all of her claims must be dismissed on summary judgment. *See Maynard*, 297 N.W.2d at 507; *Lunney*, 723 N.E.2d at 542; *Cubby*, 776 F. Supp. at 140.

2. **Imposing a Duty to Read and Fact-Check on BookSurge Would Violate the First Amendment.**

Ms. Sandler's attempt to impose strict liability on an internet self-publishing service also violates the First Amendment. *See Smith v. California*, 361 U.S. 147 (1959); *Veilleux*, 206 F.3d at 108 n.7 ("[W]e must independently review . . . whether plaintiffs established that defendants were at least negligent in making the statements, as this is a constitutional requirement (as well as a necessary element of proof under Maine law)."); *Misut*, 475 N.Y.S.2d at 236.

Although *Smith* addressed the importance of scienter among the elements for criminal possession of obscene materials,[9] the Court's observations are highly instructive:

> By dispensing with any requirement of knowledge of the contents of the book on the part of the seller, the ordinance tends to impose a severe limitation on the public's access to constitutionally protected matter. . . . If the contents of bookshops and periodical stands were restricted to material of which their proprietors had made an inspection, they might be depleted indeed. . . . The bookseller's self-censorship, compelled by the State, would be a censorship affecting the whole public, hardly less virulent for being privately administered. Through it, the distribution of all books, both obscene and not obscene, would be impeded.

361 U.S. at 153-54; *see also New York Times v. Sullivan*, 376 U.S. 254, 277 (1964) ("What a State may not constitutionally bring about by means of a criminal statute is

---

*Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1118 (W.D. Wash. 2004) (scope of CDA is interpreted broadly).

[9] *See also Lerman v. Flynt Distrib. Co.*, 745 F.2d 123, 139 (2d Cir. 1984) (civil case citing *Smith*); *Cubby*, 776 F. Supp. at 139-40 (same); *Mark v. Seattle Times*, 635 P.2d 1081, 1087 (Wash. 1981) (same).

likewise beyond the reach of its civil law of libel.  The fear of damage awards… may be markedly more inhibiting than the fear of prosecution under a criminal statute." (footnote omitted)).

Adopting Ms. Sandler's theory that BookSurge has a duty to read and fact-check the hundreds of thousands of books that it prints each year (BSMF ¶¶ 17, 95) would restrict severely the dissemination of constitutionally protected books printed by BookSurge and other P.O.D. companies.  At a minimum, BookSurge and other P.O.D. companies would be required to increase substantially their rates in order to provide the review and fact checking proposed by Ms. Sandler.  Declaration of David Symonds ("Symonds Decl."), ¶ 5.  Far more likely, companies like BookSurge would cease to exist, because self-publishing authors would be unable to afford the cost entailed in the review and fact checking necessary to protect P.O.D. companies from Ms. Sandler's new-found theory of liability.  *See* Symonds Decl., ¶ 5; *Misut*, 475 N.Y.S.2d at 236 n.2 ("[T]here would be far reaching implications from the imposition of liability on a printer in a case such as this.  The resulting chilling effect could limit an author's access to printing services; or, available printers might insist on an intrusive monitoring or censorship of printed material to protect themselves from potential liability."); *see also Maynard*, 297 N.W.2d at 507 (discussing the First Amendment impacts of imposing a duty to read and fact check on printers that provide a print media venue for "groups that would otherwise not find such access"); *Cubby*, 776 F. Supp. at 140-41 (refusing to apply strict liability to online database of information for fear of unconstitutional chilling effect under First Amendment).

If strict liability were imposed on BookSurge, then the printer's burden "would become the public's burden…." *Smith*, 361 U.S. at 153. The First Amendment bars Ms. Sandler's claims against BookSurge, and summary judgment should be granted.

**B.      The Public Concern Privilege Requires Dismissal of All Claims.**

The significant number of federal, state and local investigations and proceedings arising from the events described in *Help Us Get Mia* (and the subject matter of these actions) establishes that these events have become a matter of public concern. Accordingly, BookSurge has a privilege which provides an alternative ground to dismiss all of Ms. Sandler's claims. *Levinsky's*, 127 F.3d at 128 ("a private individual who seeks damages for a defamatory statement involving a matter of public concern cannot recover presumed or punitive damages absent a showing of actual malice")[10]; *Stokes v. Barnhart*, 257 F. Supp. 2d 288, 295 (D. Me. 2003) (noting that a plaintiff cannot recover for unreasonable disclosure of private facts where the matter publicized was of legitimate public concern); *Veilleux*, 206 F.3d at 134 (requiring a showing of actual malice to recover for false light invasion of privacy).

**1.      *Help Us Get Mia* Pertains to Matters of Public Concern.**

This Court can determine as a matter of law that *Help Us Get Mia* pertains to matters of public concern. *Morgan v. Kooistra*, 2008 ME 26, ¶ 32, --- A.2d --- ("Whether a conditional privilege exists is a question of law.").

The feud between Ms. Sandler and Ms. Calcagni spawned investigations by the police and Maine Attorney General, criminal proceedings and an appeal, a civil hate

---

[10] Because Ms. Sandler's claims rely upon presumed or punitive damages (*see* Section D below, which demonstrates that Ms. Sandler cannot prove special damages as required by Maine law), Ms. Sandler must show actual malice to overcome the public concern privilege.

crime proceeding, school disciplinary proceedings, and investigations by the Maine

Department of Education and the U.S. Department of Education's Office of Civil Rights

("OCR").  BSMF ¶¶ 25 – 42, 48 – 61, 62.  The dispute was heavily discussed and

debated in the community, and received substantial media attention.  BSMF ¶ 63.

Moreover, the questions raised by the Calcagnis and Mars in *Help Us Get Mia* regarding

law enforcement and the disenchantment of youth in Winthrop, Maine, generally was a

topic of local and national media attention.  BSMF ¶ 64.

Given the media and governmental focus on the events recorded in *Help Us Get
Mia*, it is plain as a matter of law that *Help Us Get Mia* addressed matters of public

concern.  *See, e.g.*, *Riley v. Harr*, 292 F.3d 282, 298-99 (1st Cir. 2002) (concluding that *A
Civil Action*, a book addressing toxic tort litigation in Massachusetts, was a matter of

public concern, and holding that the book's statement that the plaintiff had "suffer[ed]

from episodes of depression" was relevant to the book's purpose of chronicling "the

devastating emotional toll of the litigation on many of the participants").[11]

*Help Us Get Mia*'s focus on matters of public concern requires that Ms. Sandler's

private facts invasion of privacy claims be dismissed.  Ms. Sandler's libel, libel per se,

and false light invasion of privacy claims also must be dismissed under the public

concern privilege because, as discussed next, BookSurge did not act with actual malice.

### 2.      BookSurge Did Not Act with Actual Malice.

Ms. Sandler cannot overcome the public concern privilege unless BookSurge

acted with actual malice.  *Haworth v. Feigon*, 623 A.2d 150, 157 (Me. 1993).  Actual

malice requires proof by clear and convincing evidence that the defendant acted with

---

[11] *See also Veilleux*, 206 F.3d at 108, 132; *McCabe v. Rattiner*, 814 F.2d 839, 843 (1st
Cir. 1987); *Geiger v. Dell Publ'g Co., Inc.*, 719 F.2d 515, 517 (1st Cir. 1983).

spite or ill will, or with knowledge of the falsity of a statement or acted in reckless

disregard of a statement's potential falsity. *Id.* at 157-58 & n.5; *Rippett v. Bemis*, 672

A.2d 82, 87 (Me. 1996).

As explained in Section A above, BookSurge's fault in this case does not amount

to negligence, let alone actual malice. BookSurge and its employees: (1) do not read or

review the manuscripts they print; (2) did not read or review the manuscript submitted to

them by Ralph Calcagni; (3) knew nothing about the substance of the book; (4) knew

nothing about the individuals involved with the events described in the book; and (5) had

not received any information that would cause them to question the factuality of any of

the statements in *Help Us Get Mia*. BSMF ¶¶ 69, 89 – 93. Accordingly, Ms. Sandler

fails the test for actual malice because she cannot produce clear and convincing evidence

showing that BookSurge knew of any of the statement's falsity or "had a high degree of

awareness of probable falsity or serious doubt as to the truth" of any of the statements in

the book. *Rippett*, 672 A.2d at 87.[12]

**C.     Alternatively, All of Ms. Sandler's Libel Claims Fail Because the Allegedly
          Defamatory Statements are Either True, Protected Opinion, Not Capable of
          Defamatory Meaning, or Barred by Additional Privileges.**

Notwithstanding the lack of fault and the public concern privilege, Ms. Sandler's

claims also should be dismissed on alternative grounds because each of the individual

statements that Ms. Sandler contends are defamatory are either: (1) true; (2) protected

opinions; (3) rhetorical hyperbole or otherwise not capable of defamatory meaning;

and/or (4) protected by the fair report privilege. *Rippett*, 672 A.2d at 86. Courts must

determine as a matter of law whether a statement is defamatory and protected by

---

[12] Section G of this brief demonstrates that BookSurge did not act with spite or ill will
towards Ms. Sandler.

privilege. *Bakal v. Weare*, 583 A.2d 1028, 1030 (Me. 1990); *Caron v. Bangor Publ'g Co.*, 470 A.2d 782, 784 (Me. 1984); *Morgan*, 2008 ME 26, ¶ 32.

A chart that analyzes each of the allegedly libelous statements identified by Ms. Sandler and the applicable elements and defenses is attached to this motion as Appendix A.

### 1. Epithets.

Ms. Sandler contends that five statements in *Help Us Get Mia* involving the epithets "Jew bag," "dirty Jew," "slut," and "whore" are libelous. BSMF ¶¶ 98 – 102. These statements are rude and obnoxious, but they are not actionable as a matter of law because they are (a) rhetorical hyperbole and opinion, and/or (b) protected by the fair reports privilege.

*a. Rhetorical Hyperbole and Opinion.* None of these statements are defamatory because they are "rhetorical hyperbole" – "loose, figurative language that no reasonable person would believe presented facts." *See Levinsky's*, 127 F.3d at 128 ("the [U.S. Supreme] Court recognized the need to segregate casually used words, no matter how tastelessly couched, from fact-based accusations").[13]

The fact that these statements are hyperbole is best illustrated by the various Jewish epithets. Ms. Sandler is Jewish, and she does not claim the epithets falsely describe her religion. BSMF ¶ 5. Instead, she contends only that the statements are

---

[13] *See also* Restatement (Second) of Torts § 566, cmt. e ("There are some statements . . . which cannot reasonably be understood to be meant literally and seriously and are obviously mere vituperation and abuse."); *Levinsky's*, 127 F.3d at 128 ("For better or worse, our society has long since passed the stage at which the use of the word 'bastard' would occasion an investigation into the target's lineage . . . ."); *Robel v. Roundup Corp.*, 59 P.3d 611, 622 (Wash. 2002) (holding that "bitch," "cunt," and "fucking bitch" were

"offensive" and "derogatory."  Declaration of Matthew J. Segal ("<u>Segal Decl.</u>") Ex. F

(Jan. 2008 Sandler Deposition ("<u>Sandler Def. Dep. II</u>") at 53 - 54, 89).  But this does not

make the statements defamatory.  For example, a New York state court held in *Weiner v.*

*Doubleday & Co., Inc.*, that the phrase "big, fat, ugly Jew" "is a mere epithet" that was

not actionable libel.  535 N.Y.S.2d 597, 600 (N.Y. App. Div. 1988), *aff'd on other*

*grounds by* 74 N.Y.2d 586 (N.Y. 1989); *see also Imperial Apparel, Ltd. v. Cosmo's*

*Designer Direct, Inc.*, --- N.E.2d ----, 2008 WL 351675, at *11 (Ill. Feb. 7, 2008)

(holding that even though the use of various anti-Semitic epithets in a newspaper

advertisement was "distasteful," "epithets aimed at ethnic or religious groups fall within

the protection of the first amendment").[14]  The Court can determine as a matter of law

that the "Jew bag" and "dirty Jew" statements in *Help Us Get Mia* do not state facts about

Ms. Sandler.

The "whore" statement also is an epithet that is protected rhetorical hyperbole.

While some literal definitions of "whore" may describe someone who engages in the

crime of accepting money for sex (*see, e.g.*, *Webster's Third New Int'l Dictionary* 2612

(3d ed. 1966)), the "whore" statement in context in *Help Us Get Mia* obviously has no

such meaning.  *See Veilleux*, 206 F.3d at 108 ("A defamation claim may not be based

solely on a reading that interprets the language in the most negative way possible."

(citing *Bakal*, 583 A.2d at 1030)).  The "whore" statement at page 55 of the book is a

direct quote from a voluntary police statement made by Samantha Pietraszewski, a high

---

"vulgar names" not understood to be meant literally but rather intended for "vituperation
and abuse"); *Ward v. Zelikovsky*, 643 A.2d 972, 982-83 (N.J. 1994) (same).

[14] Ms. Sandler's own deposition testimony demonstrates that the Jewish epithets are
rhetorical hyperbole.  *See* Segal Decl., Ex. E (Nov. 2007 Sandler Deposition ("<u>Sandler</u>
<u>Def. Dep. I</u>") at 136:7-16); Sandler Def. Dep. II at 88:23-25 – 89:1-7.

school student who had information about the swastika incident. ███████ Read in

the context of Pietraszewski's entire police statement, it is clear that Ms. Calcagni, the

alleged original speaker, used the word "whore" to hurl a general insult at Ms. Sandler

that is common in high school culture and has nothing to do with the crime of

prostitution. *See Greenbelt Coop. Publ'g Ass'n v. Bresler*, 398 U.S. 6, 13-14 (1970) (use

of the word "blackmail" to describe a developer's negotiating position was not

defamatory because the context demonstrated that the newspaper was not suggesting the

commission of a crime);[15] *see also* BSMF ¶ 111 (Sandler Def. Dep. II at 248 – 249

(admitting that "whore" is a vulgar epithet that can be understood as merely "a mean,

hateful word to show discontent [sic] for somebody. And I feel like that's how this

sentence sets me up . . .")). The same analysis of the word "whore" in *Help Us Get Mia*

applies to the use of the word "slut."[16]

    *b. Protected by Fair Reports Privilege.* Even if the epithets identified by Ms.

Sandler were somehow both false and capable of defamatory meaning, the statements are

not actionable because they are privileged fair reports of official actions or proceedings.

Restatement (Second) of Torts § 611 describes the "fair reports" privilege:

---

[15] *Caron*, 470 A.2d at 784-85 ("The determination whether an allegedly defamatory statement is a statement of fact or opinion is a question of law ... [T]he crucial difference between statement[s] of fact and opinion depends upon whether ordinary persons hearing or reading the matter complained of would be likely to understand it as an expression of the speaker's or writer's opinion, or as a statement of existing fact." (internal citations and quotations omitted)).

[16] "Slut" was taken directly from a voluntary police statement made by Daniel Buckley, who was quoting Ms. Calcagni and attributing motive to Ms. Calcagni with respect to the swastika incident. ████████ *See also Halliday v. Cienkowski*, 3 A.2d 372, 373 (Pa. 1939) (holding that neither "bitch" nor "slut" are actionable because such words, by themselves, impute neither lack of chastity nor adultery); Sandler Def. Dep. II at 130:1-11. ████████████████████████████████████

> The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported.

Although the Maine Supreme Court has not yet recognized the fair reports privilege explicitly, this well-established privilege should apply in this case.[17]

All of the epithets identified by Ms. Sandler are fair and accurate reports of official documents from the various legal proceedings involving Ms. Sandler and Ms. Calcagni.  The "dirty Jew," "whore," and "slut" statements are all direct quotes from police reports and voluntary police statements prepared during the investigation of the swastika incident, and therefore are not actionable because they are an accurate and fair abridgement of an official proceeding. ██████████  ██[18]  The "Jew bag" statements are similarly protected by the fair reports privilege because they are summaries of police statements, depositions, and trial court testimony in which various people accused Ms. Calcagni, Michelle Perry, ███████████████████████ ██████ and thus, having motive to paint the swastikas.  BSMF ¶ 109.  "To qualify as 'fair and accurate' for purposes of the fair report privilege, an article reporting an official statement need only give a 'rough-and-ready' summary of the official's report; it is not necessary that the article provide an accurate recounting of the events that actually transpired."  *Yohe v. Nugent*, 321 F.3d 35, 44 (1st Cir. 2003).  *Help Us Get Mia*'s direct

---

[17] *See Trainor v. Standard Times*, 924 A.2d 766, 770 (R.I. 2007) ("Long recognized at common law, this privilege immunizes the publisher from liability for defamation if what is published is a 'fair report' of (*inter alia*) an official action or proceeding.").

[18] Although the Maine Supreme Court does not appear to have recognized the fair report privilege explicitly, Maine recognizes an absolute privilege for statements made in judicial proceedings (*Dineen v. Daughan*, 381 A.2d 663 (Me. 1978)) and a conditional privilege for statements made to law enforcement officials (*Packard v. Central Me. Power Co.*, 477 A.2d 264 (Me. 1984)).

quotation of "whore," "slut," and "dirty Jew," and its summaries of the "Jew bag"

statements from official documents, easily meet this standard.

In sum, the epithets in *Help Us Get Mia* are not actionable as a matter of law

because they are rhetorical hyperbole and protected by the fair reports privilege.

### 2. Opinions About Ms. Sandler's Personality.

Ms. Sandler identified the following emphasized excerpts of a discussion of her

friendship with Ms. Calcagni in *Help Us Get Mia* as false and defamatory:

> Page 7: "Shana was in her junior year and had recently transferred to Winthrop
> under a superintendent's agreement from Maranacook High School. Shana <u>had
> many problems at Maranacook</u> and apparently felt a different school was in order.
> . . . Shana was also in cheering <u>but she was being made fun of by some of the
> students there</u> and, consequently, <u>had been running alone</u>. She, obviously, <u>had no
> friends in the new school</u>. At some point subsequent to that first meeting, Mia
> saw <u>Shana crying at a cheering practice</u> and went over to talk with her to ask her
> what the problem was. . . . No one likes to become the ally of a <u>laughingstock</u>.
> She thought that by going out for cheering, <u>she would overcome her poor self-
> esteem</u> but that did not happen. Shana was one of those <u>loud, in-your-face people</u>
> whose <u>personality grated on everyone around her</u>. And, she was <u>not very good in
> cheering</u> because she did not have any cheering background."

BSMF ¶ 103 (emphasis added). These statements are not actionable as a matter of law

because they are (a) protected statements of opinion, (b) statements admitted to be true,

and/or (c) not defamatory to Ms. Sandler's existing reputation.

*a. Protected Statements of Opinion.* Most of the emphasized portions of

the passage are protected opinion: "had many problems at Maranacook," "but she

was being made fun of by some of the students there," "had been running alone,"

"had no friends in the new school," "laughingstock," "she would overcome her

poor self-esteem," "loud, in-your-face people," "personality grated on everyone

around her," and "not very good in cheering." *See Caron*, 470 A.2d at 785 (as a

matter of law, the court must determine "whether ordinary persons hearing or

reading the matter complained of would be likely to understand it as an expression of the speaker's or writer's opinion, or as a statement of existing fact." (internal citation and quotations omitted)). No average reader would be able to decide whether Ms. Sandler was "good in cheering," for example. Nor should the courts be called upon to decide such trivia. The statements on page 7 of *Help Us Get Mia* are non-actionable opinions.

*b. Statements Admitted to be True.* However, even if the statements about Ms. Sandler's "problems" at either Maranacook or Winthrop (e.g. "running alone," "had no friends in the new school," or "crying at a cheering practice") are statements of fact, these statements are not actionable because Ms. Sandler concedes they are true. BSMF ¶¶ 115 – 118.

*c. Not Defamatory to Ms. Sandler's Existing Reputation.* Finally, as a matter of law none of these statements about Ms. Sandler's high school years are defamatory—i.e., they did not harm her existing reputation. *Rippett*, 672 A.2d at 86 (stating a defamatory statement must lower the victim's standing in that community or deter third persons from associating with the victim); *Cohen*, 288 A.2d at 111 (describing a statement as defamatory if it exposes the subject to public hatred, contempt, or ridicule, or deprives the subject of the benefit of public confidence and social intercourse). There is no evidence that, given her admitted problems throughout high school, these statements alone somehow caused persons to avoid Ms. Sandler.

### 3. Ms. Sandler's Own Internet Postings.

Ms. Sandler claims that the following summaries of her myspace.com postings in *Help Us Get Mia* contain false and defamatory statements:

Page 45:  "According to myspace.com, Shana entered the following information about herself. . . . Will not comment on having ever shoplifted.  Has a few piercings and tattoos. . . .  "

Page 62:  "To begin, it is important to note that Shana, in her on-line autobiography, states in answer to the question, 'Have you ever shoplifted?' that she would not comment on that question.  Immediately, that sends up a red flag indicating that if she had never shoplifted, she could have easily answered, 'No.'  However, this type of answer implies that she has committed this offense. . . ."

BSMF ¶¶ 104 – 105 (emphasis added).  These statements are not actionable as a matter of law because (a) the statements are true, (b) the statements are not defamatory, and (c) the statements are protected opinion.

*a.  The Statements are True.*  Ms. Sandler admitted in her deposition that she has <u>two</u> piercings in <u>each</u> ear, and she also had a piercing in her navel.   BSMF ¶ 119.  That portion of her own myspace page excerpt is true.

*b.  The Statements are Not Defamatory.*  Ms. Sandler cannot contend that the tattoos statement is defamatory because Ms. Sandler admits that she doesn't "believe there's anything wrong with a tattoo."   BSMF ¶ 120.  She also concedes that she would date someone with tattoos.  BSMF ¶ 121.

The shoplifting statement also is neither false nor defamatory.  The first half of the statement is an accurate summary of Ms. Sandler's myspace.com on-line survey:  "To begin, it is important to note that Shana, in her on-line autobiography, states in answer to the question, 'Have you ever shoplifted?' that she would not comment on that question."  This summary from Ms. Sandler's own creation is true.  BSMF ¶ 122.   True statements are not actionable as libel or libel per se.  *Schoff v. York County*, 2000 ME 205, ¶ 9, 761 A.2d 869, 871.  Ms. Sandler also admitted that she posted these answers to the myspace.com on-line survey when her myspace.com webpage was accessible <u>to anyone</u>

in the world.  BSMF ¶¶ 134 – 136.  Accordingly, the same statement in the book could not have been defamatory because her reputation was the same from her own statements.

   *c. Protected Opinion.*  The second half of the shoplifting statement is a statement of opinion.  That portion read: "Immediately, that sends up a red flag indicating that if she had never shoplifted, she could have easily answered, 'No.'  However, this type of answer implies that she has committed this offense. . . ."  Ms. Sandler admits that the opinion expressed was a reasonable observation based on the language she used in her own internet posting.  Sandler Def. Dep. I at 87 – 88:1-5.  Statements of opinion are not actionable libel.  *See Gray v. St. Martin's Press, Inc.*, 221 F.3d 243, 248 (1st Cir. 2000) ("[I]f it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable." (emphasis added) (quoting *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1227 (7th Cir. 1993)).  This statement is a "classic" example of protected opinion.[19]

   **4.      Statement About Ms. Sandler Starting Rumors.**

   Ms. Sandler claims that the following statement in *Help Us Get Mia,* accusing Ms. Sandler of spreading rumors about Ms. Calcagni, is false and defamatory:

> Page 14:  "Shana further persisted in formulating new, more devastating rumors by stating to those who were familiar with Mia that Mia was expelled from school, was out of school so that she could have an abortion, and that Mia painted swastikas on the street signs on Route 41, an allegation that came some weeks subsequent to the previous rumors."

---

[19] *See also* Restatement (Second) of Torts § 566, ill. 5 ("A says to B about C, a city official: 'He and his wife took a trip on city business a month ago and he added her expenses in as a part of his own.' B responds: 'If he did that he is really a thief.' B's expression of opinion does not assert by implication any defamatory facts, and he is not liable to C for defamation.").

BSMF ¶ 106.  This statement is not actionable as a matter of law because the statement is (a) true, and/or (b) protected by the fair reports privilege.

  *a.  The Statement is True.*  A libelous statement, to be actionable, cannot be false in some picayune or trivial way, but rather the essence or "sting" of the statement must depart materially from the truth.  *Picard v. Brennan*, 307 A.2d 833, 836 (Me. 1973).  The defamatory sting of this statement is that Ms. Sandler started or spread rumors about Ms. Calcagni.  As a matter of law, the rumor statement is not defamatory because the sting of the statement is admittedly true.  Ms. Sandler admitted at least twice in separate proceedings that she started rumors about Ms. Calcagni being pregnant and being expelled.  BSMF ¶ 123.

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████  The statement also is an accurate summary of Ms. Sandler's testimony for the State's criminal mischief case in which she admitted telling the school administration and police that Ms. Calcagni painted the swastikas near her house.  BSMF ¶ 125; ███████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████

  The essence of the rumors statement is true, and therefore, not actionable.

  *b.  Protected by Fair Reports Privilege.*  While Ms. Sandler's repeated <u>admissions</u> under oath to starting or spreading rumors about Ms. Calcagni demonstrate the sting of the alleged defamatory statement is true, the statement also is protected by the fair reports

privilege.  The statement is a fair and accurate summary of the official records from the police investigations, judicial proceedings, and school disciplinary proceedings and investigations.  BSMF ¶¶ 123 – 126.

The truth of the statements on page 14 of *Help Us Get Mia* or the fair reports privilege provide alternative grounds to dismiss the "starting rumors" libel claims.

**5.     Music Room Statements**

Ms. Sandler claims that several statements first made in the high school's music room, and repeated in *Help Us Get Mia* at pages 22 and 23, regarding a masturbation rumor about her are false and defamatory.  BSMF ¶¶ 107 – 108.  These statements are not actionable as a matter of law because (a) they are protected by the fair reports privilege, and/or (b) when read in context, they are not defamatory statements of fact.

*a. Protected by Fair Reports Privilege.*   The statements at pages 22-23 are protected by the fair reports privilege because they are either direct quotes from, or fair and accurate summaries of, disciplinary records, civil rights investigation records, or attorney general investigations.  BSMF ¶ 127.  In short, each of the alleged defamatory statements is derived directly from official records and is privileged.

*b. These are Not Defamatory Statements of Fact.*  Even if these statements were not protected by the fair reports privilege, the context demonstrates that they are not defamatory as a matter of law.  *See Schoff*, 2000 ME 205, ¶ 9, 761 A.2d at 871 n.3.  The statements appear in a discussion of <u>whether the school administration was falsely accusing Ms. Calcagni of saying inappropriate things about Ms. Sandler</u> in order to justify the discipline and eventual suspension of Ms. Calcagni from school.  Sandler Def. Dep. I Ex. 4 ("*Help Us Get Mia*" at 21-24).  The author of *Help Us Get Mia* does not

state or suggest in any way that the music room statements are true statements of fact about Ms. Sandler.  Rather, the book argues explicitly to the contrary:  that the school administration's version of the music room incident was a "fabrication" to justify disciplinary action against Ms. Calcagni.  *Help Us Get Mia* at 24; *see also* Sandler Def. Dep. I Ex. 2 (incl. Letter from Thomas J. Hibino, U.S. Dep't of Ed. Office of Civil Rights ("OCR Decision") at 6-7 (discussing Calcagnis' contention that school fabricated music room events)).  Read in context, the statements cannot be understood to be asserting that Ms. Sandler actually did any of the things identified by the students in the music room.

Accordingly, the music room statements in *Help Us Get Mia* are not actionable as a matter of law for these alternative reasons.

**D.**     **Alternatively, All of Ms. Sandler's Libel Claims Fail Because Ms. Sandler Concedes She Has Not Suffered Special Harm under Maine Law.**

An actionable libel claim requires that a plaintiff prove special harm unless the plaintiff can also prove libel per se.  *Rippett*, 672 A.2d at 86.  Maine law has never found statements to be libelous per se unless they pertain to a plaintiff's business or profession or allege a punishable criminal offense.  *Haworth*, 623 A.2d at 156 (statements about business/profession); *Rippett*, 672 A.2d at 86 (punishable offense). Thus, Ms. Sandler must demonstrate libel per se or special harm to avoid summary judgment on all of her libel and libel per se claims.  *Id.* at 85 ("To avoid a judgment as a matter of law for the defendants on a given claim, [the plaintiff] must establish a prima facie case for each element of that claim.").

None of the statements identified by Ms. Sandler as libelous relate to her business or profession—a college senior planning to attend graduate school.  BSMF ¶¶ 1 – 2, 97 – 108.  Only two statements identified by Ms. Sandler even arguably allege a punishable

offense—i.e., the "whore" and "shoplifting" statements—but neither statement is even libelous. For the multiple alternative reasons set forth in the preceding section, these statements cannot be read as factual assertions of crimes.

Because none of the statements in *Help Us Get Mia* are libel per se, Ms. Sandler must demonstrate <u>special harm</u> in order to establish all elements of her libel claims. Special harm in the context of a libel case requires the plaintiff to demonstrate more than just loss of reputation or social standing. Special harm or "special damage" is defined as "the loss of something having economic or pecuniary value." *Withers v. Hackett*, 1998 ME 164, ¶ 9, 714 A.2d 798, 801. In other words, the plaintiff must show that the loss of reputation or social standing resulted in a loss of material advantages. Emotional distress alone is not special damage. *Id.*

Ms. Sandler admits repeatedly under oath that she has suffered <u>no</u> economic or pecuniary loss from the publication of *Help Us Get Mia*. BSMF ¶¶ 153 – 155. This case involves a plaintiff that has lost neither her job or business opportunities, nor suffered emotional or physical ailments that required medical attention. BSMF ¶¶ 153 – 156. Rather, this plaintiff is mentioned in a book that (1) recounts events that were already well-known in her surrounding community before the book's release and (2) produced expressions of sympathy from members of the community—not a loss of reputation. Sandler Def. Dep. I at 101 – 110; Sandler Def. Dep. II at 13 – 14. Because none of the statements in *Help Us Get Mia* are libel per se, and because Ms. Sandler admits she did not suffer any special harm, the Court also should dismiss her libel and libel per se claims on this alternative basis.

**E. Ms. Sandler's "False Light" Claim Also Must Be Dismissed Because Ms. Sandler Cannot Plead this Tort to Avoid the Essential Elements of a Libel Claim.**

Ms. Sandler asserts that the 12 allegedly defamatory statements she has identified in *Help Us Get Mia* also support "false light" invasion of privacy tort claims. Sandler Def. Dep. I Ex. 5 (Plaintiff's Interrogatory Ans. Nos. 9, 13, 16); Sandler Def. Dep. II Ex. 8. The false light claims are baseless for two alternative reasons: (a) lack of the element of knowledge of falsity, or actual malice; and (b) the libel defenses for the same statements.

*a. The Absence of Intent or Actual Malice.* An essential element of a false light claim is knowledge of actual falsity or reckless disregard as to falsity. This is the equivalent of "actual malice" as discussed in Section B.2 above. *See Veilleux*, 206 F.3d at 134 (citing Restatement (Second) of Torts § 652E)). As demonstrated above, BookSurge had no knowledge of the falsity of any of the statements in *Help Us Get Mia* and did not act in reckless disregard as to the potential falsity of any of the statements in the book. BSMF ¶¶ 89 – 93.

*b. The Application of the Libel Defenses.* Furthermore, Ms. Sandler may not recover for false light invasion of privacy where she would be unable to prove all of the essential elements of a libel claim on the same statement. *Rippett*, 672 A.2d at 87-88; *see also Veilleux*, 206 F.3d at 134-35 (noting that truth and opinion, and the same absolute and conditional privileges applicable to libel claims, are defenses to false light claims); *Brown v. Hearst Corp.*, 54 F.3d 21, 27 (1st Cir. 1995) ("it is not imaginable that [a false light claim] could escape the same constitutional constraint as [a] defamation claim"); *Hustler Magazine v. Falwell*, 485 U.S. 46, 56 (1988) (holding that the constitutional

defenses for defamation claims also bar a different tort claim based on the same statement as the alleged defamation).

For each of these alternative reasons, Ms. Sandler's false light claims are barred.

**F.     None of the Alleged Statements Support Ms. Sandler's Alleged "Private Facts" Invasion of Privacy Claim.**

Maine law recognizes a limited invasion of privacy claim for the public disclosure of private facts.  Maine courts require proof that: 1) the defendant disclosed an aspect of or event in the plaintiff's private life to the public; 2) the disclosure would be highly offensive to a reasonable person; and (3) the matter publicized was not of legitimate concern to the public.  *Nelson*, 373 A.2d at 1225; *Stokes*, 257 F. Supp. 2d at 295.

Ms. Sandler's private facts invasion of privacy claims should be dismissed for three alternative reasons.  First, BookSurge has demonstrated that *Help Us Get Mia* addressed issues that were of legitimate public concern.  *See* Section B.  Alternatively, summary judgment is appropriate because the facts in the statements are either (1) not private, or (2) not highly offensive to a reasonable person if disclosed.

A chart that analyzes each of the alleged private fact statements identified by Ms. Sandler and the applicable elements and defenses is attached to this motion as Appendix B.

**1.     Information Posted for Public View by Ms. Sandler on her myspace.com Webpage, and Reprinted in *Help Us Get Mia*, Was Not Private.**

Ms. Sandler claims that all of the excerpts and summaries from her myspace.com webpage included in *Help Us Get Mia* caused the disclosure of private facts that would be highly offensive to a reasonable person.  BSMF ¶ 128.  When Ms. Sandler opened the drapes to her living room, she cannot complain that a passerby looked inside.

Ms. Sandler posted this supposedly private information about herself on a website that, by her own admission, was available to the <u>entire world</u> for viewing.  BSMF ¶¶ 134 – 136.  Reproducing statements posted on the Worldwide Web in a book of which only 840 copies were printed is not an invasion of privacy.  *Veilleux v. Nat'l Broad. Co.*, 8 F. Supp. 2d 23, 37 (D. Me. 1998) ("A claim for publication of private facts arises only when the facts revealed are indeed private."); BSMF ¶¶ 84, 87.

In addition, Ms. Sandler contends that several other statements in the book reveal private facts about her.  Her arguments fail because even though these additional statements are not direct quotes from her myspace.com pages, she already revealed these supposedly private facts through myspace.com postings.  First, Ms. Sandler contends that any statement that reveals her Jewish ancestry is a private fact.  BSMF ¶ 129.  These are not "private" facts because Ms. Sandler revealed her Jewish heritage on her myspace.com webpage.  BSMF ¶ 137.  Furthermore, no reasonable person would conclude that disclosure of Jewish ancestry is highly offensive:  Ms. Sandler herself admits that "there's no shame in being Jewish."  BSMF ¶ 138.

Second, Ms. Sandler contends that the disclosure on page 12 of *Help Us Get Mia* regarding her enrollment at High Point University was somehow a "private" fact.  BSMF ¶ 130.  Ms. Sandler revealed publicly her enrollment at High Point University on her myspace.com webpage.  BSMF ¶ 139.  There is not doubt that friends and family in Maine knew this purportedly "private" fact.  Sandler Def. Dep. II at 69.  Furthermore, Ms. Sandler conceded that attendance at a respected university would not be highly offensive to a reasonable person.  Sandler Def. Dep. II at 69.

Third, Ms. Sandler contends the statements on pages 12-13 and 46 of *Help Us Get Mia* regarding her decisions to seek professional psychological care or counseling were private facts. BSMF ¶ 131.[20] Once again, Ms. Sandler revealed her decision to seek psychological help during college on her publicly accessible myspace.com webpage. BSMF ¶ 142. Ms. Sandler's choice to reveal this to the public at large on the internet shows that she believed such disclosure would not be highly offensive to a reasonable person.

Because every one of the above "facts" was neither offensive nor private, they cannot give rise to a "private facts" claim.

> **2.     Ms. Sandler's High School Transfer Under a Superintendents' Agreement Was Neither a "Private" Fact Nor Was Disclosure Highly Offensive.**

Ms. Sandler contends the statement on page 7 of *Help Us Get Mia* regarding her transfer from one high school to another pursuant to a superintendents' agreement was a private fact, and that its disclosure would be highly offensive to a reasonable person. BSMF ¶ 132. This is not a "private" fact. Ms. Sandler's transfer pursuant to a superintendents' agreement was revealed in at least two ways prior to its publication in *Help Us Get Mia*: ███████████████████████████ and (2) in a newspaper article written by Ralph and Maureen Calcagni (BSMF ¶¶ 145███).

---

[20] ███████████████████████████



Ms. Sandler's transfer from Maranacook High School in Readfield to Winthrop High School in Winthrop by special arrangement was obvious to the members of her community:  Ms. Sandler lived in Readfield and normally would not be allowed to attend Winthrop High School.  20-A Me. Rev. Stat. Ann. § 5205; Sandler Def. Dep. I at 10-12. According to Ralph Calcagni, Ms. Sandler's unique status was obvious to everyone in the community because she lived in Readfield but she attended Winthrop High School. Segal Decl., Ex. J (Jan. 2008 Ralph Calcagni Deposition ("R. Calcagni Dep. II") at 75 – 76).  Furthermore, school disciplinary records █████████████████████████ demonstrate that Ms. Sandler's transfer from Maranacook to Winthrop was obvious to the students.  BSMF ¶ 149.  The ██████████████ the newspaper article, and common sense demonstrate that Ms. Sandler's transfer pursuant to a superintendents' agreement was not a private fact at the time that *Help Us Get Mia* was released.

Even if the statement about Ms. Sandler's transfer is considered a private fact, disclosure of this fact should not be considered highly offensive to a reasonable person as a matter of law.  The transfer reflects an innocuous statutory procedure that allows students to attend schools in other districts.  ████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████
███████████

3.      **Ms. Sandler's Plastic Surgery on Her Nose Was Not a Private Fact.**

Ms. Sandler contends the statements on pages 7 and 22-23 of *Help Us Get Mia* regarding the plastic surgery on her nose reveal a private fact and its disclosure would be

highly offensive to a reasonable person.  BSMF ¶ 133.  This is not a "private" fact

because Ms. Sandler had already disclosed it.  ████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

Furthermore, even if the Court concludes that Ms. Sandler's plastic surgery

remained a private fact despite the disclosure by Ms. Sandler and others, this fact would

not be highly offensive to a reasonable person.  ████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

**G.**     **BookSurge is Not Liable for Punitive Damages.**

Punitive damages cannot be recovered under Maine law absent a showing of

<u>common law actual malice</u>.  *Norris v. Bangor Publ'g Co.*, 53 F. Supp. 2d 495, 507-08 (D.

Me. 1999); *Veilleux*, 8 F. Supp. 2d at 42, *aff'd on other grounds by* 206 F.3d 92 (1st Cir.

2000); *Haworth*, 623 A.2d at 159.  "The common law 'actual malice' showing required

to support a punitive damages claim is distinct from the 'actual malice' standard applied

in certain defamation contexts."  *Norris*, 53 F. Supp. at 507.  The common law standard

is <u>much higher</u>.  At common law, there is no implied malice allowed to establish punitive

damages—instead a plaintiff must establish actual ill will or extreme outrageous conduct

by clear and convincing evidence.  *Id.* (citing *Veilleux*, 8 F. Supp. 2d at 42).

In this case, Ms. Sandler concedes that BookSurge bore her no ill will.  BSMF ¶

157.  BookSurge confirms that it did not even know who Ms. Sandler was when the book

was printed, much less bear her any ill will.  BSMF ¶ 158.  Moreover, the only allegedly "outrageous" conduct identified by Ms. Sandler is the mere printing of the book.  BSMF ¶ 159.  The mere act of printing or publication is not clear and convincing evidence of "outrageous" conduct—otherwise punitive damages would be recoverable in any case alleging the printing or publication of defamatory statements.  This is not Maine law, and Ms. Sandler's punitive damages claim against BookSurge should be dismissed.

## IV.    CONCLUSION

BookSurge respectfully requests that the Court grant its motion for summary judgment on any one or more of these alternative grounds.

Respectfully submitted,

BOOKSURGE, LLC

By its attorneys,

/s/ Harold J. Friedman
Harold J. Friedman
Friedman, Gaythwaite, Wolf & Leavitt
P.O. Box 4726
6 City Center
Portland, ME 04112

Stephen A. Smith (Pro Hac Vice)
Matthew J. Segal (Pro Hac Vice)
Kari Vander Stoep (Pro Hac Vice)
Kirkpatrick & Lockhart Preston
 Gates Ellis LLP
925 Fourth Avenue, Suite 2900
Seattle, Washington 98104-1158

March 17, 2008

K:\2040741\00191\20743_KLV\20743P20EK