# --REDACTED--

# SEGAL DECLARATION EXHIBIT H

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE AT BANGOR


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
                                    \*
SHANA SANDLER,                      \*
                                    \*
                  Plaintiff         \*
V                                   \*
                                    \*
MIA CALCAGNI, MAUREEN CALCAGNI,     \* .
RALPH CALCAGNI, PETER MARS, and     \*
BOOKSURGE, LLC,                     \*
                                    \*
                  Defendants        \*
                                    \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

             DEPOSITION OF:  MAUREEN CALCAGNI

        BEFORE:  Lori J. Soohey, Notary Public, at the offices

    of Eaton Peabody, 80 Exchange Street, Bangor, Maine, on

    Tuesday, January 22, 2008, beginning at 9:42 a.m.


                        APPEARANCES:

Bernard J. Kubetz, Esq.            For the Plaintiff

J. William Druary, Jr., Esq.       For Defendant Mars

Bruce Mallonee, Esq.               For Defendants Calcagni

Matthew J. Segal, Esq.             For Defendant BookSurge, LLC


                DON THOMPSON & ASSOCIATES


                    Court Reporting

2b7df807-f2ae-4f86-9e8e-53a770e929d9

1  A  I don't know -- regularly -- I really don't know what you
2     mean by regularly. We met with Peter. We turned documents
3     over to him.
4  Q  What I was really asking about was did you and your husband
5     talk on a regular basis about the book as it was being
6     written?
7  A  I wouldn't say on a regular basis, no. No. I guess I
8     would say no to that on a regular basis.
9  Q  How often would you and your husband talk about anything to
10    do with the book as it was being put together?
11 A  Oh, I might say something to the effect of, Peter wants
12    more documents. Do you want to drop them off? Is Peter
13    going to pick them up?
14       Is that what you mean?
15 Q  What I mean is how often would you and your husband talk
16    about anything to do with the book?
17 A  I guess I can't recall how often. I mean, it's not
18    something that I really have a strong memory of how often.
19 Q  Did you and your husband place any limitations on what
20    Peter Mars was to do or was not to do with respect to
21    writing the book?
22 A  No, sir.
23 Q  Did Peter Mars communicate to you and your husband any
24    limits on what he was going to do with respect to writing
25    the book?

1  A  No.
2  Q  Did you place any limitations or prevent -- place any
3     limitations on Peter Mars or in any way prevent him from
4     doing whatever research was necessary in connection with
5     the book?
6  A  No.
7  Q  Did you put any limitations on him or restrict him in any
8     way in terms of any fact-checking that he felt was
9     necessary in writing the book?
10 A  No.
11    MR. DRUARY: Object to form and foundation.
12 BY MR. KUBETZ:
13 Q  Did -- he -- Mr. Mars testified yesterday that at one point
14    in time fairly early in the process he asked you and your
15    husband to provide him with a list of the names of people
16    that he could contact with respect to the information that
17    was to go into the book; do you recall that?
18 A  I do.
19 Q  Did you provide him with that list?
20 A  Yes. I gave him -- I told him any characters that were in
21    it and then gave him specific ones, too, that he asked for
22    numbers and names.
23 Q  Was it your understanding that when you gave him that list
     of names that he was going to contact any of those people
25    he felt was necessary to do research or check facts in

1     connection with writing the book?
2  A  Yes.
3  Q  As among -- as between, I guess, you and your husband on
4     the one hand and Peter Mars on the other --
5  A  Hm-hmm.
6  Q  -- who had ultimate decision-making responsibility with
7     respect to the contents of the book?
8     MR. DRUARY: Object.
9  BY MR. KUBETZ:
10 Q  Go ahead.
11 A  Mr. Mars. We relied -- we relied on him.
12 Q  And so to the extent there was a disagreement as to whether
13    certain information should go into the book or not, who was
14    the ultimate decision maker?
15 A  Mr. Mars.
16 Q  My understanding is that the title of the book was
17    originally to be Mia's Story and then it was then changed
18    to "Help Us Get Mia...."; is that correct?
19 A  That is correct.
20 Q  Okay. How did the title change?
21 A  I wasn't involved in the changing of the title.
22 Q  Okay. Who was?
23 A  I would assume Mr. Mars and my husband were.
24 Q  Is that something that your husband talked with you about?
25 A  When they changed the title he mentioned it to me, but it

1     didn't really matter to me. It didn't matter to me.
2  Q  To the extent that Mr. Mars made recommendations to you and
3     your husband with respect to the contents of the book, did
4     you and your husband accept his recommendations?
5  A  We relied on his judgment to write the book. I'm not
6     sure -- like, what recommendations would you be speaking
7     of?
8  Q  Well, did he at one point in time recommend that the names
9     of the people in the book and the location of where the
10    story took place be changed?
11 A  Absolutely not.
12 Q  He never made that recommendation?
13 A  Absolutely not. On the life of my children, he never made
14    that recommendation. Absolutely not.
15 Q  Now, some of the source information for the book came from
16    Internet documents, information that was posted on the
17    Internet and downloaded and printed out; do you recall
18    that?
19 A  I do.
20 Q  Okay. And tell me the types or categories of Internet
21    information that were used as source information for the
22    book.
23    MR. SEGAL: Object to form.
24 A  Source information?
25

1  A  Yes.

2  Q  Okay. Let's go to Exhibit E.

    A  Civil Rights Office. Came from the office of civil rights

4      in Boston. Probably was mailed to us.

5  Q  Okay.

6  A  The next one is a birthday card that Shana gave Mia on her

7      16th birthday.

8  Q  That's Exhibit F?

9  A  Yes.

10  Q  Okay.

11  A  And I had a scrap box where I kept Mia's -- I keep Mia's

12     things from school. I kept records of friend things for

13     years; and that's one of the things that I had put in her

14     memory box.

15  Q  Exhibit G is a document prepared by Mr. Shaw?

16  A  Right. Do you want me to go over again that, because I

17     thought we'd already addressed that. Do you want me --

18  Q  No, hold on just a second.

19     Let's go to Exhibit H.

20  A  Exhibit H came off from the computer.

21  Q  That's a myspace document that you downloaded from the

22     computer?

23  A  That's correct.

24  Q  Same would be true of Exhibit I?

25  A  Correct.

1  Q  Exhibit K -- excuse me, I said -- I and J are both myspace

2      documents that you downloaded, correct?

3  A  Yes.

4  Q  Okay. K is also an Internet communication, correct?

5  A  Correct.

6  Q  And is that another document that you found on the Internet

7      and downloaded?

8  A  No. That came to us -- see on the side -- that came --

9      some of them I saw on the Internet, but didn't necessarily

10     download.

11     This one -- I assume by the writing on the side --

12     came to us from probably -- could have our attorney, could

13     have been the D.A.'s office, could have been the A.G.'s

14     office.

15  Q  What does it say on the side?

16  A  It says, deposition exhibit received June 14, 2004.

17  Q  Okay.

18  A  So some of this was -- it could have been at the

19     deposition. I don't know. It could have come from inside

20     the deposition as an attachment -- I mean, what's this

21     thing that she did -- what are we doing today -- a

22     deposition. Yes. It could have come from there.

3  Q  Now, when you say deposition, are you referring to

4      Shana Sandler's deposition in the case or cases brought

25     against your daughter?

1  A  Yes, it could have been come from there; but it could have

2      come from Michaela. It could have come from --

3  Q  Right. But I'm not asking -- I'm just asking you now about

4      when you use the term deposition --

5  A  Yes, Shana's deposition.

6  Q  Okay. So we're now up to M?

7  A  What about L?

8  Q  Sorry. L.

9  A  L. Yes, I downloaded that.

10  Q  Internet communication?

11  A  Correct.

12  Q  Okay. M?

13  A  M, again, our attorney, the A.G.'s, D.A.'s office,

14     sometimes kids send us copies of things. That has a

15     received on the side, so I'm -- yeah, there it is right

16     there. This is the supposed date the A.G.'s office

17     received it.

18  Q  Okay. And whose handwriting is on the side?

19  A  This right here?

20  Q  Yes.

21  A  That's mine.

22  Q  And what does it say?

23  A  What I just read. This is supposed date the A.G.'s office

24     received it. And I distinctly remember that one because

25     they waited until the last minute when we were in the court

1      when they handed that to Michaela.

2  Q  Okay. And -- okay. And that's the A.G.'s office and not

3      the D.A.'s office?

4  A  The A.G. and the D.A. where like this.

5  Q  What do you mean by that?

6  A  They were -- they were always together. So if we got

7      something handed to us, it could have come from the D.A.,

8      it could have come from the A.G.

9      I can't tell you if it was -- I can't even remember

10     the lady's name -- Kelly.

11  Q  Patricia Kelly?

12  A  D.A. Kelly. She might have handed it to us. She might

13     have handed it to Michaela, or it might have been the A.G.

14     lady, Berkovich, I believe it was. So it could have come

15     from them.

16  Q  Okay.

17  A  That was taken --

18  Q  The next one is letter what?

19  A  That's letter N. And that's something -- that's my

20     husband's writing. He took it off from Shana's profile

21     that was posted online.

22  Q  Okay.

23  A  Exhibit O is a letter to -- well, Peter Bickerman would

24     have given us that.

25  Q  Okay.

1 before that. That's when we met about the book.

2 Q Okay. I'm going to show you Sandler Exhibit 19; and the
same question: Is this a document that you downloaded from

4 the Internet, specifically myspace, had it in your files
5 and gave it to Mr. Mars?

6 A I did download that.

7 Q Okay. And gave it to Mr. Mars?

8 A Yes. All of this information was given to Mr. Mars.

9 Q Okay. I'm going to show you what's been marked as Sandler
10 Exhibit 16. It says: Attorney general's investigation to
11 a report prepared by Margie Berkovich, there is handwriting
12 on the front page in the upper-right and lower-right.
13 Do you recognize that document and the handwriting?

14 A I don't recognize this handwriting at the bottom. That's
15 mine at the top, but I don't know whose that is at the
16 bottom.

17 Q And that's really all I was going to ask you about on that
18 document. You're free to look at it if you want.
19 MR. KUBETZ: Bruce, can I just borrow that for a
20 second; I may have just another quick second.
21 MR. SEGAL: That's what?
22 MR. KUBETZ: That was 16.
23 MR. SEGAL: Okay. We're still on 16?
24 BY MR. KUBETZ:
25 Q All right. And the handwriting in the upper-right-hand

1 corner on Sandler Exhibit 16 says at 7/1/04 hearing,
2 correct?

3 A That's correct.

4 Q And that's your handwriting?

5 A At the top, not the bottom. I don't know whose it is on
6 the bottom.

7 Q All right. And this document was in the box of materials
8 that you gave to Mr. Mars?

9 A Yes.

10 Q All e-mails sent to Mr. Mars with a return address of
11 fitnessmo came from you?

12 A Well, it could have come from my husband.
13 (To Mr. Calcagni) Sometimes you wrote under my screen
14 name, I assume; and sometimes I wrote under yours.

15 Q Okay. And what was his e-mail address?

16 A Bountyinc. Sometimes we used each others address.

17 Q Right. I'm going to show you Page 19 of Mars Exhibit 2,
18 which was a compilation of e-mails. And it's an e-mail
19 from fitnessmo to Peter Mars dated January 12, 2006. It's
20 signed Mo and Ralph. I'm going to ask you to look at it
21 and then I'm going to have a question or two about it.
22 MR. SEGAL: Can we go off the record for a moment?
`3 MR. KUBETZ: Sure.
4 (Whereupon an off-the-record discussion was held.)
25 BY MR. KUBETZ:

1 Q Okay. So the e-mail on the second -- the second e-mail on
2 the page is an e-mail that you sent to Peter Mars on
3 January 12, 2006, correct?

4 A That's correct.

5 Q Okay. The last paragraph of the e-mail that begins: Maybe
6 Emet Gabar or his assistant should call those TV
7 stations --

8 A Hm-hmm.

9 Q -- correct? Yes?

10 A That's correct.

11 Q Why did you suggest that?

12 A Why did I suggest that he --

13 Q Go ahead. Why did you suggest that Emet Gabar or his
14 assistant call either CNN and/or ESPN and tell them about
15 the book that he is working on?

16 A Because the book had a lot to do with Winthrop and the
17 problems with Winthrop; and that's what CNN and ESPN were
18 both covering. And he has contacts -- Peter has contacts,
19 and he answered and said, that's interesting. And he
20 answers, of course, he'll make a call to both of those
21 groups. He'll dig up the numbers. And, in fact, he did.

22 Q He called them both?

23 A I don't know if he called them both, but he called -- I
24 don't know which one he called. I'm actually confused with
25 the Sports Illustrated. He called somebody at Sports

1 Illustrated is who he had called. I don't know if he
2 actually made contact with those people or not.

3 Q And what you suggested to him is he contact the two TV
4 stations --

5 A Hm-hmm.

6 Q -- and tell them that they should interview you,
7 Maureen Calcagni --

8 A Right.

9 Q -- who was not only quoted in the article written by
10 Sports Illustrated, but one who has knowledge of the
11 upcoming book?

12 A That's correct.

13 Q And you went on to say, it would no doubt help the upcoming
14 book sales. What do you think Emet would think --

15 A Yes.

16 Q -- correct?

17 A Correct.

18 Q Now, who are you referring to as Emet?

19 A Peter.

20 Q Why did you refer to him as Emet?

21 A Because that's the name he told us once we were writing the
22 book process that he was going to use. And, in fact, when
23 he called Sports Illustrated, he identified himself as Emet
24 Gabar.

25 Q How do you know that?

1 to let her know that Peter Mars may, in fact, be in touch.
2 That he was writing the book about what had happened to
3 Mia. And in fact, she knew because we were waiting for a
4 copy of the transcript to give to Peter.
5 So there were e-mails back and forth between her and
6 us and her and her assistants, where is the transcript;
7 when are we going to get it, because Peter wants it.
8 Q So those communications were about obtaining copies of
9 transcripts?
10 A Well, afterwards when we were trying to get the transcript
11 because Peter wanted it because he was working on it and he
12 felt the transcript was important to his writing the book.
13 But initially it was to let her know that we had
14 contacted Peter Mars and that he had agreed to write the
15 book.
16 Q I understand that.
17 Were you obtaining the transcripts so as to -- well,
18 strike that.
19 Did Mr. Mars -- well, did Mr. Mars suggest that you
20 speak with Ms. Murphy about liability?
21 A I don't recall a specific -- we asked him about liability
22 because of his police knowledge and because of writing
23 books -- true books that he's written before.
24 Q And do you recall what his response was to that?
25 A He said that there was no problem. He said, it's a

1 juvenile thing, but it involves your daughter. If you want
2 the information out there and she doesn't object, that's up
3 to you.
4 Q Let me just confirm something.
5 Did Mia object to information being release?
6 A No, she did not.
7 Q Did you ask her about it?
8 A Yes. It had been released anyway --
9 Q Hold on. That's okay. Let me ask the next question. All
10 right?
11 A Hm-hmm.
12 Q I'm sorry.
13 I think you were going do say it had been released
14 anyway?
15 A Hm-hmm.
16 Q Tell me what you mean by that?
17 A The attorney general's office had violated her rights by
18 releasing information on the A.G. case; and therefore, as
19 Peter Bickerman's letter said, denied her the right to a
20 fair trial and her privacy as a juvenile. They had put it
21 in the paper before her juvenile hearing and denied her --
22 and it was out there.
23 MR. KUBETZ: Matt, I apologize.
24 MR. SEGAL: Hold on, are we on the record?
25 MR. KUBETZ: Yeah, can you clarify when she's talking

1 about proceeding and case, which one she's talking about?
2 MR. SEGAL: I'm sorry. What's the question, Berney?
3 Let me just continue. If you want to clarify
4 something -- I think it will be clear, actually, in a
5 minute.
6 BY MR. SEGAL:
7 Q Mrs. Calcagni, I want to clarify something. There was a
8 point raised by Mr. Kubetz. You're talking the civil
9 proceeding that was filed by the attorney general; is that
10 right?
11 That's what you're referring to when you say that
12 Mr. Bickerman wrote a letter after that was filed; is that
13 right?
14 A After the attorney general's office, all the information
15 was released to the press, to the newspapers and television
16 stations.
17 Q Let's talk about that. When you say all the information
18 was released to the newspapers, there were some stories in
19 the newspaper about the proceedings; is that right?
20 A Yes.
21 Q And you said there was information released to television
22 stations; how do you know that?
23 A Because it was on the -- friends called me to tell me it
24 was on the noontime news, and then I had the pleasure of
25 watching it on the 6:00 news.

1 Q Do you know what channel that was?
2 A Channel 8, Channel 6, and Channel 13.
3 Q And do you know -- was that Bangor?
4 A That would be -- I don't know if it was on WABI, which is
5 the Bangor area; they're an affiliate of Channel 13, but I
6 don't know if it was. I didn't have any friends watching
7 that particular one.
8 It was Channel 13 out of Portland, Channel 6 out of
9 Portland, and Channel 8 out of Portland and
10 Lewiston/Auburn.
11 Q And to your recollection every -- so basically, to your
12 recollection, all the local TV network stations carried
13 stories with the respect to the proceedings involving
14 Mia Calcagni?
15 A Correct.
16 MR. SEGAL: I apologize. I don't have a copy of this
17 one right now, but I'll circulate it. Let me get it
18 marked, please, as Maureen Exhibit 12.
19 (Deposition Exhibit No. 12, 4/20/04 Letter From
20 Bickerman to Kelley and Robbin with Attached Correspondence
21 and Documents, was marked by the reporter.)
22 BY MR. SEGAL:
23 Q Mrs. Calcagni, I'm showing you Exhibit 12 to your
24 deposition. And you have referenced, I believe, a letter
25 written by Mr. Bickerman with respect to confidentiality

1    and the attorney general proceeding.
2        Can you tell me, please, if the first two pages of
     Exhibit 12 are the letter that you are referring to?
4  A  Yes.
5  Q  There is some handwriting on the first page of this letter;
6     is that yours?
7  A  Copies to keep is mine; the other is my husband's.
8  Q  And your husband says, reference A.G.'s filing during
9     Holocaust Remembrance Week; do you see that?
10  A  Hm-hmm.
11  Q  Do you know why Mr. Calcagni wrote that on there?
12  A  No, I don't.
13  Q  All right.
14  A  Could be notes we wrote to ourselves. I don't know.
15  Q  Can I ask you if you can look through the remaining pages
16     of Exhibit 12 and tell me if these are also all documents
17     that you have seen before -- and take as much time as you
18     need to review them.
19  A  I've seen them all before.
20  Q  You've seen everything in Exhibit 12 before?
21  A  Hm-hmm. Yes, I have.
22  Q  Does that include the newspaper article --
23  A  Yes.
24  Q  Let me finish my question, Mrs. Calcagni.
25        The last two pages, you've seen those?

1  A  Yes.
2  Q  And the last two pages look to me to be an article from the
3     Capital Weekly; would you agree with that?
4  A  It looks like two of the last three pages are from the
5     Capital Weekly and the last one is from the
6     Kennebec Journal.
7  Q  Okay. The Capital Weekly is in Augusta?
8  A  I believe they have an office in Augusta; although, I
9     believe they're owned by a company -- they have several
10     papers throughout the state; I think it's in Rockland --
11     Camden or the Rockland area.
12  Q  And the Kennebec Journal is in Augusta?
13  A  Yes.
14  Q  So if I understand this correctly, once the attorney
15     general proceeding was filed, at least, the proceedings
16     against Mia Calcagni were covered by all the local TV
17     stations and numerous Maine newspapers; would you agree
18     with that?
19  A  Yes.
20  Q  Did you receive any telephone calls or e-mails or any
21     communications when this new's coverage, either televised
22     or in the newspapers, occurred?
23  A  Did people call us?
    Q  Yes.
25  A  Yes.

1  Q  Did people who called you tell you that they knew the story
2     pertaining to harassment between Mia Calcagni and
3     Shana Sandler?
4  A  I'd have to stop and think about the different
5     conversations. Some people were -- some were friends of
6     ours and they were upset. I don't recall everything right
7     now at this moment.
8  Q  You don't remember right now?
9  A  I know we got phone calls and I know that it was an
10     upsetting time. And I don't recall real specifics right
11     now.
12  Q  I think there was some discussion about myspace and
13     facebook pages with Mr. Kubetz this morning; do you
14     remember that?
15  A  Yes, I do.
16  Q  I just wanted to clarify something.
17        As far as you know, all the information pertaining
18     to -- pertaining to myspace or facebook was information
19     that you downloaded directly from the Internet, right?
20        Let me put it another way. Let me rephrase it.
21        You don't have any recollection of Mr. Bickerman or
22     any of your lawyers providing that information to you?
23  A  Some of the stuff that came off the computer?
24  Q  I'm just talking about the myspace and facebook
25     information.

1  A  I don't recall Mr. Bickerman or Michaela -- I recall them
2     giving me some computer stuff; but specifically myspace
3     or --
4  Q  Facebook?
5  A  -- facebook, I don't recall them giving me any.
6  Q  And Mrs. Wilson, she was your neighbor?
7  A  Hm-hmm.
8  Q  Yes?
9  A  Yes.
10  Q  And Mrs. Wilson, as far as you know, saw information about
11     Ms. Sandler posted on the Internet?
12        MR. KUBETZ: Objection. Foundation.
13  A  Yes.
14  BY MR. SEGAL:
15  Q  And how do you know that?
16  A  Because she told me.
17  Q  Do you know what indemnity is?
18  A  Indemnity?
19  Q  Yes.
20  A  I have heard the term used in an insurance policy. I don't
21     know. Does it mean to pay?
22  Q  Something like that. Let me put it another way.
23        Are you aware that you and Mr. Calcagni have filed a
24     claim for indemnity against BookSurge in this case?
25  A  Oh, yes.

Page 94

1  Q   Just so I'm --
2  A   I guess I wasn't aware of what the term was.
   Q   That's all right. That's why I'm asking you about it.
4      Are you aware of any contract by which BookSurge
5      agreed to indemnify you or Mr. Calcagni?
6  A   I wasn't involved with BookSurge.
7  Q   So you have no knowledge of any such contract one way or
8      the other?
9  A   I wasn't involved in the publishing of the book.
10 Q   I just want to make sure I understand that since you didn't
11     have any involvement with BookSurge, you don't have
12     knowledge of what the basis of any claim for indemnity
13     against BookSurge might be; is that fair?
14 A   Well, to the extent of what we talked to our attorney --
15 Q   I don't want you to tell me what Mr. Mallonee may have
16     discussed with you. That's privileged information.
17 A   No, I know that. We just have no knowledge of -- I mean, I
18     do have a knowledge of the claim and --
19 Q   Let me put it a different way.
20     Do you have any personal knowledge of any facts that
21     would support that claim?
22     And when I say that, I mean, do you have any knowledge
23     of any contract that would support a claim for indemnity
24     against BookSurge?
25 A   No direct knowledge, no. I mean, I don't know. I wasn't

Page 95

1      involved with BookSurge, so I don't know.
2  Q   Do you have indirect knowledge of a contract that would
3      support a claim of indemnity against BookSurge?
4  A   I assume my attorney knows what he's doing. I know my
5      attorney knows what he's doing. I wasn't involved with
6      BookSurge, so -- I wasn't involved with BookSurge.
7  Q   Okay. All I'm trying to ascertain is you don't have any
8      personal knowledge of what the basis for that claim would
9      be other than what your attorney might have told you; is
10     that fair?
11 A   Only fair in the sense of we relied on an attorney --
12     excuse me, we relied on an author who had written books who
13     knew what he was doing. We relied on BookSurge and their
14     reputation, or reputation that they had. We relied on
15     experts. We knew nothing about it.
16     So, I guess my answer would be we relied on experts.
17     We relied on the attorney. We relied on BookSurge. Am I
18     aware of -- I was a real estate broker. I had certain
19     responsibilities to people in order to buy a house, whether
20     it was written or unwritten there are certain
21     responsibilities.
22     I wasn't involved with BookSurge. I'm not aware of
23     anything directly.
   Q   Okay. The Mrs. Wilson who you say you talked to about the
25     myspace posting, that's Tracy Wilson?

Page 96

1  A   Hm-hmm. Yes, it is.
2  ■   ████  ████████████████████████████████
   ■   ██████████████████████████████████
   ■   ████████████████████████████
   ■   ■ ██████████████
   ■   ■ ██████████████████████████████
   ■   ██████████████████████████
   ■   ██████████████
   ■   ■ ██████████
   ■   ■ ██████████
   ■   ■ ████████████████████████████████
   ■   ██████████████████████████████
   ■   ████████████████
   ■   ■ ██
   ■   ■ ████████████████████████████████
   ■   ████████████████████████████
   ■   ████████████████
   ■   ■ ██
19 Q   Mr. Kubetz also asked you about Exhibits 17 and 18.
20     Do you remember that?
21 A   Yes, I do.
22 Q   And I just want to be clear.
23     Those photographs were not included in the book; is
24     that right?
25 A   No. Mr. Mars decided he wouldn't use them.

Page 97

1  Q   Were any photographs of Ms. Sandler included in the book?
2  A   I don't think so, no. Not to my recollection.
3      (Deposition Exhibit No. 13, Summary of Key Points and
4      Thoughts, was marked by the reporter.)
5  BY MR. SEGAL:
6  Q   Mrs. Calcagni, I'm showing you what's been marked as
7      Exhibit 13.
8  A   Hm-hmm.
9  Q   I just wanted to ask: Did you write this document?
10 A   Yes, I did.
11 Q   And do you know what you did with this document after you
12     wrote it?
13 A   It was -- nope, I don't. To be perfectly honest with you,
14     I don't. There were some letters that I composed or Ralph
15     had composed that we never sent. It might have been when
16     he was preparing to talk to the civil right's gentleman
17     when he came to interview us.
18 Q   The civil right's gentleman, who was that?
19 A   I truly don't remember his name.
20 Q   Someone from the office of civil rights?
21 A   Yes. Yes. In preparation to -- I would type notes to
22     myself of things that I wanted to talk about. I don't know
23     if that was even ever sent to anybody.
24 ████████████████████████████████████
25 ████████████████████████████████████



1   BY MR. SEGAL:

2b7df807-f2ae-4f86-9e8e-53a770e929d9

1        Is the book actually referring to Ms. Sandler as a Jew
2    bag on Page 6?
         MR. KUBETZ: Objection. Form and foundation.
4  A    Yes -- no, it doesn't call her that. It's quoting what
5    Michelle said in front of me at my home. And I reprimanded
6    her because my daughter-in-law is Jewish and I told her
7    that term wouldn't be used in our home.
8  Q    And, again, the significance there is -- the question is
9    whether or not Ms. Perry made an anti-Semitic remark?
10        MR. KUBETZ: Objection. Form.
11 A    It's not a question. She did make it. It's a quote about
12    what she said.
13 BY MR. SEGAL:
14 Q    All right. Without commenting on the question of who had
15    the ultimate final authority of what form it would end up
16    on, in or like, is it fair to say that you did have some
17    role in putting together information, at least, for this
18    section of the book that we just reviewed?
19 A    Putting together?
20 Q    Sure. You gathered information for this section of the
21    book, right?
22 A    No, that would be an inaccurate statement.
23 Q    Okay.
24 A    The accurate statement would be, I gave him information.
25    He chose how to put it together in the book. But I didn't

1    gather information for this segment of the book.
2  Q    He being Mr. Mars?
3  A    Mr. Mars.
4  Q    Okay.
5  A    I mean, it wasn't like -- I mean, he decided this was going
6    to be in this section of the book; and here, Maureen, will
7    you tell me the information. This information was given to
8    him.
9  Q    All right. Was it your understanding, Mrs. Calcagni, that
10    Peter Mars was writing "Help Us Get Mia...."?
11 A    Yes.
12 Q    Was it your understanding that Peter Mars was editing
13    "Help Us Get --
14 A    No. No.
15 Q    Hold on. Let me ask the question.
16 A    Sorry.
17 Q    Was it your understanding that Mr. Mars was editing the
18    book?
19 A    No.
20 Q    Why not?
21 A    Because we paid him -- when we had the meeting with him,
22    his agreement with us was to write the book. We didn't
⁊    know how to write books. If we wanted to hire an editor, I
     would have paid 2 or $300 to somebody to edit the book.
25        So, he was paid to write the book. That's why we gave

1    him all the materials.
2  Q    So in your view, writing the book included whatever editing
3    ought to be done?
4  A    I don't know the process, but we paid him as an author. We
5    knew him as an author.
6  Q    Okay. And you didn't hire anybody else separately to edit
7    the book?
8  A    No.
9  Q    Okay. In your view was Mr. Mars investigating the book?
10        Do you know what I mean by that?
11 A    Yes. You mean talking to people?
12 Q    Yes.
13 A    Yes. I mean, I don't know if you have the material -- it's
14    somewhere -- one of his students from one of his classes he
15    used to come into Winthrop to do some investigation for him
16    in January of -- it must have been January of '06.
17 Q    In your view, was Mr. Mars fact-checking the book?
18 A    Yes.
19 Q    The book website that you mentioned, Tracy Wilson you said
20    is hosting the website?
21 A    No. Tracy Wilson designed the website.
22 Q    Do you know when that was?
23 A    After the book came out. Fall of '06.
24 Q    And do you know whose server the website is on?
25        Do you know what I mean by that?

1  A    No.
2  Q    Is it on Ms. Wilson's computer, the website?
3  A    What does that mean, is it on her computer?
4  Q    Do you know where -- well, I understand you're saying she
5    designed it --
6        MR. MALLONEE: I object. Foundation.
7  BY MR. SEGAL:
8  Q    I understand you say she designed it, right?
9  A    Right.
10 Q    Do you know where the website is emanating from?
11 A    I don't know what you mean.
12 Q    All right.
13 A    I'm not very computer savvy. I'm sorry.
14 Q    I understand. Aside from designing the website, does
15    Ms. Wilson maintain and update it?
16 A    Not that I'm aware of.
17 Q    You don't know?
18 A    No, not that I'm aware of. I haven't looked at it since
19    the initial -- the initial time, which was fall of 2006.
20 Q    How did it come about that Tracy Wilson designed a website
21    for the book?
22 A    Tracy's -- that's her knowledge, I guess. I guess that's
23    her -- and she said that's something that she could do.
24    She could design a website for the book.
25 Q    Was that at your request?

Page 126

1  A  Actually, it was something that see offered to do.
2  Q  And you agreed?
   A  Yes.
4  Q  Just to be clear, BookSurge didn't have anything to do with
5     the website?
6  A  No.
7        MR. SEGAL:  Let's take a quick break.  I'm nearly
8     done.
9        (Whereupon a break was taken in the deposition at
10    2:51 p.m. and the deposition resumed at 3:00 p.m.)
11       (Deposition Exhibit No. 20, Summary of Events on
12    Evening of 11/21/03, was marked by the reporter.)
13 BY MR. SEGAL:
14 Q  Mrs. Calcagni, I'm showing you Exhibit 20.
15 A  Yes.
16 Q  Have you seen this before?
17 A  Yes.
18 Q  Is this a document that you wrote?
19 A  Yes.
20 Q  Did you write both the typewritten portions and the
21    handwritten portions?
22 A  Well, I definitely wrote the handwritten portions.  It's
23    probably a combination of my husband and I -- it's probably
24    a combination of both of us that did the typing part or
25    talked while the other one -- it's a summary of what

Page 127

1     happened.  The writing is mine.  The typing was probably a
2     combination of my husband and I.
3  Q  All right.
4        (Deposition Exhibit No. 21, Kennebec Journal Article,
5     was marked by the reporter.)
6  BY MR. SEGAL:
7  Q  Mrs. Calcagni, I'm showing you Exhibit 21.
8        Have you seen this before?
9  A  Yes.
10 Q  Can you tell me what this document is?
11 A  It's the article written in the Kennebec Journal about my
12    daughter.
13 Q  And about the legal proceedings against your daughter?
14 A  Yes.
15 Q  And is this one of the documents that you provided to
16    Mr. Mars?
17 A  That was in the box of documents, I'm sure.
18       (Deposition Exhibit No. 22, Myspace Posting for
19    Shana Sandler, was marked by the reporter.)
20 BY MR. SEGAL:
21 Q  Mrs. Calcagni, I'm showing you Exhibit 22.
22 A  Yes.
3  Q  There are some -- well, first of all, there appear to be
      some annotations in the upper-right-hand corner of this
25    document on the first page; do you see that?

Page 128

1  A  Yes.
2  Q  Is that you?
3  A  Yes.
4  Q  And it says -- it looks like, 6/20/05, M, hyphen?
5  A  Michaela -- mailed it to Michaela.
6  Q  Just so I understand, this annotation in the
7     upper-right-hand corner suggests that you,
8     Maureen Calcagni, sent this to Michaela Murphy?
9  A  Correct.  Things were still going on.  Mia was still being
10    harassed and we were still keeping track of everything.  So
11    I mailed it to Michaela.
12 Q  I just want to be clear.  She didn't send it to you; you
13    got it and sent it to her?
14 A  That's correct.
15 Q  On the second page it looks like there is maybe a number
16    written in the upper-right-hand corner; do you see that?
17 A  I do.
18 Q  You don't know who that is?
19 A  I don't know what that means?
20 Q  All right.  And is this one of the documents that you sent
21    to Mr. Mars?
22 A  It would have been in the box.
23       (Deposition Exhibit No. 23, 4/11/2005 Myspace Posting
24    for Shana Sandler, was marked by the reporter.)
25

Page 129

1  BY MR. SEGAL:
2  Q  Mrs. Calcagni, I'm showing you what's been marked as
3     Exhibit 23.
4  A  Yes.
5  Q  Have you seen this document?
6  A  Yes.
7  Q  And is this another one of the documents that you provided
8     to Mr. Mars?
9  A  Yes.  I'm sure it was in the box.

**REDACTED**



22      (Deposition Exhibit No. 29, Myspace Posting for
23      Shana Sandler, was marked by the reporter.)
24   BY MR. SEGAL:
25   Q   Mrs. Calcagni, I'm showing you what's been marked as

1      Exhibit 29.  Have you seen this document before?
2    A   Yes.
3    Q   And can you tell me what this is?
4    A   Information on Shana in myspace that she posted on myspace.
5    Q   Is this a document that you downloaded from myspace?
6    A   Yes.  Yes.
7    Q   Were there any restrictions on your viewing of this
8        document on the Internet?
9    A   No.  If I can access it, anybody can.
10      MR. KUBETZ:  I'm sorry.  I didn't hear.
11   A   I said, if I can access it, anybody can.
12      MR. KUBETZ:  Thank you.

2b7df807-f2ae-4f86-9e8e-53a770e929d9

Page 134





5  Q  Mrs. Calcagni, have you ever been convicted of a crime?
6  A  No.
7       MR. SEGAL: Thank you very much. Nothing further at
8     the moment.
9              EXAMINATION
10 BY MR. DRUARY:
11 Q  Mrs. Calcagni, you and I met each other off the record; but
12    I believe this is the first time that we've talked about
13    anything on the record.
14       My name is Bill Druary, and I represent Peter Mars;
15    you're aware of that?
16 A  Yes.
17 Q  The good news is that my questioning isn't going to be very
18    long. So I will try to move through this as quickly as
19    possible.
20       MR. SEGAL: What's the bad news?
21 BY MR. DRUARY:
22 Q  The bad news is that I do have to ask some questions.
         In terms of the final product, that is, the book that
       eventually came out that is the subject of this litigation,
25    regardless of who wrote which parts or who edited which

Page 136

1     parts, were you satisfied with the final product that you
2     ended up with?
3  A  I guess I hadn't stopped to think about that. I would say,
4     yes. It was a true account.
5  Q  And in terms of everything that's in the book, did you
6     personally believe that everything was true?
7  A  There were no lies in that book.
8       MR. KUBETZ: I apologize. I'm having -- I'm having
9     trouble hearing. Can we go off the record?
10      (Whereupon an off-the-record discussion was held.)
11 A  Could you ask that again?
12 BY MR. DRUARY:
13 Q  Sure.
14      MR. SEGAL: You could come join us, Berney.
15 BY MR. DRUARY:
16 Q  In your opinion, was everything that was in the book true?
17 A  There were no lies in the book.
18 Q  So you agree that everything in the book was true?
19 A  Yes.
20 Q  Now, you paid Mr. Mars money, as I understand it, some
21    $3,000, for the work that he did, correct?
22 A  For writing the book, yes.
23 Q  And you talked earlier -- you made reference earlier in
24    response to one of the questions that somebody asked you
25    today about how much money you had spent trying to prove

Page 137

1     that Mia was innocent.
2       Do you remember saying something about that?
3  A  Yes, I do.
4  Q  And can you tell us how much money you spent trying to do
5     that?
6  A  Dear God.
7  Q  Just a ballpark figure?
8  A  Multiple thousands of dollars. But I don't -- cashed in a
9     life insurance policy. We have no savings left. We had to
10    mortgage the house again. It's -- it's taken our heart and
11    our soul.
12 Q  Do you think you spent more than $50,000?
13 A  Oh, God, yes.
14 Q  More than a hundred?
15 A  I don't know off the top of my head.
16 Q  Do you think somewhere between 50,000 and 100,000 would be
17    a ballpark figure of how much you spent, you and your
18    husband, attempting to prove that Mia was innocent?
19 A  That would probably be a good guess, in that ballpark.
20 Q  All right. Well, I'm not looking for a guess. I'm looking
21    for your best estimate.
22      You said it was over $50,000 and you weren't sure if
23    it was over a hundred thousand dollars?
24 A  God. We got a second and a third mortgage on the house.
25      MR. KUBETZ: I'm sorry. I'm not hearing.