UNITED STATES DISTRICT COURT
DISTRICT OF MAINE AT BANGOR

| | |
|---|---|
| SHANA SANDLER,                     ) | |
|                     ) | |
|         Plaintiff      ) | |
|                     ) | |
| v.                         ) | Case No. 1:07-CV-00029-GZS |
|                     ) | |
| MIA CALCAGNI,          ) | |
| RALPH CALCAGNI,      ) | |
| MAUREEN CALCAGNI,   ) | |
| PETER MARS,           ) | |
| and                      ) | |
| BOOKSURGE, LLC,      ) | |
|                     ) | |
|         Defendants.   ) | |

**BOOKSURGE, LLC'S LOCAL RULE 56(b) STATEMENT OF
MATERIAL FACTS IN SUPPORT OF
MOTIONS FOR SUMMARY JUDGMENT**

BookSurge, LLC ("BookSurge"), pursuant to LR 56(b), does hereby set forth the

specific facts in support of its motions for summary judgment:

**Parties:**

1. Plaintiff Shana Sandler ("Ms. Sandler") is a senior at High Point University in

   North Carolina.  Declaration of Matthew J. Segal ("Segal Decl."), Ex. E (Nov.

   2007 Sandler Deposition ("Sandler Def. Dep. I") at 56:2-5).

2. She recently applied to graduate school.  Segal Decl., Ex. F (Jan. 2008 Sandler

   Deposition ("Sandler Def. Dep. II") at 75:1-16).

3. Ms. Sandler graduated from Winthrop High School in Winthrop, Maine, in June

   2004.  Sandler Def. Dep. I at 10:15-16, 84:24-25 – 85:1.

1

Dockets.Justia.com

4. Ms. Sandler was a cheerleader at Winthrop High. Sandler Def. Dep. I at 17:23-25 – 18:1.

5. Ms. Sandler is Jewish. Sandler Def. Dep. I at 68:23-25 – 69:1-4, 85:2-22, 91:19-25 – 92:1-12 & Ex. 2 (incl. Sandler's March 16 and April 11, 2005 myspace.com postings); Sandler Def. Dep. II at 59:12-17.

6. Defendant Mia Calcagni ("Ms. Calcagni") also attended Winthrop High School. Sandler Def. Dep. I at 17:1-7.

7. Defendant Ralph Calcagni is Ms. Calcagni's father. Segal Decl., Ex. I (Nov. 2007 Ralph Calcagni Deposition ("R. Calcagni Dep. I") at 3:4-11).

8. Ralph Calcagni lives in Winthrop. R. Calcagni Dep. I at 3:20-21.

9. Defendant Maureen Calcagni is Ms. Calcagni's mother. Segal Decl., Ex. G (Nov. 2007 Maureen Calcagni Deposition ("M. Calcagni Dep. I") at 6:6-7).

10. Maureen Calcagni lives in Winthrop. M. Calcagni Dep. I at 4:2-3.

11. Defendant Peter Mars is a retired police officer and author from North Monmouth, Maine. Segal Decl., Ex. K (Jan. 2008 Peter Mars Deposition ("Mars Dep.") at 6:19-25 – 7:1-3).

12. Defendant BookSurge, LLC ("BookSurge") was a print-on-demand ("P.O.D.") company located in South Carolina. Declaration of David Symonds ("Symonds Decl."), ¶ 2.

13. BookSurge is now a trade name for On-Demand Publishing, LLC. Symonds Decl., ¶ 2.

14. BookSurge is paid by self-publishing authors to print and bind PDF-formatted manuscripts using P.O.D. technology. Symonds Decl., ¶¶ 3, 6; R. Calcagni Dep. I at 43.

15. P.O.D. generally refers to digital methods that allow printing and binding of a complete book in a very short period of time. Symonds Decl., ¶ 3.

16. P.O.D. technology also facilitates production of books in very small lots, rather than hundreds or thousands at once. Symonds Decl., ¶ 3.

17. In 2007 alone, BookSurge added more than 350,000 book titles. Symonds Decl., ¶ 4.

18. BookSurge does not review submissions for content. Symonds Decl., ¶ 4.

19. If a BookSurge author or customer wishes to purchase technical editing services, these services are outsourced and performed by another, unaffiliated entity. Symonds Decl., ¶ 5.

20. The outsourced editing or proofreading services provided are technical only (such as review for grammar), and do not include a review of the content of a submission. Symonds Decl., ¶ 5.

**Conflict Between Ms. Sandler and Ms. Calcagni:**

21. Ms. Calcagni and Ms. Sandler were classmates and cheerleaders at Winthrop High School in Winthrop, Maine. Sandler Def. Dep. I at 14:2-6, 17:1-7; 19:4-11.

22. Although Ms. Sandler lived in nearby Readfield, in the Maranacook School District, she transferred to Winthrop High School in her sophomore year under a superintendents' agreement. Sandler Def. Dep. I at 10:20-25 – 11:1-8, 11:22-25 –

12:1-4, 133:14-25 – 134:1-9; Sandler Def. Dep. I Ex. 2 (incl. March 2005 Sandler

Hate Crime Deposition ("<u>Sandler Hate Crime Dep.</u>") at 20:18-25 – 21:1).

23. Although Ms. Calcagni was a year behind Ms. Sandler in school, the girls became

friends on the Winthrop High cheerleading squad. Sandler Def. Dep. I at 19:4-11;

Sandler Hate Crime Dep. at 23:18-24.

24. But their friendship began to sour over the 2003 Columbus Day weekend.

Sandler Def. Dep. I at 18:19-25 – 19:1-7, 22:9-17; Sandler Hate Crime Dep. at 32

– 33.

25. After the Columbus Day weekend, Ms. Calcagni and her friends spread rumors

about why Ms. Sandler transferred from Maranacook High School to Winthrop.

They suggested that Ms. Sandler was teased at Maranacook for ████████████

████████████████████████████ allegedly masturbating. Sandler Def. Dep.

I Ex. 2 (incl. handwritten notes from music teacher that heard Ms. Calcagni

spreading these rumors); ██████████████████████████

████████████████████████████████

████████████████████████████████

██████████████████████████████

██████████████████████████████

████████████████████████████████████

████████████████████████████████

███████████████████████████

██████████████████████████████████████

█████████████████████

26. Ms. Calcagni and her friends also apparently used various epithets referring to

    Ms. Sandler's Jewish heritage.  Sandler Hate Crime Dep. at 54; ██████████

    ████████████████████████████████████

    ████████████████████████████████

    █████████████████████████████████████

    ███████████████████████████████████████

    ███████████████████████████████████████

    ████

27. At the same time, Ms. Sandler made statements at school that referred to Ms.

    Calcagni's alleged pregnancy.  Sandler Def. Dep. I at 30-31, 43:4-18; ██████

    ████████████████████████████████

    ████████████████████████████████

    █████████████████████████████████████

    ██████████████████████████████

    █████████████████████████████████████

    █████████████████████████████

    █████████████████████████████████████

    ███████████████████████████████

    ██████████████████████████████████

    ██████████████████████████████

    ████████████████████████████████████

    ███████████████████████████████████

    ██████████████████████████

[REDACTED]

28. [REDACTED]

[REDACTED]

29. [REDACTED]

30. By November 2003, Ms. Calcagni stopped attending school because the Calcagnis believed that the high school was not taking sufficient action to protect Ms. Calcagni. Sandler Def. Dep. I Ex. 2 (incl. Oct. 2004 U.S. Department of Education, Office of Civil Rights Decision ("OCR Decision") at 2).

31. In addition to contacting school administrators, the Calcagnis and the Sandlers also contacted the police on various occasions regarding the harassment, and eventually, the police issued anti-harassment/restraining orders to both Ms. Calcagni and Ms. Sandler. Sandler Def. Dep. I Ex. 5 (Plaintiff's Ans. to Interrogatories of Def. BookSurge, No. 24); [REDACTED]

32. The Calcagnis complained to school officials that Ms. Sandler's harassment of Ms. Calcagni was making it impossible for Ms. Calcagni to return to school.



R. Calcagni Dep. I at 88; Segal Decl., Ex. H (Jan. 2008 Maureen Calcagni Deposition ("M. Calcagni Dep. II") at

33.

34. The high school suspended both girls.

Sandler Def. Dep. I at 35:20-25 – 36:1-17; Sandler Hate Crime Dep. at 25, 28:11-25 – 29:1-19; Sandler Def. Dep. I Ex. 2 (incl. excerpt of Ms. Sandler's April 2004 Criminal Mischief Trial Testimony ("Sandler Trial Testimony") at 84:21-25 – 85:1-3).

35.

36.

37. ████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

38. ██████████████████████████████████

39. The Calcagnis then filed a complaint with the U.S. Department of Education's Office of Civil Rights ("OCR") in Boston. OCR Decision at 1.

40. The Calcagnis contended that the school district failed to protect their daughter from the sexually harassing pregnancy rumors spread by Ms. Sandler, and that the school district fabricated the masturbation accusations against Ms. Calcagni. OCR Decision at 1, 6.

41. OCR investigated and eventually released findings that confirmed that Ms. Calcagni suffered harassment through the pregnancy statements. OCR Decision at 3.

42. However, OCR concluded that the school district had not fabricated the masturbation statements and had responded to the pregnancy statements appropriately. OCR Decision at 2-4, 6-7.

**Swastika Incident:**

43. ██████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

████████████████████████████

44. Ms. Calcagni also spent time with friends from Maranacook High School, including Tyler Beck, Drew Scott, and Daniel Buckley. Sandler Hate Crime Dep. at 59:25 – 60:1-13.

45. Ms. Calcagni apparently concocted a plan to paint swastikas on road signs near Ms. Sandler's house in Readfield and on road signs on the route between Readfield and Winthrop. Sandler Hate Crime Dep. at 45, 57-58.

46. Over the 2003 Veterans Day holiday weekend, Ms. Calcagni and Thayer-Adams spray painted swastikas on the road signs while driving around with Cundy, Krumbach, Beck, Scott, and Buckley. Sandler Def. Dep. I at 67-68; Sandler Def. Dep. I Ex. 1 (Plaintiff's Amended Complaint, ¶ 9); Sandler Def. Dep. I Ex. 2 (incl. *State v. Mia Calcagni* Decision, Docket No. AUG-JV-04-006, Sept. 9, 2004 ("*State v. Mia Calcagni* Decision") at 3).

47. Ms. Sandler saw the swastikas and her family called the police. Sandler Def. Dep. I at 68 – 69; Sandler Hate Crime Dep. at 46:17-25.

**Police Investigation:**

48. Ms. Sandler told school administrators and police that she thought Ms. Calcagni painted the swastikas. Sandler Hate Crime Dep. at 47 – 48, 64:17-25 – 65:1-19; Sandler Trial Testimony at 87:18-25 – 88:1-2.

49. All of the students in the car that night, with the exception of Annette Krumbach, accused Ms. Calcagni and Thayer-Adams of painting the signs. *State v. Mia Calcagni* Decision at 2; ███████████████████████

███████████████████████████████████

█████████████████████████████████████

50. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮

51. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮

52. While the police and attorney general's office investigated the swastika incident, the Calcagni family denied Ms. Calcagni's involvement, and Ms. Calcagni accused another student, Michelle Perry, of painting the swastikas. *State v. Mia Calcagni* Decision at 2; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮

53. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



**Criminal Mischief Charges and Prosecution:**

54. Ms. Calcagni and Thayer-Adams were charged with criminal mischief. *State v. Mia Calcagni* Decision at 1.

55. Ms. Calcagni was tried and convicted of criminal mischief. Sandler Def. Dep. I Ex. 1 (Plaintiff's Amended Complaint, ¶ 10); *State v. Mia Calcagni* Decision at 3.

56. An appeal was unsuccessful. M. Calcagni Dep. I at 18:18-25 – 19:1-3.

**Civil Hate Crime Prosecution:**

57.

58.

59. Before the criminal mischief case went to trial, the AG's office decided to prosecute a civil hate crime against Ms. Calcagni and Thayer-Adams. M. Calcagni Dep. II Ex. 12 (compilation of correspondence between Ms. Calcagni's

attorney, the assistant attorney general, and district attorney regarding the filing of the civil hate crime case and the ensuing publicity).

60. The civil hate prosecution led to depositions of Ms. Sandler, ██████████ ████████████ *See* Sandler Hate Crime Dep.; ███████████████ ████████████████████████████████ ████████████████████

61. Ms. Calcagni agreed to a consent decree in the hate crime case.   Sandler Def. Dep. I Ex. 2 (incl. consent decree).

**Media Coverage:**

62. The feud between Ms. Sandler and Ms. Calcagni and the swastika incident spawned investigations by the police and Maine Attorney General, criminal proceedings and an appeal, a civil hate crime proceeding, school disciplinary proceedings, and investigations by the Maine Department of Education and the U.S. Department of Education's Office of Civil Rights ("OCR").  Sandler Def. Dep. I Ex. 1 & Ex. 2; ███████████████████████ ██████████████████████████████████ ██████████████████████████████████ ████████████████████████████ ███████████████████████████ ███████████

63. The dispute between Ms. Sandler and Ms. Calcagni and the swastika incident received print and broadcast media attention.  *See* R. Calcagni Dep. I at 97:2-5, 98:16 – 100:3 & Exs. 4, 8 (newspaper articles); ███████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████ R. Calcagni Dep. I at 98:20-25 – 99:1-6 (discussing publicity in

the Capital Weekly, other local papers, and television stations); M. Calcagni Dep.

II at 87 – 91 (discussing print and television coverage of civil hate crime case); M.

Calcagni Dep. II Ex. 12 (correspondence between Calcagnis' attorney, district

attorney's office, and attorney general's office regarding newspaper coverage of

hate crime prosecution and Calcagnis' frustration that daughter's prosecution was

made public).

64. The questions raised by the Calcagnis regarding law enforcement and the

disenchantment of youth in Winthrop, Maine, in *Help Us Get Mia* generally was a

topic of local and national media attention. Segal Decl., Ex. DD (Sports

Illustrated article and local newspaper articles regarding Winthrop youth and teen

suicide epidemic).

***Help Us Get Mia***:

65. After Ms. Calcagni was convicted of criminal mischief and agreed to the consent

decree in the civil hate crime case, the Calcagnis wanted to tell their side of the

story. M. Calcagni Dep. I at 17:7-12.

66. The Calcagnis hired a local author, defendant Peter Mars, in April 2005 to help

them write a book based on the documents they had collected from the various

school, police, and attorney general investigations and court proceedings

involving their daughter. *See* R. Calcagni Dep. I at 10:19-25 – 11:1-16, 17:15-25

– 18:1-11; M. Calcagni Dep. I at 30:19-25 – 31:1-10, 41:9-25 – 42:1-9, 113:14-18, 135:13-15 – 136:1-15, 151:4-16.

67. The Calcagnis and Mars produced a manuscript titled *Help Us Get Mia*, most of which was a compilation of excerpts from the police reports, trial transcripts, and other official records.  *See* Sandler Def. Dep. I Ex. 4 (complete copy of *Help Us Get Mia* ("*Help Us Get Mia*")).

68. Once *Help Us Get Mia* was written, the Calcagnis decided to self-publish the book through BookSurge, a print-on-demand ("P.O.D.") company.  R. Calcagni Dep. I at 42:12-25; Symonds Decl., ¶ 3.

69. BookSurge prints books for self-publishing authors and offers no fact-checking or similar editing services.  Symonds Decl., ¶¶ 3 – 5.

70. Ralph Calcagni's transaction with BookSurge is illustrative of a typical BookSurge customer experience.  Symonds Decl., ¶ 6.  Ralph Calcagni purchased a package from BookSurge known as "Author's Express PDF."  Symonds Decl., ¶ 6; R. Calcagni Dep. I at 106-07.

71. Under the "Author's Express PDF" package, the author uploads a completed copy of his or her work in "PDF" file format.  Symonds Decl., ¶ 6; R. Calcagni Dep. I at 118:8-25 – 119:1-8.

72. BookSurge then prints the file in a "book" format.  Symonds Decl., ¶ 6.

73. Ralph Calcagni uploaded a PDF version of the manuscript to BookSurge's website.  R. Calcagni Dep. I at 106-07, 118-19.

74. BookSurge converted a PDF computer file of the *Help Us Get Mia* manuscript into book format.  Symonds Decl., ¶ 6.

75. The total cost was $1499, but this included 250 copies of the book—the actual printing cost was $99.  Symonds Decl., ¶ 6.

76. Because Ralph Calcagni purchased 250 advance copies of the book, the $99 charge was waived.  Symonds Decl., ¶ 6.

77. Ralph Calcagni did not contract with BookSurge for any fact checking or editorial services, and he did not expect BookSurge to provide any.  R. Calcagni Dep. I at 107:17-25 – 108:1-11.

78. According to Ralph and Maureen Calcagni, they hired Peter Mars to provide independent fact-checking and editing services for *Help Us Get Mia*.  M. Calcagni Dep. I at 58:12-15, 162:12-15; M. Calcagni Dep. II at 7:13-25 – 8:1-2, 123 – 124.

79. Mars did not dispute during his deposition that he left the Calcagnis with the impression that he would fact-check and edit *Help Us Get Mia*.  Mars Dep. at 169 – 171 (171:14-15 "I think they thought that I was going to contact people, but I didn't."), 202:13-18 ("Q.  You never intended to talk to any of the witnesses?  A. No.  Q. But I think you indicated you didn't tell the Calcagnis that.  So as far as you know, it was their impression that you were going to.  A.  That was probably their impression.");

80. The bound version of the book was available in September 2006.  *See* Symonds Decl., Ex. B.

81. BookSurge's customers and authors have the option to list their book for sale on Amazon.com.  Symonds Decl., ¶ 6.

82. A self-publishing author can also register independently as an author on Amazon.com, with no additional cost. Symonds Decl., ¶ 6.

83. Ralph Calcagni opted to make *Help Us Get Mia* available for sale on Amazon.com's and BookSurge's websites. R. Calcagni Dep. I at 52:2-9.

84. The Calcagnis purchased 760 copies. R. Calcagni Dep. I at 48:18-22; Symonds Decl., ¶ 10 & Ex. B.

85. The Calcagnis gave the book away to friends and family. R. Calcagni Dep. I at 50:4-8.

86. Ralph Calcagni also sold the book to bookstores in Winthrop and surrounding communities through a Bangor distributor, Magazines, Inc. R. Calcagni Dep. I at 50:9-24.

87. Approximately 80 copies were purchased on-line through Amazon.com and the BookSurge website. Symonds Decl., Ex. B.

88. No other copies of the book were produced or sold. Symonds Decl., Ex. B.

89. BookSurge and its employees do not read or review the manuscripts they print. Symonds Decl., ¶ 4.

90. BookSurge and its employees did not read or review the manuscript submitted to them by Ralph Calcagni. Symonds Decl., ¶ 8.

91. BookSurge and its employees knew nothing about the substance of the *Help Us Get Mia*. Symonds Decl., ¶ 8.

92. BookSurge and its employees knew nothing about the individuals involved with the events described in the book. Symonds Decl., ¶ 9.

93. BookSurge and its employees had not received any information that would cause them to question the factuality of any of the statements in *Help Us Get Mia*. Symonds Decl., ¶¶ 8 – 9; Sandler Def. Dep. I at 45:17-25 – 46:1-2.

94. There was no contract between the Calcagnis and BookSurge that required BookSurge to indemnify the Calcagnis. Symonds Decl., ¶ 11.

**Ms. Sandler Sues Mia, Ralph, and Maureen Calcagni, Peter Mars and BookSurge:**

95. Ms. Sandler filed this lawsuit against Ralph, Maureen, and Mia Calcagni, Mars, and BookSurge in February 2007, claiming intentional infliction of emotional distress against Ms. Calcagni, and claiming libel, libel per se, false light invasion of privacy, unreasonable disclosure of private facts, and punitive damages against all of the Defendants. Sandler Def. Dep. I Ex. 1 (Plaintiff's Amended Complaint). Ms. Sandler contended during her deposition that BookSurge should have reviewed and fact checked *Help Us Get Mia*. Sandler Def. Dep. I at 51, 55.

96. In her first set of interrogatory answers, Ms. Sandler identified 45 statements from *Help Us Get Mia* that she alleged were either libel, libel per se, false light invasion of privacy, or unreasonable disclosure of private facts. She did not, however, delineate which statements pertained to which claims. Sandler Def. Dep. I Ex. 5 (see Attachment A); Sandler Def. Dep. I at 131:16-25 – 132:1-5, 137:15-25 – 138:1-4.

97. Ms. Sandler reduced her list of allegedly "actionable" statements from 45 to 12 during her deposition in January 2008, and delineated which statements she believes are libel and which statements she believes reveal true but private facts about her. Sandler Def. Dep. II at 33:21-25 – 34:1-2 & Ex. 8 (Attachment A as amended on Jan. 17, 2008).

**Statements that Ms. Sandler Alleges are Libelous:**

**Epithets.**

98. *Help Us Get Mia* at 3: "'Michelle said she's going to teach 'Jew-Bag' (Michelle's name for Shana) . . . a lesson.'" Sandler Def. Dep. I at 135:24-25 – 136:1-16; Sandler Def. Dep. II at 88:23-25 – 89:1-2 & Ex. 8.

99. *Help Us Get Mia* at 6: "Michelle openly disliked Shana who she one time referred to as 'that Jew bag' in front of Maureen." Sandler Def. Dep. I at 135:24-25 – 136:1-16; Sandler Def. Dep. II at 88:23-25 – 89:1-2 & Ex. 8.

100. *Help Us Get Mia* at 55: "'Mia thinks that this whole thing is a joke. She always laughs about it but she doesn't realize what she is doing to Shana. She also said that Shana was a 'whore.''" Sandler Def. Dep. II at 120:17-19 & Ex. 8.

101. *Help Us Get Mia* at 67: "'The recent issues involve: Mia Calcagni, Annette Krumbach, Sara Wilson referring to Shana as a 'dirty Jew' Etc.'" Sandler Def. Dep. II at 127:20-24 & Ex. 8.

102. *Help Us Get Mia* at 75: "'Daniel stated that Mia, Shannon, and Annette all referred to Shana as a . . . 'slut.''" Sandler Def. Dep. II at 130:6-8, 131:1-3 & Ex. 8.

**Opinions About Ms. Sandler's Personality.**

103. *Help Us Get Mia* at 7: "Shana was in her junior year and had recently transferred to Winthrop under a superintendent's agreement from Maranacook High School. Shana had many problems at Maranacook and apparently felt a different school was in order. . . . Shana was also in cheering but she was being made fun of by some of the students there and, consequently, had been running

alone.  She, obviously, <u>had no friends in the new school</u>.  At some point

subsequent to that first meeting, Mia saw <u>Shana crying at a cheering practice</u> and

went over to talk with her to ask her what the problem was.  . . .   <u>No one likes to</u>

<u>become the ally of a laughingstock</u>.  She thought that by going out for cheering,

<u>she would overcome her poor self-esteem</u> but that did not happen.  Shana was one

of those <u>loud, in-your-face people</u> whose <u>personality grated on everyone around</u>

<u>her</u>.  And, she was <u>not very good in cheering</u> because she did not have any

cheering background.”  Sandler Def. Dep. II at 90 – 104 (emphasis indicates

allegedly libelous portions of statement) & Ex. 8.

**Ms. Sandler's Own Internet Postings.**

104.     *Help Us Get Mia* at 45:  “According to myspace.com, Shana entered the

following information about herself. . . . Will not comment on having ever

shoplifted.  Has a few piercings and tattoos. . . .”  Sandler Def. Dep. II at 118:3-6

& Ex. 8.

105.     *Help Us Get Mia* at 62:  “To begin, it is important to note that Shana, in

her on-line autobiography, states in answer to the question, ‘Have you ever

shoplifted?’ that she would not comment on that question.  Immediately, that

sends up a red flag indicating that if she had never shoplifted, she could have

easily answered, ‘No.’  However, this type of answer implies that she has

committed this offense. . . .”  Sandler Def. Dep. II at 126:16-25 – 127:1-18 & Ex.

8.

**Statement About Ms. Sandler Starting Rumors.**

106.     *Help Us Get Mia* at 14:  "Shana further persisted in formulating new, more

devastating rumors by stating to those who were familiar with Mia that Mia was

expelled from school, was out of school so that she could have an abortion, and

that Mia painted swastikas on the street signs on Route 41, an allegation that came

some weeks subsequent to the previous rumors."  Sandler Def. Dep. II at 106:22-

25 – 107:1-4 & Ex. 8.

**Music Room Statements.**

107.     *Help Us Get Mia* at 22-23:  "Mia said she had befriended Shana and

answered the girl's question by telling her that Shana was getting harassed at the

other school because she had a nose-job.  At that time, another girl piped up and

asked, 'Wasn't it because Shana was playing with herself in the bathroom while a

school bus waited for her?'  Mia said, 'I don't know, but I've heard that.'  Mia

said that after those remarks, everyone was laughing, including Mr. Shaw.  After

the laughter had gone on for several minutes, Mr. Shaw said, 'Moving on. . .'

Later, in the hall, Mia said that Mr. Shaw stopped her and asked, 'You're serious

about what you heard?'  Mia, feeling uncomfortable about discussing this subject

with a teacher, answered, 'I really have no idea.  All I can tell you is that's what I

heard some of the kids say.'"  Sandler Def. Dep. II at 112:10-25 – 113:1-3 & Ex.

8.

108.     *Help Us Get Mia* at 23:  "What follows is a note Shaw scrawled in

longhand:  '*On October 24, I was in my office. . . . When I came out I headed*

*toward the piano (see diagram) and Mia, on my left, said something like, 'Hey,*

*Mr. Shaw, you wanna hear a story about Shana?' I said something like, 'No, if it is the story I think it is; I've already heard it.' Mia: 'Was it about why she left Maranacook?' Me: 'Yes, I've heard that story and I'm pretty sure it is just a story.' At this point, I've taken my seat at the piano. But other students around Mia start to get curious. One soprano asks what it was Mia was alluding to. Mia said, 'She was caught fingering herself.' (or something very close to that).'"*

Sandler Def. Dep. II at 116:17-25 & Ex. 8.

**Facts Relevant to Statements that Ms. Sandler Contends are Libelous:**

**Epithets.**

109.    The term "Jew bag" came up repeatedly in the official documents from the school and police investigations and court proceedings. ████████████████

████████████████████████████████████████

████████████████████████████████████

████████████    M. Calcagni Dep. I at 36:13-25 – 37:1-19 (explaining that the use of the term "Jew bag" in *Help Us Get Mia* was to show that Michelle Perry used the term and admitted to using it in her trial testimony); ████████████

████████████████████████████████

████████████████████████████████████████

██████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████

████████████████████████████████



110.

111.     Ms. Sandler admitted in her deposition that people use the word "whore" as an insult, and do not always intend the word to refer to prostitution. Sandler Def. Dep. II at 248:17-25 – 249:1-2.

112.

113.

114. 

**Opinions About Ms. Sandler's Personality.**

115.     Ms. Sandler admitted that she was made fun of Maranacook High School. Sandler Def. Dep. II at 94:17-22.

116.

117.     Ms. Sandler admitted that she was harassed by students at Winthrop High School. Sandler Def. Dep. II at 97 – 98.

118.     Ms. Sandler admitted that she cried at cheer practice. Sandler Def. Dep. II at 96:8-10.

**Ms. Sandler's Own Internet Postings.**

119.     Ms. Sandler admitted in her deposition that she has two piercings in each ear, and she also had a piercing in her navel. Sandler Def. Dep. II at 118:14-25 – 119:1-16.

120.     Ms. Sandler admits that she doesn't "believe there's anything wrong with a tattoo." *See* Sandler Def. Dep. II at 119:21-25 – 120:1-14.

121.     Ms. Sandler also concedes that she would date someone with tattoos. Sandler Def. Dep. I at 88:6-18, 89:13-16.

122.    The following is an accurate summary of Ms. Sandler's March 16, 2005

myspace.com survey:  "To begin, it is important to note that Shana, in her on-line

autobiography, states in answer to the question, 'Have you ever shoplifted?' that

she would not comment on that question."  Sandler Def. Dep. I at 86:21-25 –

87:1-18 (referring to Sandler Def. Dep. I Ex. 2, which includes the March 16,

2005 myspace.com survey).

**Statement About Ms. Sandler Starting Rumors.**

123.    Ms. Sandler admitted at least twice in separate proceedings that she started

rumors about Ms. Calcagni being pregnant and being expelled.  Sandler Def. Dep.

I at 30-31, 43:4-18, 98:12-25 – 99:1-20; Sandler Hate Crime Dep. at 26:22-25 –

27:1-19; ███████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████ *see also* Sandler Def. Dep. I Ex. 2

& ████████████████████████████ (incl. IM exchange provided to attorney

general's office by Ms. Sandler in which Ms. Sandler ("SummerEyes9") states

that "MIA GOT EXSPELLED [sic]"); Sandler Def. Dep. I Ex. 2 & ████████

████████████ (incl. Ms. Calcagni ("PrTyLiLsHoRtY") and Justin Childs

("xow4e2e0dox") instant messages in which Ms. Childs reports that Shana told

him that Ms. Calcagni was expelled); ███████████████████████████████

█████████████████████████████████

124.    ████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████



125.     Ms. Sandler testified in the State's criminal mischief case that she

admitted telling the school administration and police that Ms. Calcagni painted

the swastikas near her house.  Sandler Trial Testimony at 87:18-25 – 88:1-2;

Sandler Def. Dep. II at 107:7-17; *see also*

126.    The Calcagnis wrote a letter to Officer Carson stating that Shana was "telling people [Ms. Calcagni] is expelled, that she has painted the signs and that she is out either due to a miscarriage or an abortion" and this letter was in the Winthrop School District's files.  Sandler Def. Dep. I Ex. 2 (incl. Nov. 25, 2003 letter) & ███████████████████████████████████████████████

████████████

**Music Room Statements.**

127.    The statements at pages 22-23 are either direct quotes from, or fair and accurate summaries of, Winthrop High School disciplinary records, the civil rights investigation records, or attorney general investigations.  *See* Sandler Def. Dep. I Ex. 2 (incl. handwritten note from music teacher that heard Ms. Calcagni spreading rumors about Ms. Sandler, which is directly quoted on pages 22 – 23 or *Help Us Get Mia*); ████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████ R. Calcagni

Dep. I at 92-95 (referring to Sandler Def. Dep. I Ex. 2 (incl. handwritten disciplinary record from school officials that is quoted in *Help Us Get Mia*));

OCR Decision at 6-7 (discussing Calcagnis' contention that school fabricated music room events); Segal Decl., Ex. J (Jan. 2008 R. Calcagni Deposition ("R. Calcagni Dep. II") █████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████

**Statements that Ms. Sandler Alleges Reveal Private Facts:**

> **Information Posted for Public View by Ms. Sandler on her myspace.com Webpage, and Reprinted in *Help Us Get Mia*.**

128.     Ms. Sandler claims that all of the excerpts and summaries from her myspace.com webpage included in *Help Us Get Mia* caused the disclosure of private facts that would be highly offensive to a reasonable person.  Sandler Def. Dep. II at 71:19-25, 72:14-25 – 73:1-15 & Ex. 8.

129.     Ms. Sandler contends the three following statements revealed a private fact—her Jewish ancestry (Sandler Def. Dep. I at 136:17-25 – 137:1-3; Sandler Def. Dep. II at 54:2-13 & Ex. 8):

    a.  *Help Us Get Mia* at 3:  "'Michelle said she's going to teach 'Jew-Bag' (Michelle's name for Shana) . . . a lesson.'";

    b.  *Help Us Get Mia* at 6:  "Michelle openly disliked Shana who she one time referred to as 'that Jew bag' in front of Maureen.";

    c.  *Help Us Get Mia* at 67:   "'The recent issues involve:  Mia Calcagni, Annette Krumbach, Sara Wilson referring to Shana as a 'dirty Jew' Etc.'"

130.     Ms. Sandler contends that the disclosure on page 12 of *Help Us Get Mia* regarding her enrollment at High Point University reveals a "private" fact. Sandler Def. Dep. II at 68:22-25 – 69:1-16, 70:11-13 & Ex. 8.

131.     Ms. Sandler contends the following statements regarding her decisions to seek professional psychological care or counseling were private facts (Sandler Def. Dep. II at 56:23-25 – 57:1-24, 81:8-15 & Ex. 8):

    a.   *Help Us Get Mia* at 12-13: "Shana had issues and needed to seek professional help, as she did while she was a student at Maranacook, and as she would again do in the spring of 2005 while attending college in North Carolina."

    b.   *Help Us Get Mia* at 46: "In her most recent page, she writes: … '*I have been feeling depressed for the past 3-4 weeks. Not good and I have NO idea why, so I am taking in upon myself to do [sic] see the psyc doctor on campus. At least I am addmiting* [sic] *that something is wrong and I need help to figure out why, I don't want to feel this way anymore, especially when I have no reason to be sad or have any idea why I am sad*.' . . ."

**Ms. Sandler's Transfer from One High School to Another.**

132.     Ms. Sandler claims that the following statement regarding her transfer from one high school to another was a private fact: *Help Us Get Mia* at 7: "Shana was in her junior year and had recently transferred to Winthrop under a superintendent's agreement from Maranacook High School. Shana had many problems at Maranacook and apparently felt a different school was in order. Shana was relieved that her parents wouldn't have to pay tuition to Winthrop, even though they lived in Readfield, because of the agreement between the

schools' superintendents." Sandler Def. Dep. I at 133:14-25 – 134:1-9, 134:19-22; Sandler Def. Dep. II at 54:24-25 – 55:1-25, 59:21-25 – 64:1-22 & Ex. 8.

**Ms. Sandler's Plastic Surgery on Her Nose.**

133.    Ms. Sandler claims that the following statements regarding the plastic surgery on her nose reveal a private fact (Sandler Def. Dep. I at 15, 133:2-7, 134:19-25; Sandler Def. Dep. II at 56:19-22, 64:23-25 – 67:1-23 & Ex. 8):

    a.    *Help Us Get Mia* at 7: "At some point subsequent to that first meeting, Mia saw Shana crying at a cheering practice and went over to talk with her to ask her what the problem was. Shana opened up and said that ever since she had been a freshman and had a nose job kids had made fun of her and avoided her."

    b.    *Help Us Get Mia* at 22-23: "Mia said she had befriended Shana and answered the girl's question by telling her that Shana was getting harassed at the other school because she had a nose-job."

**<u>Facts Relevant to Statements that Ms. Sandler Contends Reveal Private Facts</u>:**

**Information Posted for Public View by Ms. Sandler on her myspace.com Webpage, and Reprinted in *Help Us Get Mia*.**

134.    Ms. Sandler conceded during her deposition that all of the myspace.com webpage postings excerpted in *Help Us Get Mia* were available to anyone for viewing when they were originally posted. Sandler Def. Dep. I at 75:22-25 – 77:1-15; Sandler Def. Dep. II at 69:18-25, 73:3-25 – 74:1-9.

135.    Ms. Sandler explained during her deposition that she later changed the public access to her myspace.com pages to a limited, pre-screened group of people. Sandler Def. Dep. I at 75 – 79.

136.     All of the statements from Ms. Sandler's myspace.com page quoted or

summarized in *Help Us Get Mia* were obtained by Maureen Calcagni, who

accessed Ms. Sandler's myspace.com postings, downloaded, and printed them

without a password.  R. Calcagni Dep. I at 26:16-25 – 27:1-17; M. Calcagni Dep.

I at 169:24-25 – 170: 1-15, 185 – 187 (187:16-20 "Q.  – were there any

restrictions on access to any of this material on the Internet?  A.  None at all.  Q.

It was all open to the public?  A.  Open to the public."); M. Calcagni Dep. II at

46:19-25 – 47:1-3, 58:2-6, 92:12-25 – 93:1-16, 132:22-25 – 133:1-12; Sandler

Def. Dep. I Ex. 2 (incl. myspace.com postings quoted in *Help Us Get Mia* and

downloaded by M. Calcagni).

137.     Ms. Sandler revealed her Jewish heritage on her myspace.com webpage.

Sandler Def. Dep. I at 82:12-24, 85:2-22, 91:19-25 – 92:1-20 and Ex. 2 (incl. Ms.

Sandler's March 16, 2005 myspace.com survey answers in which Ms. Sandler

lists "Jewish" as her heritage; incl. Ms. Sandler's April 11, 2005 myspace.com

posting, which stated "*J.A.P. Baby!! If you don't know what that is, it's a slang*

*used to describe spoiled little brats who get their way (hehe) who are Jewish aka*

*Jewish American Princess, but in my case it would be Jewish American Duchess*

*hahaha.  But I am really not spoiled or a brat, I just am very good at getting what*

*I want =)*").

138.     Ms. Sandler herself admits that "there's no shame in being Jewish."

Sandler Def. Dep. I at 69:5-10; *see also* Sandler Def. Dep. II at 59:18-20 ("Q. Do

you believe that it's offensive for people to know that you are Jewish?  A.  No.").

139.     Ms. Sandler revealed publicly her enrollment at High Point University on her myspace.com webpage.  Sandler Def. Dep. I Ex. 2 (incl. Ms. Sandler's March 16, April 11, and May 5, 2005 myspace.com data); Sandler Def. Dep. II at 192:3-6 & Ex. 19 at C 00409 (Ms. Sandler myspace.com posting); M. Calcagni Dep. II at 132:22-25 – 133:1-12 & Ex. 29 at C 00409 (M. Calcagni testified that she did not need a password to download Ms. Sandler's myspace.com posting that is Ex. 29 to M. Calcagni's deposition; the posting reveals that Ms. Sandler attends High Point University in North Carolina).

140.     Ms. Sandler admitted in her Hate Crime Deposition that she received psychological help while at Maranacook High School.  Sandler Hate Crime Dep. at 17-20.

141.     Ms. Sandler admitted in her deposition for this case that she received psychological help while in middle school and college. Sandler Def. Dep. II at
██████████████ 150:15-24 & ███████████████████████
██████████████ 256 – 258.

142.     Ms. Sandler revealed her decision to seek psychological help during college on her publicly accessible myspace.com webpage.  Sandler Def. Dep. I at 89:17-25 – 90:1, 90:19-25 – 91:1-9 & Ex. 2 (incl. April 11, 2005 myspace.com posting).

**Ms. Sandler's Transfer from One High School to Another.**

143.     

144. ████████████████████████████████████████

████████████████████████████████████

145.     Ms. Sandler's transfer pursuant to a superintendents' agreement was

revealed in a newspaper article written by Ralph and Maureen Calcagni. R.

Calcagni Dep. I at 141:12-25 – 142:1-21 & Ex. 8 (newspaper articles).

146. ██████████████████████████████

████████████████████████████████████████

██████████████████████████

147. ██████████████████████████████

████████████████████████████████████

████████████████████████████████████████

██

148. ████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

██

149.     School disciplinary records and ██████████████████████████

demonstrate that Ms. Sandler's transfer from Maranacook to Winthrop was public

information known by Ms. Sandler's classmates at Winthrop.  Sandler Def. Dep. I

Ex. 2 (incl. handwritten note from music teacher regarding classroom discussion

about why Ms. Sandler left Maranacook); ██████████████████████

████████████████████████████████████████

████████████████████████████



**Ms. Sandler's Plastic Surgery on Her Nose.**

150.

151.

152.

**Facts Relevant to Ms. Sandler's Alleged Damages:**

153.    Ms. Sandler admits she has not "suffered an economic or pecuniary loss yet" from the allegedly libelous statements.  Sandler Def. Dep. I Ex. 5 (Interrogatory Ans. No. 5).

154.    Ms. Sandler admits that she "cannot quantify those damages" for "the harm to my reputation and emotional distress I suffered as a result of the false statements about me in the book."  Sandler Def. Dep. I Ex. 5 (Interrogatory Ans. No. 8).

155.    Ms. Sandler admits she has no medical or other documents of any kind that relate to the damage she is claiming in the case.  Sandler Def. Dep. I at 127:10-25 – 128:1-7.

156.    ██████████████████████████████████████████████
        ████████████████████████████████████████
        ██████████████████████████████████████
        ████████████████████████████████████████
        █████████████████████████

**Facts Relevant to Ms. Sandler's Claim for Punitive Damages:**

157.    Ms. Sandler concedes that BookSurge bore her no ill will. Sandler Def. Dep. I at 53:25 – 54:1-17.

158.    BookSurge confirms that it did not even know who Ms. Sandler was when the book was printed, much less bear her any ill will.  Symonds Decl., ¶ 9.

159.    The only allegedly "outrageous" conduct identified by Ms. Sandler is the mere printing of the book.  Sandler Def. Dep. I at 53:18-25 – 54:1-11; *see also*

Sandler Def. Dep. I Ex. 5 (responding "I do not know" to all interrogatories

asking her to identify alleged ill will or outrageous actions).

Respectfully submitted,

BOOKSURGE, LLC

By its attorneys,


/s/ Harold J. Friedman
Harold J. Friedman
Friedman, Gaythwaite, Wolf & Leavitt
P.O. Box 4726
6 City Center
Portland, ME 04112

Stephen A. Smith (Pro Hac Vice)
Matthew J. Segal (Pro Hac Vice)
Kari Vander Stoep (Pro Hac Vice)
Kirkpatrick & Lockhart Preston
 Gates Ellis LLP
925 Fourth Avenue, Suite 2900
Seattle, Washington 98104-1158


March 17, 2008

K:\2040741\00191\20743_KLV\20743P20EL