UNITED STATES DISTRICT COURT
DISTRICT OF MAINE AT BANGOR

| | |
|---|---|
| SHANA SANDLER, )<br>)<br>        Plaintiff    )<br>)<br>v.    )<br>)<br>MIA CALCAGNI, )<br>RALPH CALCAGNI, )<br>MAUREEN CALCAGNI, )<br>PETER MARS, )<br>and )<br>BOOKSURGE, LLC, )<br>)<br>        Defendants.    )<br>) | Case No. 1:07-CV-00029-GZS |

### **BOOKSURGE, LLC'S MEMORANDUM OPPOSING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

## I. INTRODUCTION AND SUMMARY OF ARGUMENT

Shana Sandler's ("Ms. Sandler's") Motion for Partial Summary Judgment ("Motion") seeks a result contrary to both Maine law and fundamental constitutional principles. Without any basis in the record to establish the requisite level of actual <u>fault</u> by Defendant BookSurge, LLC ("BookSurge"), Ms. Sandler contends that BookSurge should nonetheless be held liable based on imputed knowledge of the material it printed. Maine law and the First Amendment compel one conclusion: BookSurge did not have a duty to review, edit or fact check a finished, self-published manuscript that was uploaded onto its internet site, and cannot be held strictly liable for the content of the submission. This Court should deny Ms. Sandler's Motion and grant BookSurge's Motion for Summary Judgment ("BookSurge's Motion").

1

## II. COUNTERSTATEMENT OF FACTS

Defendants Ralph and Maureen Calcagni and Peter Mars produced a manuscript titled *Help Us Get Mia*, a book that chronicled and critiqued civil and criminal prosecutions against Ralph and Maureen's daughter Mia. BookSurge, LLC's Additional Statement of Material Facts ("BASMF") ¶ 6. Once *Help Us Get Mia* was written, the Calcagnis decided to self-publish the book. BASMF ¶ 7. They turned to BookSurge, a print-on-demand ("P.O.D.") company. BASMF ¶ 8.

Self-publishing authors pay BookSurge to print and bind PDF-formatted manuscripts using P.O.D. technology. BASMF ¶¶ 1-3. P.O.D. generally refers to digital methods that allow printing and binding of a complete book in a very short period of time and in small lots—as few as one book at a time. BASMF ¶¶ 4-5. Self-publishing authors upload their submissions over BookSurge's website, and pay BookSurge for the right to print the manuscripts in bound form. BASMF ¶¶ 13, 21. In 2007 alone, BookSurge added more than 350,000 separate titles to its virtual inventory. BASMF ¶ 18.

BookSurge simply cannot be equated with a traditional publisher with respect to *Help Us Get Mia*. BASMF ¶¶ 61-69. First, BookSurge does not review <u>any</u> of its customers' submissions for content and offers <u>no</u> fact-checking or substantive editing services.[1] BASMF ¶¶ 16, 63-64. The massive volume of new titles that BookSurge handles each year does not permit BookSurge to review them for content. BASMF ¶¶ 17-18. Thus, BookSurge's review of any book is limited to a technical review of the uploaded computer file to ensure that it will be compatible with BookSurge's P.O.D.

---

[1] In the event that a BookSurge author or customer wishes to purchase technical editing services, these services are limited to a review of grammar and are outsourced and performed by another, unaffiliated entity. BASMF ¶¶ 19-20.

technology. BASMF ¶¶ 22. The only substantive contact that BookSurge employees have with a book is with its title—the "interior of the book wouldn't be seen" by BookSurge employees during the uploading and printing process. BASMF ¶ 23.

Second, BookSurge does not solicit work for printing or publication as traditional publishers do. *See, e.g.*, BASMF ¶ 10. Rather, those who want BookSurge to print self-published work contact BookSurge, and BookSurge may then follow up by email or telephone. BASMF ¶ 11.

Third, unlike a traditional publisher that might actively advertise, or fund other promotional activities to market new titles, BookSurge "does not go out and attempt to persuade people to purchase books in its inventory by making sales calls." BASMF ¶ 41; *see also* BASMF ¶¶ 40, 66-67. Although some customers may purchase marketing materials from BookSurge, "[t]he marketing process is the responsibility of the author." BASMF ¶ 42. Certainly in this case there is no evidence or even suggestion that BookSurge engaged in the type of marketing activities that traditional publishers conduct.

Fourth, BookSurge's "authors" and customers <u>pay</u> BookSurge for the right to print their books, as opposed to traditional publishers that pay authors for the right to publish their manuscripts. BASMF ¶¶ 13, 65. BookSurge obtains only a non-exclusive license to its customers' books. BASMF ¶¶ 14, 68-69. Many self-publishing authors use BookSurge's printing services to create a product that they can send to traditional publishers for future publication through traditional channels. BASMF ¶ 15.

Finally, BookSurge does not distribute books like traditional publishers. BASMF ¶ 69. Most BookSurge self-publishing authors buy copies of their books and self-distribute to local bookstores, distributors, friends, and family. BASMF ¶ 43. Although

3

listing on Amazon.com is facilitated by an agreement between BookSurge and Amazon.com, self-publishing authors can also sell their works through Amazon.com's website.  BASMF ¶ 46.

Ralph Calcagni's experience demonstrates that BookSurge should not be treated as a traditional publisher with respect to *Help Us Get Mia*.  Ralph Calcagni sought out BookSurge through internet searches and determined that BookSurge was the best P.O.D. service available to self-publish *Help Us Get Mia*.  BASMF ¶ 8.  He contacted BookSurge through the Internet, and BookSurge responded to his inquiry by emails and follow-up phone calls.  BASMF ¶ 12.  Ralph Calcagni purchased a package from BookSurge known as "Author's Express PDF."  BASMF ¶ 24.  Under that package, the author uploads a completed copy of his or her work in "PDF" file format on the BookSurge website,[2] and BookSurge prints the file in a "book" format (to the extent copies are ordered).  BASMF ¶¶ 25-28.  The total cost to Mr. Calcagni for the Author's Express PDF service was $1499, but this included 250 copies of the book—the actual first printing cost was $99 (which was waived).  BASMF ¶ 29.  Ralph Calcagni did not contract with BookSurge for any fact checking or editorial services, and he did not expect BookSurge to provide any.  BASMF ¶ 30.

*Help Us Get Mia*'s copyright page demonstrates how limited BookSurge's contact is with the contents of its customers' manuscripts.  Even though BookSurge provides copyright page samples on its website that do <u>not</u> label BookSurge as a "publisher," Ralph Calcagni submitted as part of his PDF upload *Help Us Get Mia*'s copyright page, labeling BookSurge as the book's "publisher."  BASMF ¶¶ 35-36.  BookSurge did not

---

[2] "PDF" is an acronym for "Portable Document Format."  Unlike Word, the PDF format does not permit editing of text or content.

read or review *Help Us Get Mia*. BASMF ¶¶ 31, 37-38. Accordingly, BookSurge did not read, could not edit, and did not alter the copyright page provided in Ralph Calcagni's PDF of *Help Us Get Mia*. BASMF ¶ 39.

The bound version of *Help Us Get Mia* was available in September 2006, and the Calcagnis eventually purchased 760 copies. BASMF ¶¶ 49-50. Ralph Calcagni sold the book directly to bookstores in Winthrop, Maine, and surrounding communities and to a Bangor distributor, Magazines, Inc. BASMF ¶ 52. In addition, Ralph Calcagni opted to make *Help Us Get Mia* available for sale on Amazon.com's and BookSurge's websites. BASMF ¶¶ 45, 53. Approximately 80 copies of *Help Us Get Mia* were purchased on-line. BASMF ¶ 54. In total, 840 copies of *Help Us Get Mia* were produced and sold either to Ralph Calcagni or on-line. BASMF ¶¶ 55-56. Although BookSurge may list its customers' titles through an on-line electronic feed to distributor Baker & Taylor and retailers Abebooks.com and Alibris.com (BASMF ¶¶ 47-48), there is no evidence that *Help Us Get Mia* was ever listed through either company. BASMF ¶ 57.

### III. ARGUMENT

The First Amendment and Maine's common law require fault to impose liability for libel and associated torts. Because there is no fault here, Ms. Sandler's motion should be denied on this ground alone. Alternatively, the federal Communications Decency Act bars liability. Regardless, Ms. Sandler is not entitled to partial summary judgment.

**A. The Requirement of Fault under Maine Law and the First Amendment is Not Met in this Case.**

The First Amendment's baseline defamation requirement is that defendants, whether a "publisher," "republisher," "broadcaster," "printer," or "distributor," must have some fault—at least negligence—for liability to attach. In *Gertz v. Robert Welch, Inc.*,

the U.S. Supreme Court concluded that common law strict liability for publishers and republishers[3] was unconstitutional. 418 U.S. 323, 340 (1974) ("Our decisions recognize that a rule of strict liability that compels a publisher or broadcaster to guarantee the accuracy of his factual assertions may lead to intolerable self-censorship. Allowing the media to avoid liability only by proving the truth of all injurious statements does not accord adequate protection to First Amendment liberties."). Maine law is in accord. *See* BookSurge's Motion at 7-13; *Levinsky's, Inc. v. Wal-Mart Stores, Inc.*, 127 F.3d 122, 128 (1st Cir. 1997) ("Simply put, Maine defamation law does not recognize liability without fault; rather, as a predicate to recovery, Maine requires a defamation plaintiff to show that the defendant acted at least negligently."); *Veilleux*, 206 F.3d at 108 & n.7 (1st Cir. 2000).

   *1. Printers and Distributors Lack Editorial Control, Have No Duty to Read, and No Liability.* Ms. Sandler cites no authority that would hold a defendant strictly liable for providing the limited type of printing and distributing services over the internet that BookSurge provided with respect to *Help Us Get Mia*. The authorities cited in BookSurge's Motion demonstrate that Ms. Sandler's arguments ignore the reality of internet printing and self-publishing.

   For example, in *Maynard v. Port Publications, Inc.*, 297 N.W.2d 500 (Wis. 1980), the Wisconsin Supreme Court addressed whether Port Publications had a duty to read and

---

[3] Ms. Sandler's Motion begins with the unremarkable proposition that original publishers of libelous statements to third parties, and "republishers" of such statements, may be liable for libel even if they are not the author or original speaker of the defamatory statement. Motion at 4-5. These cases, however, do not eliminate the constitutional or Maine common law requirement that any libel defendant must be at least negligent before liability can be imposed. *Veilleux v. Nat'l Broad. Co.*, 206 F.3d 92, 108 n.7 (1st Cir. 2000) ("[W]e must independently review . . . whether plaintiffs established that defendants were at least negligent in making the statements, as this is a constitutional requirement (as well as a necessary element of proof under Maine law)."); *Auvil v. CBS "60 Minutes"*, 800 F. Supp. 928, 931 (E.D. Wash. 1992) ("[T]he

review an allegedly libelous newspaper. *Id.* The newspaper at issue was "written, edited, [and] otherwise prepared" by another organization and was submitted to Port Publications for printing. *Id.* at 502. Applying *Gertz*, the court concluded that Port Publications's role in the production of that newspaper was that of a printer; having no duty to read or review the newspaper, it was not negligent for its printing. *Id.* at 506-07 ("Is Port Publications . . . subject to liability because of its failure to read and investigate material submitted for publication in order to discover and censor any potentially defamatory material? . . . [T]hose who are held liable for defamation <u>because of their role in the publication process</u> must know or have reason to know of the existence of the libel. Port, as a contract printer, has no reason to know."). Notably, the *Maynard* Court did not hold Port liable simply because it played a role in the "publication process," used the word "publications" in its corporate name, or "wr[ote], edit[ed], print[ed], and publish[ed]" several other magazines and newspapers. *Id.* at 502.

Similarly, in *Misut v. Mooney*, a New York court concluded that a printer was not liable for libelous statements in a newspaper, even though it reviewed and edited these materials for nudity, profanity, and vulgarity, because the printer:

> <u>had no other input into the material which it printed</u>. It did not undertake to confirm facts or check sources. It did not exercise editorial judgment nor did it seek to determine the truth of the material which it printed. It merely offers a service to those who seek to disseminate thoughts via the written word.

475 N.Y.S.2d 233, 233 (N.Y. Sup. Ct. 1984).

BookSurge's limited role in helping print *Help Us Get Mia* through an internet upload of a finished manuscripts is closely akin to the activities of the printers in

---

local [TV broadcasting] affiliates did republish . . . however, there is no liability for any defamation absent fault.").

*Maynard* and *Misut*, and unlike those of a traditional book publisher. Like the defendant in *Misut*, BookSurge "ha[s] no [] input into the material which it print[s]" (475 N.Y.S.2d at 233), and therefore, has no duty to review its customers' manuscripts.

Courts have recognized this reality with respect to entities that use the Internet to receive and disseminate substantial volumes of third-party content. In *Cubby, Inc. v. CompuServe, Inc.*, 776 F. Supp. 135, 140-41 (S.D.N.Y. 1991), the court held that CompuServe's operation of an on-line library, offering subscribers access to thousands of publications and discussion forums, did not require it to read and review all of the publications that it distributed. The court emphasized that CompuServe had "<u>no [] editorial control</u>" over the publications on its service (*id.* at 140 (emphasis added)), and "[g]iven the relevant First Amendment considerations, the appropriate standard of liability to be applied to CompuServe [was] whether it knew or had reason to know of the allegedly defamatory [] statements." *Id.* at 140-41; *see also Lunney v. Prodigy Servs. Co.*, 723 N.E.2d 539, 542 (N.Y. 1999) (holding that Prodigy could not be required "to guarantee the content" of "the millions of [] messages" posted on its electronic bulletin board by third parties because its "passive" role in the publication process did not go beyond screening for vulgarities).

Similarly, BookSurge's distribution mechanisms and the volume of publications that it distributes demonstrate that it has <u>no way to exercise meaningful editorial control</u> over the manuscripts that it prints and distributes. Like CompuServe (776 F. Supp. at 137), BookSurge makes third-party content available to the public by offering several on-line, electronic channels through which its printing customers can distribute their end

8

product.[4]  Like CompuServe, BookSurge makes thousands (if not hundreds of thousands) of new publications available to the public each year.  BASMF ¶ 18; 776 F. Supp. at 137.  And, just like CompuServe, BookSurge also receives submissions like *Help Us Get Mia* through on-line uploads.  BASMF ¶¶ 21-23; 776 F. Supp. at 140.  "CompuServe [and BookSurge] ha[ve] no more editorial control over such a publication than does a public library, book store, or newsstand, and it would be no more feasible for CompuServe [and BookSurge] to examine every publication [they] carr[y] for potentially defamatory statements than it would be for any other distributor to do so."  *Id.*

BookSurge does not have the ability to control the content of the manuscripts from its self-publishing customers in part based on the sheer volume of titles that it handles each year.  BASMF ¶¶ 16-18.  BookSurge added more than 350,000 new titles in 2007 alone, while charging self-publishing authors such as Ralph Calcagni approximately $99 to print a completed PDF manuscript upload.  BASMF ¶¶ 18, 29.  Refusing a duty to read and review each book, at that price, is precisely the rationale adopted by the decisions on printers and distributors.

*2.  The Right to Reject Works Creates No Duty.*  Ms. Sandler argues that BookSurge has editorial control over its customers' manuscripts because a provision in its posted terms and conditions[5] gives BookSurge the right <u>to reject</u> works from its authors and customers.  Motion at 2, 8 (BookSurge had a "right to presumably control the

---

[4] Of course, BookSurge customers also have the option to buy <u>wholesale hard copies</u> of their books, which they can self-distribute to distributors and retailers.  BASMF ¶¶ 43, 51-52.  This distribution scenario places BookSurge firmly within the reasoning of *Misut* and *Maynard*.

[5] *See* Affidavit of Bernard J. Kubetz in Support of Plaintiff's Motion for Partial Summary Judgment ("Kubetz Aff."), Ex. 3 at BS000003.  Although Ms. Sandler contends this agreement constitutes the contract between BookSurge and Ralph Calcagni, neither BookSurge nor Ralph Calcagni has a copy of this agreement signed by Ralph Calcagni.  BookSurge's Opposing Statement of Material Facts ("BOSMF") ¶ 6.  As a result, there is no signed agreement that governs the relationship between BookSurge and Ralph Calcagni.  BOSMF ¶ 6.

9

content of what it publishes."), 10. In essence, Ms. Sandler argues that this rejection right imposed a duty on BookSurge to read and review all submitted manuscripts for libel. Motion at 8. However, Ms. Sandler's argument fails because many courts have found that printing and distributing entities did <u>not</u> have a duty to read, review, and fact-check challenged publications simply because they retained a right to reject a publication or manuscript.

In *Misut*, the court ruled that although the defendant could and did screen the works that it received for nudity, profanity, and vulgarity, and "eliminat[ed]" such elements from the final versions of the publications that it printed, this did not create a duty to read or review the publications for content:

> [T]he Court does not view the duty of a printer to be inclusive of an obligation to confirm facts, check sources and to thereby be responsible for the truth of printed statements. . . .
>
> The fact that the defendant Merlin, the printer, examined the material submitted to it to the extent that it sought to locate and eliminate nudity, profanity and vulgarity is no indication that the printer had any knowledge or any reason to know of the libelous nature of any of the material which is the subject of this action. That the defendant Merlin may have taken steps to enforce its own standards of decency or civility, or to ensure its own compliance with the obscenity laws of the state, is not an indication that the defendant Merlin was in a position to test the truth of statements submitted by an independent author.

475 N.Y.S.2d at 233, 235-36.

Similarly, in *Maynard*, the court noted that even though the defendant had refused to print prior issues of a newspaper based on obscene content, the right to reject did not impose a duty to read and review for content. 297 N.W.2d at 503, 504, 505 ("We do not believe that these two instances, when Port because of the obscenity statutes refused to print certain photographs, support a reasonable inference that Port assumed editorial or censorship responsibilities with respect to [the challenged newspaper]."); *see also Auvil*,

800 F. Supp. at 931 ("The local affiliates . . . had some period of time in which to review programming and also some idea of the content. It is argued that these features, coupled with the power to censor, triggered the duty to censor. That is a leap which the Court is not prepared to join in."); *Lunney*, 723 N.E.2d at 542 (holding reservation of broad editorial discretion to screen its bulletin board messages for vulgarities does not impose liability as a publisher of such messages).

This Court should follow the well-reasoned analysis and sound policy embodied in these decisions. Because BookSurge did not have a duty to review *Help Us Get Mia* for content, its right to screen or reject does not create such a duty.

*3. The Authorities Require Proof of Fault, and Do Not Presume It.* Ms. Sandler relies heavily on the 1984 edition of the Prosser & Keeton treatise *The Law of Torts*. Motion at 5-6. This treatise, however, does not create any <u>presumption</u> of liability based on <u>imputed knowledge</u>, but instead emphasizes that <u>any</u> "publisher's" liability must be determined based on proof of fault:

> Those who manufacture books by way of printing and selling them, and those who print and sell newspapers, magazines, journals, and the like, are subject to liability as primary publishers because they have the opportunity to know the content of the material being published and should therefore be subject to the same liability rules as are the author and originator of the written material. This does not mean that such a primary publisher is vicariously liable for the author's tortious conduct. <u>It only means that the publisher is subject to liability for publishing with actual malice or negligence, depending upon the plaintiff's status</u>.
>
> <u>Prior to *New York Times* and its progeny, the primary publisher was strictly liable in the same way as the author. Today, the primary publisher as a public medium will not be subject to liability except on proof of fault of an authorized agent</u>.

Prosser & Keeton, *The Law of Torts*, § 113, p. 810 (5th ed. 1984) (emphasis added) (Attachment A). Moreover, if this treatise could be read to support the premise of

11

liability without fault, that support is founded on cases that predate the Supreme Court's decision to the contrary in *Gertz*. *See id.* at pp. 803 n.61-64, 810-11 n.5-9.

Ms. Sandler does not cite <u>any</u> case authority holding a "publisher" (whether "primary" or otherwise) liable based on "imputed knowledge." Ms. Sandler cites only three cases that even mention the "primary" vs. "secondary" concept. Motion at 5. In all three cases, the courts determined that the defendants were <u>not liable</u> at common law or were <u>immune from liability</u> based on the federal Communications Decency Act ("CDA"). *Dworkin v. Hustler Magazine, Inc.*, 611 F. Supp. 781, 785-87 (D. Wyo. 1985); *see also Grace v. eBay, Inc.*, 16 Cal. Rptr. 3d 192, 195 (Cal. Ct. App. 2004) (noting that eBay was a distributor that would be held to the "knew or had reason to know" common law fault standard if it did not receive immunity through the CDA) [6]; *Barrett v. Rosenthal*, 146 P.3d 510, 529 (Cal. 2006) (concluding that an operator of an Internet discussion group that republished a libelous statement received immunity through the CDA). The fact that the defendants in *Dworkin*, *Grace*, and *Barrett* were not liable does not compel the conclusion that BookSurge is liable.

The other cases cited in the Motion lend no further support to Ms. Sandler's theory. *Piper v. Mize*, 2003 WL 21338696 (Tenn. Ct. App. 2003), an <u>unpublished</u> case that furnishes the bulk of Ms. Sandler's case law analysis (Motion at 6, 8-9), does not address the concept of fault at all. *Piper* held that the defendant distributor was properly dismissed based on the absence of any evidence showing that the publications distributed from the defendant's convenience store were ever read by a third party. 2003 WL 21338696, at *7-8. "Publication" or "communication" to third parties is a required

---

[6] The *Grace* decision also was later vacated by the California Supreme Court, which Ms. Sandler failed to mention in her motion. *See* 21 Cal. Rptr. 3d 611 (Cal. 2004); Motion at 5.

element of all libel claims, but it is an element wholly separate from the fault element. *See Cole v. Chandler*, 2000 ME 104, ¶ 5, 752 A.2d 1189, 1193 (listing "an unprivileged publication to a third party" separate from "fault amounting at least to negligence on the part of the publisher" among the four elements of a libel claim). *Piper* simply does not provide any analysis that assists this Court in determining the alleged duties or fault of BookSurge.

*Anderson v. New York Telephone Co.*, 320 N.E.2d 647, 649 (N.Y. 1974), a <u>concurring</u> opinion[7] analyzed and heavily cited by Ms. Sandler (Motion at 7, 9), also does not address the concept of fault. The opinion merely noted that lessors of equipment used in the printing or transmission of a libelous message are not liable <u>regardless of the lessor's knowledge</u>. 320 N.E.2d at 649. In other words, the *Anderson* concurring opinion discussed a third category of libel defendants that are completely exempt from libel liability at common law. The concurring opinion in *Anderson* is simply irrelevant to Ms. Sandler's argument.[8]

  *4. The "Primary" and "Secondary" Publisher Distinction is a Fiction.* Several of the recent cases and treatises cited in Ms. Sandler's Motion also demonstrate that the distinction between "primary" and "secondary" publishers has become a distinction without a difference. For example, a treatise cited in Ms. Sandler's Motion (Motion at 11), Rodney A. Smolla's *Law of Defamation*, noted that "The importance of the special

---

[7] Ms. Sandler's Motion did not note that it was citing a concurring opinion of two justices of the New York Court of Appeals and that the majority of the court, in a one sentence decision referring to the appellate division's dissenting opinion, merely reinstated the supreme court's dismissal of the case. 320 N.E.2d at 647.

[8] Finally, *Hart v. Bennet* (Motion at 5) provides a simple discussion of publisher vs. republisher liability and does not define the difference between primary and secondary publishers or hold that the defendant is a primary publisher that can be imputed with knowledge of the challenged publication. 672 N.W.2d 306, 318 (Wis. Ct. App. 2003).

13

common-law 'scienter' requirement for secondary publishers such as distributors, vendors, or libraries has been obviated to some degree by <u>modern constitutional fault standards</u>, which would normally require some notice of the defamatory character of the statement to impose liability in any event, . . ." R. Smolla, *Law of Defamation*, § 4:92 (2d ed., updated 2007) (emphasis added)). Similarly, the *Grace* decision cited by Ms. Sandler also noted that "[a] primary publisher, such as an author or a publishing company, is presumed to know the content of the published material, has the ability to control the content of the publication, and therefore generally is held liable for a defamatory statement, <u>provided that constitutional requirements imposed by the First Amendment are satisfied</u>." 16 Cal. Rptr. 3d at 198 (emphasis added)). Finally, the Reporter's Notes for Restatement (Second) of Torts § 581, which Ms. Sandler describes at pages 5-6 of her Motion, state that the difference between authors and publishers and entities that merely deliver and transmit publications may be irrelevant post-*Gertz*: "This would seem to be affected by the holding in *Gertz* . . . . Since *Gertz* [] and the elimination of strict liability, the difference is not as significant as it once was.").[9]

Following *Gertz*, liability must arise from fault, not labels. What BookSurge actually did in this case, and its role in the virtual printing process, was to assume no duty to review for content. This is consistent with Maine law and the First Amendment. Based on the record before the Court, no duty should attach.

*5. The Distortion of the Evidentiary Record.* Perhaps cognizant that the record does not support the imposition of a duty on BookSurge, Ms. Sandler goes to great

---

[9] Ms. Sandler citation to Restatement (Second) of Torts § 581 (Motion at 5-6) should, therefore, be considered in the context of this caveat.

lengths to distort the record and portray BookSurge as a traditional publisher of *Help Us Get Mia*.

First, Ms. Sandler claims that the "published by" reference on *Help Us Get Mia*'s copyright page is the "most compelling indicia of Booksurge's role" (Motion at 7, 10). As noted above, however, Mr. Calcagni alone made this reference. BASMF ¶ 36. BookSurge did not write, review or edit this page, and the reference to BookSurge as "publisher" is contrary to the suggested copyright format on the BookSurge website. BASMF ¶¶ 35-39. Ralph Calcagni's apparent decision to refer to BookSurge as "publisher" on the copyright page is no more a "compelling indicia" of its role than would be a similar reference to Random House if Mr. Calcagni chose to identify Random House as the publisher on that page.

Second, BookSurge did not "actively solicit[]" *Help Us Get Mia* or any other titles. Motion at 3, 8, 9, 10. Ralph Calcagni sought out and initially contacted BookSurge through an internet-based web-landing page, and BookSurge responded to Ralph Calcagni's inquiry. BASMF ¶¶ 11-12. These interactions cannot be equated with a traditional publisher—seeking particular authors and books for publication based on the content, and paying those authors for the right to publish their books. BASMF ¶¶ 63-65, 68-69.

Third, BookSurge did not market *Help Us Get Mia*. BASMF ¶¶ 40-42. BookSurge does not "market" self-published works in the way a traditional publisher does. BASMF ¶¶ 40-42. Ms. Sandler does not allege that BookSurge, for example, sponsored any book signings or speaking engagements, sought or promoted reviews of the book, circulated media copies of the book, issued press releases, or any of the other

marketing campaigns funded and operated by traditional publishers. BASMF ¶¶ 66-67. Aside from the sale of the book itself, Ms. Sandler fails to identify any "marketing" of *Help Us Get Mia* by BookSurge.

Fourth, Ms. Sandler claims that the identification of BookSurge as a "PUBLISHER" (Kubetz Aff., Ex. 3 at BS000002) in the terms and conditions posted on BookSurge's website provides further support for concluding that BookSurge is a traditional publisher. Motion at 8. This label, however, does not automatically make BookSurge a "publisher" that has a duty to read and review its customers' manuscripts, especially where the undisputed record shows that BookSurge does not exercise editorial control over its customers' manuscripts and that BookSurge's activities with respect to *Help Us Get Mia* were limited to printing and distribution. BASMF ¶¶ 16-34, 43-57, 63-64; *see also Maynard*, 297 N.W.2d at 506-07 (refusing to hold Port Publications liable even though Port played a role in the publication process, had "publications" in its corporate name, and played a role more equivalent to a traditional publisher in the case of other publications that were not challenged by Maynard).

Finally, Ms. Sandler claims that BookSurge has "unparalleled" access to certain distribution channels. Motion at 3, 9, 10. The undisputed record, however, demonstrates that any distribution BookSurge performs is limited to listings on websites (BASMF ¶¶ 44-48), or the use of automated electronic feeds (BASMF ¶¶ 47-48). In this case, "distribution" was limited to 80 copies of *Help Us Get Mia* sold on the Amazon.com and BookSurge websites. BASMF ¶¶ 53-54, 57.

If anything, Ms. Sandler's reliance on these factors demonstrates that BookSurge did nothing more than print and distribute *Help Us Get Mia*. Section III.A.1. of this

memorandum demonstrates that printing and distribution do not create a duty to read and review for content.

**B.      The Communications Decency Act Bars Liability.**

Alternatively, if the Court were to accept Ms. Sandler's broad notion of BookSurge as equivalent to a traditional "publisher," BookSurge would qualify for immunity under the federal Communications Decency Act ("CDA"), 47 U.S.C. § 230, *et seq.* Under § 230(c)(1), "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." BookSurge is a provider of an "interactive computer service," which is defined broadly as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions." *Id.* § 230(f)(2). BookSurge operates a website[10] that provides self-publishing authors access to a computer server through which they can upload completed PDF manuscripts of their own creation. BASMF ¶¶ 11-12, 21, 25-27.

As such, BookSurge customers are the "information content providers," which are defined by the CDA as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3). The content is then made available

---

[10] An "interactive computer service" includes website operators. *See Gentry v. eBay, Inc.*, 121 Cal. Rptr. 2d 703, 714 n.7 (Cal. Ct. App. 2002); *Carafano v. Metrosplash.com*, Inc., 207 F. Supp. 2d 1055, 1066 (C.D. Cal. 2002), *aff'd on other grounds*, 339 F.3d 1119 (9th Cir. 2003); *Schneider v. Amazon.com, Inc.*, 31 P.3d 37, 40-41 (Wash. Ct. App. 2001).

through purchase on the Internet. BASMF ¶¶ 44-48, 53-54. Indeed, this is the sole manner in which BookSurge made content available in this case.

Although the information created by BookSurge customers may be "provided" to end users in hard copy or electronic form,[11] the CDA does not limit its immunity based on this distinction. For example, Craigslist should not be held liable solely because one of its end users may elect to print a copy of a posted advertisement, rather than viewing it on the screen. *See, e.g.*, *Chicago Lawyers' Committee for Civil Rights Under Law, Inc. v. Craigslist, Inc.*, --- F.3d ----, No. 07-1101, Slip op. at 8-10 (7th Cir. March 14, 2008) (holding that Craigslist, the operator of a website that permits users to post ads for available housing and other goods, is a publisher that receives CDA immunity from liability under the federal Fair Housing Act). The decision of BookSurge or a BookSurge customer to make a self-published manuscript available in hard copy, rather than as an electronic manuscript, should not dictate whether the CDA applies.

Because BookSurge is a provider of an interactive computer service and BookSurge's customers act as information content providers, the CDA bars Ms. Sandler's claims.[12]

---

[11] BookSurge's posted terms and conditions, relied upon by Ms. Sandler, specifically anticipate that a manuscript uploaded to BookSurge may be sold and transmitted to customers either electronically or in hard copy. Kubetz Aff., Ex. 3 at BS000003; BASMF ¶ 60.

[12] The last five pages of Ms. Sandler's Motion are dedicated to her view of the elements of her libel, false light, and private facts claims. Motion at 10-15. Although she does not seek dispositive relief on these elements, the Court should take note that this section of Ms. Sandler's Motion commits the same mistake as the preceding 10 pages—a failure to recognize that fault amounting to at least negligence is required to find a publisher, or any other entity involved in printing and distributing books, liable for libel, private facts invasion of privacy, or false light invasion of privacy. Motion at 12-14. At any rate, Ms. Sandler fails to establish the elements of these claims for the additional reasons stated in BookSurge's Motion.

## IV. CONCLUSION

The First Amendment does not permit imposing strict liability on any defamation defendant. Ms. Sandler's suggestions that BookSurge should be liable in this case based on imputed or presumptive liability is merely strict liability by another name. In a world where the technology exists to bring more speech to the public, the courts—and Congress in the CDA—have recognized that "the Internet and interactive computer services . . . offer[] 'a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity . . . [that] have flourished, to the benefit of all Americans, with a minimum of government regulation.'" *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997) (quoting 47 U.S.C. § 230(a)(3) & (4)). Requiring an internet printer to review hundreds of thousands of submissions for content will have the opposite effect—it will discourage self-publication and restrict the flow of content. The Court should reject this premise and rule in favor of more, rather than less, protected speech.

BookSurge respectfully requests that the Court deny Plaintiff's Motion for Partial Summary Judgment, and grant BookSurge's Motion.

Respectfully submitted,

BOOKSURGE, LLC

By its attorneys,

/s/ Harold J. Friedman
Harold J. Friedman
Friedman, Gaythwaite, Wolf & Leavitt
P.O. Box 4726
6 City Center
Portland, ME 04112

Stephen A. Smith (Pro Hac Vice)
Matthew J. Segal (Pro Hac Vice)
Kari Vander Stoep (Pro Hac Vice)
Kirkpatrick & Lockhart Preston
 Gates Ellis LLP
925 Fourth Avenue, Suite 2900
Seattle, Washington 98104-1158

April 2, 2008

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE AT BANGOR

| | |
|---|---|
| SHANA SANDLER, )<br>)<br>Plaintiff )<br>)<br>v. )<br>)<br>MIA CALCAGNI, )<br>RALPH CALCAGNI, )<br>MAUREEN CALCAGNI, )<br>PETER MARS, )<br>and )<br>BOOKSURGE, LLC, )<br>)<br>Defendants. )<br>) | Case No. 1:07-CV-00029-GZS |

## CERTIFICATE OF SERVICE

I hereby certify that on April 2, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

_____
Dawn M. Taylor, Legal Assistant