UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| **SHANA SANDLER**, ) | |
| ) | |
| *Plaintiff* ) | |
| ) | |
| v. ) | |
| ) | Case No. 1:07-cv-00029 |
| ) | |
| **MIA CALCAGNI** *et al*, ) | |
| ) | |
| *Defendants* ) | |
| ) | |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
## DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Plaintiff Shana Sandler opposes Defendant Booksurge's Motion for Summary Judgment (Docket No. 96) and Defendant Peter Mars' Motion for Summary Judgment (Docket No. 104)[1] and submits the following memorandum in support of her opposition.

### INTRODUCTION

Defendants Ralph and Maureen Calcagni and Peter Mars wrote, and Defendant Booksurge, LLC ("Booksurge") published, a hateful, slanderous attack against Plaintiff Shana Sandler ("Sandler") in the book *Help Us Get Mia* (the "Book"). The Book includes countless false, defamatory and outrageous statements about Sandler including, but not limited to, statements that she was a "REDACTED REDACTED REDACTED in the bathroom while a

---

[1] Defendant Mars adopted by reference the arguments contained in Booksurge's Motion for Summary Judgment on all claims of Plaintiff Shana Sandler and Incorporated Memorandum of Law (Docket No. 96), with the exception of the arguments made in Section III(A) thereof. Accordingly, because Defendant Mars' motion does not raise separate or additional claims of those made by Defendant Booksurge, Plaintiff responds to the two motions together.

school bus was waiting for her. The Book also includes numerous outrageous invasions of privacy, including the disclosures of Sandler's confidential health care information.

Defendant Booksurge, as the publisher of the Book, seeks to avoid liability for its role in the publication and dissemination of the Book by arguing that there are multiple alternative grounds for summary judgment. Although Booksurge latches on to the actual malice standard of fault that attaches to defamation cases involving statements about public officials and public figures and/or matters of public concern, it fails to establish that Plaintiff is subject to this enhanced standard of proof. Booksurge turns the constitutional analysis on its head and focuses on *its* status to argue in favor the heightened standard of proof. Once the constitutional analysis is turned around, it becomes evident that the defamatory statements in this case do not involve any public official or public figure or matters of public concern and that Sandler's claim for defamation is subject only to proof of negligence required by Maine law. This status determination also allows Sandler to recover presumed damages without demonstrating that the statements were made with actual malice and in the absence of special damages.

Booksurge is liable on Sandler's claim of defamation for the false and defamatory statements about her in the book. There are numerous statements in the Book that Plaintiff demonstrates to be false and susceptible to defamatory meaning. There are also statements in the Book that constitute defamation per se. These defamatory statements are not protected by any privilege and Sandler can recover presumed damages for their publication. The statements constituting defamation per se are actionable without special damage. While the corpus of the defamation claim can be established on the basis of many of the statements in the Book, summary judgment is inappropriate at this point because there is a genuine issue of material fact as to Booksurge's negligence and as to some of the defamatory statements in the Book.

The Book also contains statements that reveal private facts about Sandler – REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED. Again, there are genuine issues of material fact as to whether disclosing these statements would be highly offensive to a reasonable person. Therefore, summary judgment is inappropriate on the private facts claim.

## BACKGROUND

Sandler is a university student in North Carolina with plans to attend graduate school. Defendant Booksurge's Statement of Material Facts ("DSMF") ¶¶1 – 2.

Defendant Booksurge is a book manufacturer, publisher and distributor located in Charleston, South Carolina. Plaintiff's Statement of Material Facts filed in support of her Motion for Partial Summary Judgment ("PSMF") (Docket No. 88) ¶ 3.

In 2003, Sandler was a high school student attending Winthrop High School in Winthrop, Maine, where she had recently transferred from Maranacook Community High School in nearby Readfield, Maine. DSMF ¶¶ 21-24; Plaintiff's Statement of Additional Material Facts ("PSAMF") ¶ 1. Sandler became involved in a number of school activities, including cheerleading, where she met Mia Calcagni. DSMF ¶ 23; PSAMF ¶ 2. The two became friends, but that friendship was short-lived. DSMF ¶¶ 23-24. In October 2003, Sandler and other students had gathered at Tyler Tripp's home, an ex-boyfriend of Mia Calcagni. PSAMF ¶¶ 3-4. Sandler spoke with Mia and informed Mia that she was at the home of another student, Ryan LeClair. PSAMF ¶ 5.

Mia, disbelieving Sandler's response, thought Sandler was "setting her up" and set about proving it. PSAMF ¶ 6. Mia, together with two female friends, drove by Tyler Tripp's house to

see if Sandler was there. PSAMF ¶ 7. Upon driving past Tripp's house, Tripp and four other young men confronted the girls. PSAMF ¶ 8. Michelle Perry, a passenger in the vehicle, did not see Sandler among the people who confronted Mia Calcagni and the other occupants in the car. PSAMF ¶ 9. Following the confrontation, Tyler Tripp telephoned the police to complain that Mia Calcagni was harassing him which led the Maine State Police to serve Mia and Samantha Pietraszewski with paperwork directing each to stay away from Mr. Tripp. PSAMF ¶¶ 10-11. When the police spoke with Mia, she gave them "a lot of attitude" until her mother, Maureen Calcagni, told the officer to leave. PSAMF ¶ 12. After the trooper left, Mia repeatedly expressed her anger with Sandler, calling her a "Jew" and saying that she would find a way to get her back for setting her up. PSAMF ¶¶ 13.

Mia followed through on her threats and on the Tuesday following the Columbus Day weekend began verbally harassing Sandler.[2] PSAMF ¶ 14. Mia Calcagni and her friends used various epithets to refer to Sandler's Jewish heritage, calling her a "Jew," verbally harassing her, making references to Sandler having undergone cosmetic surgery and spreading rumors that Sandler masturbated in the bathroom while a school bus waited for her among other torments. PSAMF ¶¶ 13, 25; DSMF ¶¶ 26, 33. Mia's harassment of Sandler rose to an ugly crescendo when Mia and another student painted swastikas on road signs near Sandler's home in Readfield over the 2003 Veterans Day weekend. DSMF ¶¶ 45-46, 55.

---

[2] Sandler was the latest victim of Mia's harassment. Mia had previously harassed Tyler Tripp by placing flyers on cars parked in the Hall-Dale High School parking lot indicating that Tyler was going to be a father and spreading rumors about herself being pregnant. PSAMF ¶¶ 15-16. She had also harassed Kristen Adams through email and instant message communications and, through her friends, harassed Josh Brougham as well. PSAMF ¶ 22-23. Nearly a month before the harassment of Sandler, Officer Carlson of the Winthrop Police Department responded to a complaint of harassment and criminal threatening over the internet involving Mia Calcagni and other students involving comments to "cut her and see what color her blood is," "then leave her on the floor twitching in her own pool of blood." PSAMF ¶ 24.

Although Maureen Calcagni had previously called the Winthrop Police in April 2003 to report that Mia was violent and physically destructive in the Calcagni home and abusive toward her parents, they became her staunch, if irrational, defenders. PSAMF ¶ 21. When Mia, Maureen and Ralph Calcagni visited the police station on November 22, 2003, Maureen claimed she knew Mia's whereabouts on the evening of the swastika incident, even though the two disagreed as to that location. PSAMF ¶ 17. Maureen claimed that Mia was at "a boy's house," but Mia disagreed; Maureen answered firmly that Mia was, in fact, at a boy's house, at which point Mia capitulated and agreed she was at a boy's house. PSAMF ¶ 18. After conducting interviews of several of the witnesses involved in the swastika painting incident on November 10, 2003, Winthrop Police Officer Lynne Doucette determined that "it was obvious" that Mia Calcagni was lying about her involvement in the incident. PSAMF ¶¶ 19-20.

When the Winthrop High School suspended Mia, Ralph and Maureen Calcagni challenged that suspension through an appeal to the Winthrop School Committee, stating that they would not accept the suspension and their plans to hold the school responsible for anything that happens to Mia. PSAMF ¶¶ 26-27. Following the January 2004 decision of the Winthrop School Committee to uphold Mia Calcagni's suspension, Ralph and Maureen Calcagni filed a complaint with the Maine Department of Education against the Winthrop Schools. PSAMF ¶¶ 28-29.

Ralph and Maureen Calcagni also took their cause to the public. On January 5, 2004 their "letter to the citizens of Winthrop and surrounding communities" was published in the *Kennebec Journal* to "counter the lies that originated in school and were allowed to continue without intervention until our daughter's name is cleared and the truth is known." PSAMF ¶ 30. The letter discussed, without naming Sandler, the harassment between Sandler and Mia. PSAMF

¶ 31. After this letter, Ralph Calcagni had one or two additional letters to the editor published on the topic of the ongoing harassment between Sandler and Mia Calcagni. PSAMF ¶ 32. Ralph and Maureen Calcagni also spoke about the perceived harassment of Mia with several dozen individuals, some of whom wrote their own letters to the editor in support of Mia. PSAMF ¶¶ 33-36. The *Capital Weekly* eventually reported the decision of the Maine Attorney General to charge Shannon Thayer-Adams and Mia Calcagni with a civil hate crime on April 23, 2004 for their role in painting the swastikas on the street signs near Sandler's home. PSAMF ¶¶ 37-38. That story, however, did not mention Sandler. PSAMF ¶ 39.

Mia Calcagni was eventually tried and convicted of criminal mischief for her involvement in painting the swastikas on street signs near Sandler's home. DSMF ¶ 55. An appeal was unsuccessful. DSMF ¶ 56. The Maine Attorney General subsequently charged Mia with a civil hate crime for the same acts, and Mia entered into a consent decree with the Attorney General's Office to resolve the complaint. DSMF ¶¶ 59, 61.

Having lost their battle with the Winthrop schools and the courts, and unable to persuade the public through their letters to the editor, the Calcagnis decided to produce the Book. They solicited and obtained the help of a local author, Defendant Peter Mars. Their goal was to "tell their side of the story." DSMF ¶¶ 65-67. The Book depicts Sandler unfavorably and chronicles several events involving her as a student at Maranacook Community High School and Winthrop High School, including her interactions with Mia Calcagni. PSMF ¶ 4. Ralph Calcagni entered into an "Author Publishing Agreement" with Booksurge, LLC to publish the Book in print. PSMF ¶¶ 6-7. The publication of the Book, and its statements about Sandler, form the basis for this litigation. DSMF ¶ 95.

Summary judgment is appropriate only when the facts, so marshaled, demonstrate that "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Mandel v. The Boston Phoenix, Inc.*, 456 F.3d 198, 205 (1st Cir. 2006) (*quoting DuPoutot v. Raffaelly*, 424 F.3d 112, 117 (1st Cir. 2005)). "In this regard, 'material' means that a contested fact has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant." *Navarro v. Pfizer Corp.*, 261 F.3d 90, 93-94 (1st Cir. 2001). "By like token, 'genuine' means that the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party." *Id.*

In determining whether this burden is met, the Court must view the record in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences in its favor. *Santoni v. Potter*, 369 F.3d 594, 598 (1st Cir. 2004). This requirement is not a hollow one and summary judgment "should be granted only where . . . [further] inquiry into the fact is not desirable to clarify application of the law." *Mandel*, 456 F.3d at 205 (quoting *Stevens v. Howard D. Johnson Co.*, 181 F.2d 390, 394 (4th Cir. 1950)).

## ARGUMENT

## I.    SANDLER'S CLAIMS FOR DEFAMATION AGAINST BOOKSURGE ARE SUBJECT ONLY TO PROOF OF NEGLIGENCE AS ESTABLISHED BY MAINE LAW.

The foundational question in a defamation claim is whether the statement involves a public official or figure or a matter of public concern and this inquiry should be conducted as a threshold matter. *Mandel v. The Boston Phoenix, Inc.*, 456 F.3d 198, 204 – 05 (1st Cir. 2006); *Pendleton v. City of Haverhill*, 156 F.3d 57, 66 – 67 (1st Cir. 1998); *Kassel v. Gannett Co.*, 875

F.2d 935, 938 – 39 (1st Cir. 1989); *see also, Snead v. Redland Aggregates Ltd.,* 998 F.2d 1325, 1328 (5th Cir. 1993) ("[o]nly after making these findings can we properly analyze various issues raised on appeal, as the status of the libel plaintiff and the alleged libelous speech determines the minimum constitutionally-required standard of fault."); *See also In Re: IBP Confidential Business Documents Litigation*, 797 F.2d 632, 644 – 45  8th Cir. 1986).

Short of imposing liability without fault, states may define for themselves the appropriate standards regarding defamation of private individuals.  *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 347 (1974).  Maine allows "private person" recovery so long as negligence is proven. *Lester v. Powers*, 596 A.2d 65, 69 (Me. 1991)*; see also Levinsky's, Inc. v. Wal-Mart Stores, Inc.,* 127 F.3d 122, 128 (1st Cir. 1997).  However, if the statement is about a plaintiff who is a public official or public figure or involves a matter of public concern, federal constitutional law bars libel recoveries absent clear and convincing proof of "actual malice," *i.e.,* knowledge of falsity or reckless disregard for the truth.  *See Gertz*, 418 U.S. at 342; *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964).  In addition, the actual malice standard is applied to recoveries of presumed and punitive damages in these situations.  *Gertz*, 418 U.S. at 348; *see also Baker v. Charles,* 919 F. Supp. 41, 46 (D. Me. 1996).  A private individual seeking to recover damages for libel on matters of private concern, however, is not subject to the actual malice standard and can recover for defamation on the state law elements of the tort and can recover presumed and punitive damages without showing actual malice.  *Gertz*, 418 U.S. 349; *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 761.

A defamation defendant bears the burden of establishing that the defamatory statement involves either a public official or public figure or a matter of public concern, or both. *Galarneau v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 504 F.3d 189, 199 (1st Cir. 2007).

Only if the defendant succeeds in satisfying this threshold requirement does the First Amendment impose special burdens on a plaintiff. *Id.* The defendant's burden extends only to establishing the *plaintiff's* status or that the challenged statements involve a matter of public concern; the defendant's status, in a defamation claim, is of little consequence and does not affect or otherwise alter the constitutionally-required standard of fault. The fundamental First Amendment principle is that "the inherent worth of speech in terms of its capacity for informing the public does not depend on the identity of its source." *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 767 (1978); *Dun & Bradstreet, Inc.*, 472 U.S. at 773 and n.4 (White, J. concurring in result).

Booksurge asks this Court to turn the analysis of the constitutionally-required standard of fault on its head, arguing that *its* status requires the imposition of the heightened, constitutionally-required actual malice standard of fault and that the "public concern" privilege requires dismissal of all claims.[3] This analysis represents a misapplication of the law. Booksurge bears the burden of establishing that Sandler is either a public official or public figure or that the statements in the Book constitute matters of public concern. Otherwise, Sandler is only required to prove that the defamatory statements in the Book were disseminated with negligence. *Galarneau*, 504 F.3d at 199; *See Kassel*, 875 F.2d at 938-39.

---

[3] Defendant mistakenly characterizes this threshold analysis as a "privilege" – referring to a "public concern" privilege and arguing the privilege is absolute and requires dismissal of all claims. This characterization is incorrect. Statements involving public concern alter the constitutionally-required standard of fault. A privilege, by contrast, does not change the actionable quality of words published, but serves only to rebut the inference of malice that is imputed in the absence of a privilege. *Galarneau v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 504, F.3d 189, 198 (1st Cir. 2007) (*citing Saunders v. VanPelt*, 497 A.2d 1121, 1124 (Me. 1985). Where a conditional privilege exists, "liability for defamation attaches only if the person who made the defamatory statement loses the privilege [by] abusing it. *Lester*, 596 A.2d at 69. A conditional privilege may be abused if the defamatory statement is made with reckless disregard at to its falsity. *Cole*, 2000 ME 104, 752 A.2d at 1194.

**A.  Sandler is Not a Public Official or Public Figure**

Sandler is not a public official or public figure and Booksurge has failed to present any evidence of such status. *Galarneau*, 504 F.3d at 199  The determination of whether a plaintiff is a public figure or public official necessitates a detailed, fact-specific determination. *Rosenblatt v. Baer*, 383 U.S. 75, 83 (1966); *Pendleton v. City of Haverhill*, 156 F.3d 57, 61 (1st Cir. 1998); *Penobscot Indian Nation v. Key Bank*, 112 F.3d 538, 561 (1st Cir. 1997); *Mandel v. The Boston Phoenix*, 456 F.3d 198, 207 (1st Cir. 2006).  Roughly defined, public officials include those officials who hold particular kinds of public office with an analysis that focuses on the inherent attributes of the position that define it as one of influence over issues of public importance, its special access to the media as a means of self-help and a risk of diminished privacy upon assuming the position. *Time, Inc. v. Pape,* 401 U.S. 279, 281 (1971); *Hutchinson v. Proxmire*, 443 U.S. 111, 119 n.8 (1979); *Kassel v. Gannett Co.*, 875 F.2d 935, 939 (1st Cir. 1989).  Public figure status has the same legal impact as the public official designation, but the two terms are not synonymous. *Kassel*, 875 F.2d at 941 n.4.  Public figures may or may not be public officials; at the very least they are persons "who have assumed roles of especial prominence in the affairs of society." *Gertz*, 418 U.S. at 345.

Booksurge has failed to present any evidence in support of its burden that Sandler is either a public official or public figure.  The only evidence Booksurge has put forth on Sandler is that she is a senior at High Point University in North Carolina and hopes to attend graduate school.  DSMF ¶ 1-2.  This establishes that Sandler is a private individual and not a public employee or someone who has achieved a heightened prominence in the affairs of society.  Booksurge has failed to satisfy its burden of proving that Sandler is a public official or public figure and by not arguing this point, waived it.  Accordingly, the only basis to require Sandler to

prove that the defamatory statements were made with actual malice would be if they relate to matters of public concern.

**B.     The Statements Are Not Matters of Public Concern Because They Do Not Have An Impact Beyond the Parties in this Controversy**

Matters of public concern are those that can be "fairly considered as relating to any matter of political, social or other concern to the community," while matters of private concern address "matters of only personal interest." *Levinsky's, Inc. v. Wal-Mart Stores, Inc.*, 127 F.3d 122, 132 (1st Cir. 1997) (*quoting Connick v. Myers*, 461 U.S. 138, 146 – 147 (1983)). Locating particular statements along the public/private continuum is not easy, but the determination is made by examining the expression's "content, form and context . . . as revealed by the whole record." *Dun & Bradstreet*, 472 U.S. at 761 (*quoting Connick v. Myers*, 461 U.S. 138, 147-148 (1983)); *Levinksy's*, 127 F.3d at 128. Courts called upon to make such a determination have found the *Connick* line of cases – involving public employees terminated for making comments that arguably relate to matters of public concern – to be instructive, an analogy approved by the Supreme Court and encouraged by the First Circuit Court of Appeals. *Dun & Bradstreet*, 472 U.S. at 759; *Levinsky's*, 127 F.3d at 132.

The defamatory statements at issue in this litigation, identified in DSMF ¶¶ 98-108, involve statements about Sandler, her background, and events that occurred while she was a high school student. These include, but are not limited to, statements that Sandler was a REDACTED REDACTED REDACTED REDACTED had problems at Maranacook Community High School, REDACTED REDACTED while a school bus waited for her, among other statements. *Id.* None of the defamatory statements can be "fairly considered as relating to any matter of political, social or other concern to the community," *Connick*, 461 U.S. at 146-147.

Booksurge cursorily contends that, because the "feud" between Sandler and Mia Calcagni involved a criminal proceeding and an appeal, a civil hate crime proceeding and school disciplinary proceeding, this somehow endows the events in the Book as matters of public concern. The argument, however, is fallacious. The challenged statements in this suit are statements about Sandler, not Mia Calcagni. It was *Mia Calcagni*, not Sandler, who was convicted by the Maine District Court of painting swastikas adjacent to Sandler's home. DSMF ¶ 55. It was Mia Calcagni who was separately charged with a hate crime by the Maine Attorney General and who entered into a consent decree. DSMF ¶ 61. Sandler was the victim of that criminal activity. As such, her personal affairs, health records and a salacious rumor about masturbation do not become matters of public concern.

The question of matters of public concern versus private matters is definitional: do the statements relate to matters "of political, social or other concern to the community" or are they merely "matters of only personal interest?" *Levinsky's*, 127 F.3d at 132. That determination is made by looking at the "content, form and context" of the defamatory expressions. *Dun & Bradstreet*, 472 U.S. at 761. Booksurge has failed to provide this required examination, but even if it is undertaken, the examination demonstrates that the alleged defamatory statements about Shana Sandler (as opposed to the Book as a whole) relate to no matter of public concern.

Looking at the form of the statements, they are disseminated through a "print-on-demand" book which Ralph Calcagni paid Booksurge to publish. DSMF ¶¶ 68, 75. An author or publisher cannot make a matter one of public concern simply by disseminating a statement into the public domain. *Snead,* 998 F.2d at 1330. However, the limited dissemination of statements supports finding that it does not relate to a matter of public interest. *Dun & Bradstreet*, 472 U.S. at 762 (dissemination of five false credit reports did not relate to matters of

public concern.)  Here, beyond the Calcagni family and Ralph Calcagni's efforts to distribute the Book to local bookstores, only 80 copies were purchased online through the Amazon.com and Booksurge.com websites.  DSMF ¶¶ 84-87.  Booksurge concedes in its Statement of Material Facts that the Book received limited dissemination.  *Id.*

The content of the defamatory statements does not raise any matters of public concern. While many of the statements come from records obtained through juvenile court proceedings, the Supreme Court has made clear that individuals do not forfeit their "degree of protection which the law of defamation would otherwise afford them simply by being drawn into a courtroom."  *Time, Inc. v. Firestone,* 424 U.S. 448, 457 (1976).  It is hard to imagine that the content of the challenged defamatory statements could "reasonably be expected to have an impact beyond the parties directly enmeshed in the particular controversy."  *In re IBP Confidential Business Documents Litigation*, 797 F.2d 632, 635 (8th Cir. 1986).

Like the content of the statements, the context indicate that they were not made in response to any existing matter of public concern.  Ralph and Maureen Calcagni have attempted to intertwine their defense of Mia with the spate of unrelated teen suicides that occurred in Winthrop between 2003 and 2005 and suggest some link between the charges brought against their daughter and five suicides of members of the Winthrop High School football team.  No plausible relationship exists.  According to a report released by the Maine Youth Suicide Prevention Program in the aftermath of the final suicide, drug and alcohol use and anti-social behavior in Winthrop exceed state averages, which may have been a factor in the suicides. PSAMF ¶¶ 46, 48.  Following the suicides, however, it was never suggested that cheerleader rivalries, student discipline, bullying or student conflicts at Winthrop High School in any way contributed to the suicides.  PSAMF ¶¶ 41, 43, 45, 47, 49.  It stretches the imagination and

makes light of the deaths of five individuals to suggest there is any reasonable connection between the five suicides and statements that Sandler masturbated in a girl's bathroom, that she is a Jew-Bag or that she had problems in high school.

Nor was there an existing "public" concern over student discipline and harassment at the local high school beyond Ralph and Maureen Calcagni and their friends. Public controversies, like existing public concerns, exist where issues affect the public and not merely the litigants. *Time, Inc. v. Firestone*, 424 U.S. 448, 454 (1976) (divorce by doyenne of Palm Beach society, though a "cause célèbre" in certain social circles, did not concern a matter of general public interest); *Norris v. Bangor Publ'g Co.*, 53 F. Supp. 2d 495, 503 (D. Me. 1999). Here, the issues affected only the Calcagni family. They wrote a letter on the perceived harassment of their daughter to the editor of a newspaper, addressed to the residents of Winthrop and the surrounding communities. PSAMF ¶ 30. Ralph Calcagni went on to write an additional one or two letters to the editor on this same topic. PSAMF ¶ 32. Ralph and Maureen Calcagni spoke with several dozen people about their daughter's plight and Andy and Claudia Pipes, close friends of the Calcagnis, followed suit and wrote their own letters to the editor in support of Mia Calcagni. PSAMF ¶¶ 33-36. Even though Ralph and Maureen Calcagni persisted in this defense of their daughter, the statements in the Book that are challenged in this lawsuit – statements about Sandler and not Mia – simply fail to affect anyone beyond the Plaintiff.

The three relevant factors discussed above strongly support the conclusion that the statements at issue in the Book involve a matter of purely private concern. Viewed in the light most favorable to Sandler as the non-moving party, Sandler's claim for defamation is subject only to the negligence standard established by Maine law for "private" plaintiff defamation and

she can recover presumed and punitive damages without demonstrating that the defamatory statements were made with actual malice.

## II.   BOOKSURGE IS LIABLE ON SANDLER'S CLAIM OF DEFAMATION FOR THE FALSE AND DEFAMATORY STATEMENTS ABOUT HER CONTAINED IN THE BOOK.

In order to state a claim for defamation in Maine, a private person must establish (a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting to at least negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication. *Penobscot Indian Nation v. Key Bank of Maine*, 112 F.3d 538, 559 (1st Cir. 1997).

### A.   Booksurge is the Publisher of the Book and Liable for any Defamatory Statements in It

Plaintiff adopts and incorporates by reference the arguments contained in her Motion for Partial Summary Judgment (Docket No. 87) and her Statement of Material Facts (Docket No. 88) that Booksurge is the publisher of the Book and, as the publisher, is liable for any defamatory statements or invasions of privacy contained therein.

### B.   The Book Contains False and Defamatory Statements About Sandler

The Book contains a number of false and defamatory statements about Sandler, couched as opinions, that imply the existence of undisclosed defamatory facts. Despite Booksurge's arguments, there are a number of actionable false and defamatory statements in the Book that are (1) untrue, (2) actionable as statements of mixed opinion and fact and, as set forth below (3) unprotected by any privilege.

A statement is defamatory if it "tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him."

*Rippett v. Bemis*, 672 A.2d 82, 86 (Me. 1996). A statement couched as an opinion is actionable if it presents or implies the existence of facts which are capable of being proven true or false. *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18 – 19 (1990); *see also* RESTATEMENT (SECOND) OF TORTS § 566 (1977). The actionability of the statement depends on whether it contains an objectively verifiable assertion.[4] To determine whether a statement is an opinion, a court "must 'examine the statement in its totality and the context in which it was uttered or published. The court must consider all the words used . . . [and] must give weight to cautionary terms used by the person publishing the statement.' Finally, the court must consider all the circumstances surrounding the statement." *Yohe v. Nugent*, 321 F.3d 35, 41 (1st Cir. 2003) (*citing Lyons v. Globe Newspaper Co.*, 415 Mass. 258, 263, 612 N.E.2d 1158 (1993)).

The statements in the book, identified in DSMF ¶¶ 103, 106 – 108 and organized below by (1) statements that relate to Sandler's background, (2) statements made in the music room and (3) statements about Sandler generally, are all actionable because they state facts or present opinions that contain undisclosed facts which are capable of being proven false.

### 1. Statements About Sandler's Background

The Book contains the following false and defamatory statements about Plaintiff: **"Shana had many problems at Maranacook," "Shana . . . was being made fun of by some of the students**

---

[4] The *Milkovich* Court explained factual asserted cloaked as opinions as follows:

> If a speaker says, "In my opinion John Jones is a liar," he *implies a knowledge of facts* which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, *if those facts are either incorrect or incomplete*, or *if his assessment of them is erroneous*, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications; and the statement, "In my opinion Jones is a liar," can cause as much damage to reputation as the statement, "Jones is a liar."

*Milkovich*, 497 U.S. at 18 – 19 (emphasis added).

there . . . [and] had been running alone, "she . . . had no friends in the new school." DSMF ¶ 103.

While Sandler has conceded the truth of the statements about her experience at Maranacook Community High School, (Plaintiff's Response to Defendant's Statement of Material Facts ("Pl. Resp. to DSMF") ¶¶ 115 – 118), the statement that Sandler "had no friends in the new school" is untrue and susceptible to a defamatory meaning. PSAMF ¶ 55. Booksurge's Statement of Material Facts contains no statements that refute this assertion. Booksurge's assertion in its Motion that Sandler has conceded the truth of this statement is false and is unsupported by its Statement of Material Facts. Accordingly, there is no basis for summary judgment as to this statement.

### 2.    Music Room Statements

The Book contains the following false and defamatory statements about Sandler, which the Book indicates occurred in the high school music room: Sandler was harassed at Maranacook Community High School because she REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED. DSMF ¶¶ 107-108. These statements are false; REDACTED REDACTED REDACTED REDACTED REDACTED. PSAMF ¶¶ 50-51, 54. They are also defamatory statements of fact because they would tend to lower Sandler's reputation in the community and deter people from associating with her.

These statements appear in a segment of the Book that paints the initial character portrait of Sandler and underlies the rest of the book. These statements appear within pages of epithets about Sandler – that she is a REDACTED REDACTED REDACTED RE – amidst the more factual opinions about Sandler, especially her experience at her former high school. These include that she had "many problems" there, was "made fun of by some of the students there"

and "had been running alone."  This is the context in which the statements appear that Sandler

REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED

REDACTED

In addition to the context, this court must also evaluate all the circumstances surrounding the statements.  *Yohe*, 321 F.3d at 41.  The circumstances here are the publication of the Book that paints a very unflattering picture of Sandler and depicts her as a social miscreant and sexual deviant.  From these circumstances and the shameful character sketch drawn of Sandler, it is incredible that Booksurge suggests that the music room statements should not be taken as assertions of fact, but only as an attempt by the school administration to justify disciplinary action against Mia.  The argument lacks credibility.

### 3.    Generalized Statements About Sandler

The Book contains the false and defamatory generalized statements that Sandler is a

REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED

REDACTED    REDACTED    REDACTED    REDACTED    REDACTED    REDACTED

REDACTED.  DSMF ¶ 106.  Summary judgment is inappropriate on these statements because some statements are equally susceptible to conflicting meaning and because there are genuine issues of material fact concerning the statements.

Summary judgment is inappropriate on the statement that Sandler is a REDACT because the term is susceptible to conflicting meanings.    REDACTED REDACTED REDACTED

REDACTED REDACTED REDACTED REDACTED.  *See* Section II(f) infra.  Booksurge concedes the word could have this meaning, but argues that the statement in the Book that Sandler is a REDAC "obviously" has no such meaning because the word was contained in a voluntary police statement by Samantha Pietraszewski.  As already discussed, the context and

circumstances for this statement are a literary attack on Sandler. REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED. Such a construction is particularly supportable here where the Book separately describes Sandler REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED. While Booksurge may find its definition of the term REDACTED to suggest something different, the term is equally susceptible to other logical and conflicting meanings. Summary judgment is inappropriate on whether the term REDACTED is defamatory because the statement and the context in which it was made are capable of conflicting interpretations. *Haworth v. Feigon*, 623 A.2d 150, 156 (Me. 1993).

The statements that Sandler REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDAC. Pl. Resp. to DSMF ¶ 27. Such a singular statement, however, does not rise to the level of "rumors," that Booksurge alleges Sandler to have spread. Mia Calcagni, however, was actively spreading rumors that she was pregnant with Tyler Tripp's baby. PSAMF ¶¶ 15-16. REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTE. REDA. DSMF ¶32. This is only hearsay on the part of the Calcagnis that such a statement was made and is far from being conclusive on this point. The Defendant's evidence on this point is wholly insufficient to establish that the statement is true. This point is disputed and therefore summary judgment is inappropriate on this point.

Summary judgment is equally inappropriate on the statement that REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED

REDACTED REDACTED REDACTED REDACTED REDACTED R. Pl. Resp. to DSMF ¶ 125. This falls short of establishing that Sandler spread *rumors*, plural, about this. There is a genuine issue of material fact whether Sandler engaged in the alleged action and therefore summary judgment is inappropriate as it relates to these statements.

### C. The Defamatory Statements in the Book Were Unprivileged

The defamatory statements in the Book are not protected by the "fair reports" privilege. The privilege protects the publication of defamatory matter concerning another contained in a report or an official report or record of an official action, proceeding, or meeting open to the public that deals with a matter of public concern. But as Booksurge has conceded, Maine does not recognize such a privilege. *Booksurge, LLC's Motion for Summary Judgment on All Claims of Plaintiff Shana Sandler*, p. 19. While Booksurge would invite this court to recognize such a privilege, the U.S. Court of Appeals for the First Circuit has already expressly refused to recognize such a privilege in Maine law. *Penobscot Indian Nation*, 112 F.3d at 561 n. 30. Even if Maine were to recognize such a privilege, the defamatory statements contained in the Book would not be protected because, as discussed above, they do not relate to matters of public concern.

### D. There is a Genuine Issue of Material Fact Concerning Booksurge's Negligence

A genuine issue of material fact exists concerning Booksurge's negligence in publishing the defamatory statements in the Book. Booksurge argues that it was not negligent in publishing the Book because it was not the publisher and had no "duty" to determine the accuracy of the Book's content. Booksurge concedes it did absolutely nothing to verify any of the facts set forth in the Book.

The existence of a material issue of fact precludes the entry of summary judgment concerning an issue. *Penobscot Indian Nation*, 112 F.3d at 559 – 560. "If, after . . . canvassing . . . the material presented, the district court finds that *some* genuine factual issue remains in the case, whose resolution one way or another *could* affect its outcome, the court must deny the motion." *Lipsett v. University of P. R.,* 864 F.2d 881, 885 (1st Cir. 1988) (emphasis original). Negligence is a jury question and [s]ummary judgment is inappropriate in [cases involving] negligence . . . if genuine issues of material fact exist or if reasonable jurors could draw different inferences from agreed facts." *Taylor v. Gallagher*, 737 F.2d 134, 137 (1st Cir. 1984); *Penobscot Indian Nation*, 112 F.3d at 560 (*citing Anderson v. Liberty Lobby, Inc.*, 477  U.S. 242, 248 (1986).

Given the negligence standard in Maine – what a reasonably prudent person would do acting under like circumstances – a jury could find negligence in this case that makes the imposition of summary judgment inappropriate. *Penobscot Indian Nation,* 112 F.3d at 560 (*citing Lambert v. Tripp*, 560 A.2d 1097, 1100 (Me. 1989); *Wing v. Morse*, 300 A.2d 491, 499 (Me. 1973); RESTATEMENT (SECOND) OF TORTS § 283 (1978)).  Plaintiff's designated expert witness, H. Allen Fernald, is a publishing executive with over forty years experience.  PSAMF ¶¶ 56-57.  He previously served as a Vice President at CBS, Inc. in various publishing divisions and started the book publishing operation at Down East Enterprise, Inc., which publishes 20 to 25 books a year.  PSAMF ¶¶ 57-58.  Mr. Fernald testified at his deposition that a book publisher like Booksurge has a duty to review the manuscript of *Help Us Get Mia* in an effort to ensure that it was suitable for publication and to check for factual accuracy before publication and dissemination.  PSAMF ¶¶ 57.  One of the considerations that would make a book inappropriate to publish is a manuscript that contains material that is "libelous, scurrilous or objectionable."

PSAMF ¶ 60. Mr. Fernald testified that if a reasonably prudent publisher reviewed a manuscript that contained statements that one of the book's characters had REDACTED REDACTED REDACTED REDACTED REDACTED, and similar statements, those statements should raise red flags that would require a close review of the manuscript. PSAMF ¶¶ 61-62.

Summary judgment is inappropriate in this case. There is a dispute about what a reasonably prudent person acting in Booksurge's position would have done upon receiving a manuscript like *Help Us Get Mia*. Reasonable jurors could come to different conclusions on the question of negligence. They could conclude that Booksurge's "head in the sand" approach to fact checking is below the accepted standard of care expected of a reasonably prudent publisher. Because there is a legitimate jury question on the issue of negligence, summary judgment is inappropriate.

### E. Because Sandler is a Private Individual and the Statements Do Not Involve Matters of Public Concern, Sandler Can Recover Presumed Damages

Sandler's "private person" defamation claim allows her to recover presumed damages without a showing of actual malice and without proof of actual injury. Section I, *supra; Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 761 (1986). Under traditional rules in "private person" defamation claims, the existence of injury is presumed from the fact of publication and juries may award sums as compensation for such damage to reputation without proof that the harm actually occurred. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349 (1974); *Galarneau*, 504 F.3d at 203. Maine adheres to this rule. *Galarneau*, 504 F.3d at 203. While Booksurge has suggested that Plaintiff's failure to demonstrate actual damages to date is evidence that she cannot recover damages, this overlooks the Plaintiff's entitlement to presumed damages. Plaintiff's status as a private person allows her to recover compensation without proving actual, quantifiable losses.

### F. The Book Contains Statements That Constitute Defamation Per Se And Are Actionable Irrespective of Special Damages

The statements in the Book that Sandler was "playing with herself in the bathroom while a school bus waited for her," that she "was caught fingering herself" and that she is a REDACTE constitute defamation per se and are actionable without proof of special damages.[5]

A statement that falsely charges a punishable offense constitutes slander per se. *Rippett v. Bemis*, 672 A.2d 82, 86 (1996). Once the doctrine is applicable, it relieves the burden of proving actual damages as a prerequisite to recovery. *Levinsky's v. Wal-Mart Stores, Inc.*, 127 F.3d 122, 135 (1st Cir. 1997). Here, the statements that Sandler was "playing with herself" and "caught fingering herself" move beyond rhetorical hyperbole and falsely accuse Sandler of engaging in the crime of indecent conduct by engaging in a sexual act and by exposing her genitals under circumstances that are likely to cause affront or alarm in violation of 17-A M.R.S.A. § 854. Such a violation constitutes a Class E crime in Maine. *Id.* These statements are false; Sandler has never masturbated in public or been caught "fingering herself." PSAMF ¶¶ 53-54, 57.

These statements also constitute defamation per se because they accuse Sandler of immoral and unethical acts. RESTATEMENT (SECOND) OF TORTS § 569, *comment f.* As the comment to the RESTATEMENT explains, "[i]t is actionable per se to accuse in libelous form either a man or woman of any sexual misconduct irrespective of whether the misconduct constitutes a criminal offense or whether it harms the other in his business, trade or profession." *Id.*

---

[5] This memorandum uses the term "special damages" in accordance with the common law definition, i.e., "'[g]eneral damages' are compensatory damages for harm so frequently resulting from the tort that it is the basis of the action that the existence of the damages is normally anticipated,' whereas '[s]pecial damages ' are compensatory damages for a harm other than one for which general damages are given.'" *Galarneau*, 504 F.3d at 203 n.8 (*citing* RESTATEMENT (SECOND) OF TORTS § 904(1) (1979).

REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED.

These statements constitute defamation per se and relieve Sandler of the burden of proving special damages. Sandler can recover general damages without having to prove causation, including "elements of mental suffering, humiliation, embarrassment, effect upon reputation and loss of social standing, so far as they . . . may reasonably be presumed." *Galarneau*, 504 F.3d at 203-04; *Saunders*, 497 A.2d at 1124-25.

### III.     The Book Contains Statements That Are Invasions of Sandler's Privacy

The statements in the Book that Sandler underwent plastic surgery, REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED about Plaintiff and constitute an invasion of her privacy. DSMF ¶¶ 131, 131(a), 132, 133. However, there is a genuine issue of material fact

concerning whether publication of these facts would be highly offensive to a reasonable question that precludes the entry of summary judgment on this claim.

One who gives publicity to a matter concerning the private life of another is subject to liability for invasion of his privacy, "if the matter publicized is of a kind that (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public." *Nelson v. Maine Times*, 373 A.2d 1221, 1225 (Me. 1976); *see also* RESTATEMENT (SECOND) OF TORTS § 652D. The publicity given must be to "matters concerning the private, as opposed to the public, life of the person involved." *Nelson*, 373 A.2d at 1225. The matters need be of a kind not widely known; they do not need to be secrets held inviolate and known to no one other than their keeper. RESTATEMENT (SECOND) OF TORTS § 652D, *comment b.* As a comment to the Restatement notes:

> Every individual has some phases of his life and his activities and some facts about himself that he does not expose to the public eye, but keeps entirely to himself *or at most reveals only to his family or to his close personal friends.* Sexual relations, for example, are normally private matters, as are family quarrels, many unpleasant or disgraceful or humiliating illnesses, most intimate personal letters, most details of a man's life in his home, and some of his past history that he would rather forget. When these intimate details of his life are spread before the public gaze in a manner highly offensive to the ordinary reasonable man, there is an actionable invasion of his privacy, unless the matter is one of legitimate public concern.

RESTATEMENT (SECOND) OF TORTS § 652D, *comment b* (emphasis added); *cited by Veilleux v. National Broadcasting Co.,* 8 F. Supp. 2d 23, 37 (D. Me. 1998). The publicity must also be to a matter that is not a *legitimate* matter of public concern.[6] *Nelson*, 373 A.2d at 1225 (emphasis added). Finally, the publicity must be highly offensive to a reasonable person.

---

[6] As this Court has previously explained, "[t]he inquiry involved in determining matters of legitimate public concern to the public for the purposes of the invasion of privacy tort of public disclosure of private fact is distinct from that used to determine whether a defamatory statement regards a matter of public concern." *Veilleux*, 8 F. Supp. 2d at 37 n.5.

Publication of the statements in the Book that Sandler underwent REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED DSMF ¶¶ 141, 143, 150.  *See* RESTATEMENT (SECOND) OF TORTS § 652D, *comment b.* REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED RED.  Nor are these matters of legitimate public concern – which typically is regarded as news that includes crimes, arrests and deaths among others.  *See* RESTATEMENT (SECOND) OF TORTS § 652D, *comment g.*  REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACT.  Similarly, the decision to transfer schools and the circumstances that led to that request, are not of public concern.  The circumstances that bring a new student to a school are not matters of legitimate public concern.  A student might be tuition-paying or live in a family situation (such as divorced or separated parents) that allows her to attend the school as a matter of right.  These circumstances are not matters of legitimate public concern.

There is a genuine issue of material fact as to whether public disclosure of these private facts about Sandler would be highly offensive to a reasonable person.  Booksurge cursorily argues, without support, that disclosure of these private facts would not be highly offensive to a reasonable person.  Plaintiff disagrees and reasonable jurors could reach different conclusions.  Accordingly, summary judgment is inappropriate on this issue.

**CONCLUSION**

For the reasons stated in this memorandum, Plaintiff respectfully requests that Booksurge's Motion for Summary Judgment on All Claims of Plaintiff Shana Sandler be denied.

Dated at Bangor, Maine, this 14th day of April, 2008.

PLAINTIFF, Shana Sandler,

By: ___*/s/ Bernard J. Kubetz*_____

Bernard J. Kubetz, Esq.
Michael R. Clisham, Esq.
EATON PEABODY
P. O. Box 1210
80 Exchange Street
Bangor, Maine 04402-1210
(207) 947-0111
bkubetz@eatonpeabody.com

**CERTIFICATE OF SERVICE**

I, Bernard J. Kubetz, hereby certify that on April 14, 2008, I electronically filed the foregoing Plaintiff's Opposition to Defendants' Motions for Summary Judgment with the Clerk of the United States District Court using the CM/ECF system, which will send notification of such filing to the following:

Bruce Mallonee, Esq.
Rudman & Winchell, LLC
P. O. Box 1401
Bangor, Maine 04402-1401
bmallonee@rudman-winchell.com

Steven P. Wright, Esq.
Kirkpatrick & Lockhart Preston Gates Ellis LLP
State Street Financial Center
One Lincoln Street
Boston, Massachusetts 02111-2950
steven.wright@klgates.com

Matthew J. Segal, Esq.
Stephen A. Smith, Esq.
Kirkpatrick & Lockhart Preston Gates Ellis LLP
925 Fourth Avenue, Suite 2900
Seattle, Washington 98104-1158
matthew.segal@klgates.com

J. William Druary, Jr., Esq.
Marden, Dubord, Bernier & Stevens
P. O. Box 708
Waterville, Maine 04903-0708
bdruary@mardendubord.com

Harold J. Friedman, Esq.
Friedman, Gaythwaite Wolf & Leavitt
P. O. Box 4726
Portland, Maine 04112-4726
hfriedman@FGWL-law.com


*/s/ Bernard J. Kubetz*_____ _____
Bernard J. Kubetz