UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

|  |  |  |
|---|---|---|
| **SHANA SANDLER**, | ) | |
| | ) | |
| *Plaintiff* | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 1:07-cv-00029 |
| | ) | |
| **MIA CALCAGNI** *et al*, | ) | |
| | ) | |
| *Defendants* | ) | |
| | ) | |

---

### PLAINTIFF'S RESPONSE TO DEFENDANT BOOKSURGE'S STATEMENT OF MATERIAL FACTS AND PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS

---

Plaintiff Shana Sandler submits her Response to Defendant Booksurge's Statement of Material Facts in Opposition to Defendant Booksurge's Motion for Summary Judgment and her Statement of Additional Material Facts pursuant to Fed. R. Civ. P. 56 and Local Rule 56(c) as follows.

### PLAINTIFF'S RESPONSE TO DEFENDANT BOOKSURGE'S STATEMENT OF MATERIAL FACTS

1.      Admitted.

2.      Admitted.

3.      Admitted.

4.      Admitted.

5.      Admitted.

6.      Admitted.

7.      Admitted.

Dockets.Justia.com

8.      Admitted.

9.      Admitted.

10.     Admitted.

11.     Admitted.

12.     Denied.  Booksurge is a book manufacturer, publisher and distributor located in Charleston, South Carolina.  Affidavit of Bernard J. Kubetz in Support of Plaintiff's Motion for Partial Summary Judgment, dated March 5, 2008 ("Kubetz Aff."), Ex. 1 at 10:23-25; 11:20-22; 15:14-20;  26:1-13;  28:1-15;  28:24-25;  30:24-25;  31:1-20;  Ex. 7, *"Help Us Get Mia"* at BS000046; Kubetz Aff., Ex. 3 at BS000003.

13.     Admitted.

14.     Admitted.

15.     Admitted.

16.     Admitted.

17.     Admitted.

18.     Admitted.

19.     Admitted.

20.     Admitted.

21.     Admitted.

22.     Admitted.

23.     Admitted.

24.     Admitted.

25.     Admitted.

26.     Admitted.

27.     Qualified.  Ms. Sandler made the statement that "the baby's kicking."  She made this statement in the presence of others and was not explicitly in reference to Mia Calcagni.  Ms. Sandler never mentioned Ms. Calcagni's name.  Segal Dec., Ex. E-2 at 27:1 - 28:5; 63:19-25.

28.     Admitted.

29.     Admitted.

30.     Admitted.

31.     Qualified.  The Winthrop Police Department issued "Notice to Quit" to both Mia Calcagni and Shana Sandler forbidding each to have contact with the other pursuant to 17-A M.R.S.A. § 506A.  These are not "restraining orders" or a court order of any kind.

32.     Admitted.

33.     Admitted.

34.     Admitted.

35.     Admitted.

36.     Admitted.

37.     Admitted.

38.     Admitted.

39.     Admitted.

40.     Denied.  The record citation provided by Defendant establishes that the Calcagnis contended that the school district failed to protect their daughter from sexually harassing pregnancy rumors spread by an individual identified as "Student B" and that the school district fabricated the masturbation accusation against Mia Calcagni.  The citation does not establish that Plaintiff spread the alleged pregnancy rumors.  Segal Dec., Ex. E-2.

41.     Admitted.

42.     Admitted.

43.     Admitted.

44.     Admitted.

45.     Admitted.

46.     Admitted.

47.     Admitted.

48.     Admitted.

49.     Admitted.

50.     Admitted.

51.     Admitted.

52.     Admitted.

53.     Admitted.

54.     Admitted.

55.     Admitted.

56.     Admitted.

57.     Admitted.

58.     Admitted.

59.     Admitted.

60.     Admitted.

61.     Admitted.

62.     Qualified.  Mia Calcagni's criminal actions in painting swastikas in and around Shana Sandler's home led to investigations by police and the Maine Attorney General, criminal proceedings and an appeal and a civil hate crime proceeding.  *See* Segal Dec., Ex. E-2 (*State of*

*Maine v. Mia Calcagni*) at 1-3; Ex. G at 18:18 - 19:3; Ex. E-2; Ex. U at 3, 17-18; Ex. H-12. Defendants Ralph and Maureen Calcagni complained to the U.S. Department of Education's Office of Civil Rights concerning the treatment of Mia Calcagni by the Winthrop School Department which, in turn, investigated their complaint. Segal Dec., Ex. E-2 (OCR Decision) at 1. The behavior between Ms. Sandler and Mia Calcagni only led to school disciplinary proceedings. Segal Dec., Ex. P at WHS000421-422; Ex. O at WHS000575-576.

63.  Qualified. The record citation provided by Defendant establishes that the swastika incident received print and media broadcast attention. Segal Dec., Ex. I at 98:16 – 100:3; Ex. I-8; Ex. H at 87 – 91; Ex. H-12. The publicity surrounding the personal dispute between Ms. Sandler and Mia Calcagni did not receive print or media attention, but was publicized by Defendants Ralph and Maureen Calcagni through open letters to the community in a local newspaper and through a similar letter from close personal friends of theirs. Segal Dec., Ex. I at 98:16 - 100:3; Ex. I-8.

64.  Denied. The record citation provided by Defendant does not stand for this factual proposition. The *Sports Illustrated* article and the local newspaper articles regarding the five suicides in Winthrop between 2003 and 2005 have no relation to the racial, ethnic and personal animus of Ralph, Maureen and Mia Calcagni to Shana Sandler that is the focus of the book. Segal Dec., Ex. DD, Ex. E-4.

65.  Admitted.

66.  Denied. *See* Declaration of William Druary, Ex. A at 20:8-16 ("Q: And how much did you charge [the Calcagnis]? A: $3,000. Q: And what was involved in that charge? What did they get for $3,000? A: I would take the material they gave me, transcribe it onto the computer, put it in the order that seemed to make the most sense, making sure that the grammar

was correct, and then return it to them for their approval. And that was it."), 26:4-6 ("Q: You – it's my understanding that it's your position that you were not the author of the book; is that correct? A: That is correct.").

67. Denied. The manuscript *Help Us Get Mia* is a characterization and interpretation of the personal dispute between Mia Calcagni and Shana Sandler and the investigations by the police and Maine Attorney General, the criminal proceeding and appeal, the civil hate crime proceeding and the school disciplinary proceedings. Segal Dec., Ex. E-4; s*ee also,* Druary Dec., Ex. A at 20:11-16, 26:4-6.

68. Denied. Ralph Calcagni published *Help Us Get Mia* through an "Author Publishing Agreement" with Booksurge, LLC. The assertion that Ralph Calcagni "self-published" the book through Booksurge is contrary to express terms and conditions governing the relationship between the parties. Kubetz Aff., Ex. 7, *"Help Us Get Mia"* at BS00045; Kubetz Aff., Ex. 1 at 47:6-9, 48:6-14; Kubetz Aff., Ex. 4 at BS000001 – BS000007.

69. Qualified. Plaintiff admits that Booksurge offers no fact-checking or editing services to its authors, but denies that it merely prints books for self-publishing authors. Booksurge is a book manufacturer, publisher and distributor who actively seeks and promotes the books of its authors. Plaintiff's Statement of Material Facts, filed in support of her motion for Partial Summary Judgment, ¶¶ 3, 9, 11 – 13.

70. Admitted.

71. Admitted.

72. Admitted.

73. Admitted.

74. Admitted.

75.    Admitted.

76.    Admitted.

77.    Admitted.

78.    Qualified.  Plaintiff admits that Maureen Calcagni testified that she hired Mr. Mars to provide independent fact-checking services.  Plaintiff denies that Maureen Calcagni testified that she hired Mr. Mars to provide editing services.  Segal Dec., Ex. H at 123:17-19 ("Q: Was it your understanding that Mr. Mars was editing the book? A: No).  Plaintiff denies the statement to the extent it is attributed to Ralph Calcagni; the statement does not cite supporting testimony or other admissible evidence from Mr. Calcagni.

79.    Denied.  Druary Dec., Ex. A at 171:14-15 ("contact people . . ." but not "fact-check" or "edit"), 202:13-18 (probably Calcagni's impression Mars would "talk to" witnesses, but not "fact-check" or "edit").

80.    Admitted.

81.    Admitted.

82.    Admitted.

83.    Denied.  The material cited does not support this proposition.  Mr. Calcagni stated that the book *Help Us Get Mia* was available for purchase through Amazon.com and that he was aware of that; Mr. Calcagni, in the material cited, did not state that the book was available through Amazon.com as a result of any effort or choice of his own.  He merely confirmed his awareness of this fact.  In addition, the material cited contains no reference for the proposition that Mr. Calcagni opted to have *Help Us Get Mia* available for sale on Booksurge's website. Segal Dec., Ex. I at 52: 2 – 9.

84.    Admitted.

85.  Admitted.

86.  Admitted.

87.  Admitted.

88.  Admitted.

89.  Admitted.

90.  Admitted.

91.  Admitted.

92.  Admitted.

93.  Admitted.

94.  Admitted.

95.  Admitted.

96.  Admitted.

97.  Admitted.

98.  Qualified.  Plaintiff admits that the statement is a true and accurate representation of the passage of *Help Us Get Mia* that it purports to reference, but otherwise denies any organization, categorization or reference accorded to it by Booksurge that is not within the language of this numbered statement.

99.  Qualified.  Plaintiff admits that the statement is a true and accurate representation of the passage of *Help Us Get Mia* that it purports to reference, but otherwise denies any organization, categorization or reference accorded to it by Booksurge that is not within the language of this numbered statement.

100.  Qualified.  Plaintiff admits that the statement is a true and accurate representation of the passage of *Help Us Get Mia* that it purports to reference, but otherwise denies any

organization, categorization or reference accorded to it by Booksurge that is not within the language of this numbered statement.

101.    Qualified.  Plaintiff admits that the statement is a true and accurate representation of the passage of *Help Us Get Mia* that it purports to reference, but otherwise denies any organization, categorization or reference accorded to it by Booksurge that is not within the language of this numbered statement.

102.    Qualified.  Plaintiff admits that the statement is a true and accurate representation of the passage of *Help Us Get Mia* that it purports to reference, but otherwise denies any organization, categorization or reference accorded to it by Booksurge that is not within the language of this numbered statement.

103.    Qualified.  Plaintiff admits that the statement is a true and accurate representation of the passage of *Help Us Get Mia* that it purports to reference, but otherwise denies any organization, categorization or reference accorded to it by Booksurge that is not within the language of this numbered statement.

104.    Qualified.  Plaintiff admits that the statement is a true and accurate representation of the passage of *Help Us Get Mia* that it purports to reference, but otherwise denies any organization, categorization or reference accorded to it by Booksurge that is not within the language of this numbered statement.

105.    Qualified.  Plaintiff admits that the statement is a true and accurate representation of the passage of *Help Us Get Mia* that it purports to reference, but otherwise denies any organization, categorization or reference accorded to it by Booksurge that is not within the language of this numbered statement.

106.     Qualified.  Plaintiff admits that the statement is a true and accurate representation of the passage of *Help Us Get Mia* that it purports to reference, but otherwise denies any organization, categorization or reference accorded to it by Booksurge that is not within the language of this numbered statement.

107.     Qualified.  Plaintiff admits that the statement is a true and accurate representation of the passage of *Help Us Get Mia* that it purports to reference, but otherwise denies any organization, categorization or reference accorded to it by Booksurge that is not within the language of this numbered statement.

108.     Qualified.  Plaintiff admits that the statement is a true and accurate representation of the passage of *Help Us Get Mia* that it purports to reference, but otherwise denies any organization, categorization or reference accorded to it by Booksurge that is not within the language of this numbered statement.

109.     Admitted.

110.     Admitted.

111.     Admitted.

112.     Admitted.

113.     Denied.  Ms. Sandler provided her definition of a "slut" as someone who goes around and sleeps with people, but then immediately denied that definition applied to her.  Segal Dec., Ex. F at 251:18-20 ("A. From my personal understanding, a slut is someone who goes around and sleeps with people, and I don't go around and sleep with people.")

114.     Admitted.

115.     Admitted.

116.     Admitted.

117.    Admitted.

118.    Admitted.

119.    Admitted.

120.    Qualified.  This statement mischaracterizes Ms. Sandler's statement.  Ms. Sandler stated that she did not believe there was anything wrong with having a tattoo that means something significant, but finds tattoos offensive when they are hurtful toward others.  Segal Dec., Ex. F at 119:21 – 120:14.

121.    Admitted.

122.    Admitted.

123.    Qualified.  Ms. Sandler admits that she made the statement to the individual in the instant message exchange that Mia Calcagni was expelled from school; Ms. Sandler denies starting rumors, plural, about this event.  Ms. Sandler admits she made the statement that "the baby's kicking," but denies that she started rumors, plural, about this occurrence.  Segal Dec., Ex. E-2 at 27:1 - 28:5; 63:19-25.

124.    REDACTED     REDACTED     REDACTED     REDACTED     REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED

125.    REDACTED     REDACTED     REDACTED     REDACTED     REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED

126.    Admitted.

127.    Admitted.

128.  Admitted.

129.

    a.    Admitted.

    b.    Admitted.

    c.    Admitted.

130.  Admitted.

131.

    a.    Admitted.

    b.    Admitted.

132.  Admitted.

133.

    a.    Admitted.

    b.    Admitted.

134.  Admitted.

135.  Admitted.

136.  Admitted.

137.  Admitted.

138.  Admitted.

139.  Admitted.

140.  Admitted.

141.  Admitted.

142.  Admitted.

143.  Admitted.

144.    Admitted.

145.    Qualified.  The newspaper article written by the Calcagnis revealed the transfer of a student to Winthrop High School under a Superintendent's Agreement, but did not explicitly mention Ms. Sandler by name.  Segal Dec., Exhibit I-8.

146.    Admitted.

147.    Admitted.

148.    Admitted.

149.    Admitted.

150.    REDACTED     REDACTED     REDACTED     REDACTED     REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED.

151.    REDACTED     REDACTED     REDACTED     REDACTED     REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED

152.    REDACTED     REDACTED     REDACTED     REDACTED     REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED.

153.    Admitted.

154.    Admitted.

155.    Admitted.

156.    Admitted.

157.    Admitted.

158.    Admitted.

159.    Admitted.

**PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS**

<u>The Events at Winthrop High School</u>

1.      Shana Sandler transferred to Winthrop High School in Winthrop, Maine from Maranacook Community High School in Readfield, Maine in March 2003.  Segal Dec., Ex. E at 9:21-23, 10:2-8, 16:8-15; Segal Dec., Ex. E-2 (Sandler Hate Crime Deposition) at 10:2-4, 17:9-10; Segal Dec., Ex. Q at MCH000008

2.      At Winthrop, Ms. Sandler was involved in a number of extracurricular activities, including varsity soccer, varsity cheering, competition cheering, plays, and vocal competitions among others.  Segal Dec., Ex. E at 17:23 - 18:9.

3.      Mia Calcagni and Tyler Tripp, a student at Hall-Dale High School, were involved in a romantic relationship prior to October 2003.  Segal Dec., Ex. H-15 at CAL00091; Ex. S at 02167.

4.      On October 11, 2003, Columbus Day Weekend, Shana Sandler and other students were gathered at Tyler Tripp's house.   Segal Dec., Ex. E at 22:19 - 24:16; Ex. H-15 at CAL000091 – 92.

5.      During the Columbus Day Weekend gathering at Tyler Tripp's house, Shana Sandler spoke with Mia Calcagni and Shana informed Mia that she was at the home of another student, Ryan LeClair.  Segal Dec., Ex. H-15 at CAL000091; Ex. S at 02167.

6.      Mia Calcagni did not believe that Shana was at Ryan LeClair's home and believed that Shana was "setting her up."  Segal Dec., Ex. H-15 at CAL000091 – 92; Ex. S at 02167; Ex. T at 02612.

7.      Mia Calcagni decided that she and her friends, Michelle Perry and Samantha Pietraszewski, should drive by Tyler Tripp's house to see if Shana was there and lying about being at Ryan LeClair's home.  Segal Dec., Ex. H-15 at CAL000091 – 92.

8.      Upon driving past Tyler Tripp's house, Tripp and four other young men confronted Mia Calcagni, Michelle Perry and Samantha Pietraszewski.  Segal. Dec., Ex H-15 at CAL000092; Ex. T at 02613.

9.      Michelle Perry did not see Shana among the people who confronted the Mia Calcagni, Samantha Pietraszewski and herself.  Segal Dec., Ex. H-15 at CAL000092.

10.      Following the confrontation near Tyler Tripp's home, Tyler telephoned the police to complain that Mia Calcagni was harassing him.  Segal Dec., Ex. H-15 at CAL000093.

11.      The Maine State Police served Mia Calcagni and Samantha Pietraszewski with paperwork directing each to stay away from Tyler Tripp.  Segal Dec., Ex. H-15 at CAL000092 – 93; Ex. S at 02168; Ex. T at 02613.

12.      Mia Calcagni gave the police a "lot of attitude" and her mother, Maureen Calcagni, told the officer to leave.  Segal Dec., Ex. T at 02613.

13.     After the trooper left, Mia Calcagni expressed her anger with Shana Sandler by referring to her as a "Jew," and by saying repeatedly that she would find a way to get her back for setting her up.  Segal Dec., Ex H-15 at CAL000092 - 93; Ex. H-27; Ex. T at 02613.

14.     On the Tuesday following the Columbus Day Weekend in 2003, Mia Calcagni began verbally harassing Shana Sandler.  Segal Dec., Ex H-15 at CAL000093.

15.     Ms. Calcagni started rumors about herself being pregnant.  Segal Dec., Ex. H-15 at CAL 000091, 000093; Segal Dec., Ex. T, at 02612.

16.     Mia Calcagni placed flyers on cars parked in the Hall-Dale High School parking lot indicating that one of the Hall-Dale students (Tyler Tripp) was going to be a father.  Segal Dec., Ex. T at 02612.

17.     On November 22, 2003 Mia Calcagni, together with Ralph and Maureen Calcagni, came to the Winthrop Police Station.  Maureen Calcagni claimed she knew her daughter's whereabouts on November 10, 2003, but Mia and Maureen disagreed about Mia's location on that evening.  Segal Dec., Ex. Y at WHS000027.

18.     At the police station, Maureen claimed Mia was at a boy's house, while Mia disagreed.  Maureen answered firmly that Mia was at a boy's house, at which point Mia capitulated and agreed that she was at a boy's house.  Segal Dec., Ex. Y at WHS000027.

19.     After conducting interviews of several of the witnesses involved in the swastika painting incident on November 10, 2003, Winthrop Police Officer Lynne Doucette determined that it was obvious that Mia Calcagni was lying about her involvement in the incident.  Segal Dec., Ex. Y at WPD000029.

20.     Officer Doucette determined that the sworn statement Mia Calcagni gave to her whereabouts on the evening of November 10, 2003 was invalid and that Mia lied in that

statement and attempted to have the others students involved in the swastika painting incident lie as well.  Segal Dec., Ex. Y at WPD000029.

21.     Officer Doucette recounted Mia Calcagni's involvements with the Winthrop Police Department to include an incident on April 26, 2003 in which Maureen Calcagni called the police to request an officer to respond and speak with them about Mia's destructive behavior, in which Mia was violent, physically destructive in the Calcagni home and verbally abusive toward her parents.  Segal Dec., Ex. Y at WPD000030.

22.     Officer Doucette recounted that on August 7, 2003, Lisa Adams, mother of Kristen Adams, called in reference to Kristen being harassed by Mia Calcagni over the telephone and through email and instant message communications.  The harassment included threats of physical harm to Kristen on August 5, 2003.  Segal Dec., Ex. Y at WPD000030.

23.     Officer Doucette recounted that on August 13, 2003, Joshua Brougham reported being harassed by friends of Mia Calcagni.  Segal Dec., Ex. Y at WPD000030.

24.     Officer Doucette recounted that on September 24, 2003, Officer Carlson responded to a complaint of harassment and criminal threatening over the internet involving Mia Calcagni, Annette Krumback, Kayla Hart, Sara Wilson and Sam Giampetro to comments to "cut her and see what color her blood is," "then leave her on the floor twitching in her own pool of blood."  Segal Dec., Ex. Y at WPD000031.

25.     Mia Calcagni made statements at school that referred to Shana Sandler masturbating in a bathroom while a school bus waited for her.  Segal Dec., Ex. F-34.

### Ralph & Maureen Calcagni's Defense of Mia

26.     On December 29, 2003 Ralph and Maureen Calcagni appealed the decision of the Principal of Winthrop High School to suspend Mia Calcagni to the Winthrop School Committee,

stating that "[i]t is clear from [Principal] Phil's [Richardson] ridiculous response that there is no willingness on the administration's part to amicable [sic] resolve this. We totally disagree with what he says and will not accept this." Segal Dec., Ex. P at WHS000409 - WHS000410, WHS000421 - WHS000422.

27.    In their letter to the Chair of the Winthrop School Committee appealing Mia's suspension, Ralph and Maureen Calcagni indicated that they planned to hold the school responsible for Mia's physical, emotional, mental and educational well-being as they "relate to the matters (rumors) that originate at Winthrop High School. IF ANYTHING HAPPENS TO MIA THAT SCHOOL WILL BE HELD RESPONSIBLE." Segal Dec., Ex. P at WHS000419.

28.    On January 27, 2004 the Chair of the Winthrop School Committee informed Ralph and Maureen Calcagni that it had voted 3-2 to uphold the decision to suspend Mia Calcagni. Segal Dec., Ex. P at WHS000405 – WHS000406.

29.    On February 15, 2004 Ralph and Maureen Calcagni filed a complaint with the Maine Department of Education alleging various individuals in the Winthrop Schools, some involved with the suspension of Mia Calcagni, denied Mia a free and appropriate education. Segal Dec., Ex. H-14.

30.    On January 5, 2004 Ralph and Maureen Calcagni published "A letter to the citizens of Winthrop and surrounding communities" in the *Kennebec Journal* to "counter the lies that originated in school and were allowed to continue without intervention until our daughter's name is cleared and the truth is known." Segal Dec., Ex. F-40.

31.    The January 5, 2004 "A letter to the citizens of Winthrop and surrounding communities" in the *Kennebec Journal* discussed without naming Shana Sandler, the harassment between Shana and Mia. Segal Dec., Ex. F-40.

32.     After the "A letter to the citizens of Winthrop and surrounding communities," Ralph Calcagni published one or two additional letters to the editor on the topic of the ongoing harassment between Shana Sandler and Mia Calcagni.  Kubetz Dec., Ex. 4 at 74:15 – 76:8.

33.     Ralph and Maureen Calcagni discussed the harassment of their daughter with several dozen individuals.  Segal Dec., Ex. I at 100:14-21.

34.     Ralph and Maureen Calcagni discussed the harassment of their daughter with Andy and Claudia Pipes, friends of theirs.  Segal Dec., Ex. I at 99:18-22.

35.     Andy and Claudia Pipes published a letter in a local newspaper entitled "We can be silence [sic] no more" on the topic of the perceived harassment of Mia Calcagni.  Segal Dec., Ex. I-8.

36.     Andy and Claudia Pipes published a letter to the editor in the *Capital Weekly* entitled "Teen Damaged" on the subject of the perceived harassment of Mia Calcagni.  Segal Dec., Ex. I-4.

<u>Media Attention to the Hate Crime</u>

37.     The decision of the Maine Attorney General to charge Shannon Thayer-Adams and Mia Calcagni with a civil hate crime was reported in the *Capital Weekly* on April 23, 2004.  Segal. Dec., Ex. I-4.

38.     The April 23, 2004 *Capital Weekly* story concerning Mia Calcagni and Shannon Thayer-Adams indicated that the basis for the state's charges was spray painting swastikas on the road in the proximity of a student Mia Calcagni and Shannon Thayer-Adams knew to be Jewish.  Segal Dec., Ex. I-4.

39.     The April 23, 2004 *Capital Weekly* story does not mention Shana Sandler by name.  Segal Dec., Ex. I-4.

<u>Media Attention to the Suicides of Five Winthrop Football Players</u>

40.     The January 9, 2006 *Sports Illustrated* article entitled "What Went Wrong in Winthrop? One high school football team, five suicides in three years.  Can we learn anything?" by E.M. Swift describes five suicides of current or former members of the Winthrop High School football team between April 2003 and June 2005.  Segal Dec., Ex. EE.

41.     The January 9, 2006 *Sports Illustrated* article does not describe or reference student discipline, harassment, bullying or inter-student conflict at Winthrop High School.  Segal Dec., Ex. EE.

42.     The newspaper article by Chris Churchill entitled "Winthrop confronts youth suicides" describes the efforts by Winthrop school officials to address the youth suicide problem in the aftermath of a report released by the Maine Youth Suicide Prevention Program.  Segal Dec., Ex. DD.

43.     The newspaper article by Chris Churchill entitled "Winthrop confronts youth suicides" does not describe or reference student discipline, bullying or inter-student conflict at Winthrop High School.  Segal Dec., Ex. EE.

44.     The newspaper article by Chris Churchill entitled "Winthrop officials discuss report on spate of suicides" discusses a meeting in which Winthrop's elected officials gathered to discuss the report by the Maine Youth Suicide Prevention Program on five suicides.  Segal Dec., Ex. EE.

45.     The newspaper article by Chris Churchill entitled "Winthrop officials discuss report on spate of suicides" does not describe or reference student discipline, bullying or inter-student conflict at Winthrop High School.  Segal Dec., Ex. EE.

46.     The *Associated Press* newspaper article entitled "Cluster of youth suicides prompts local gathering" describes a meeting in which Winthrop residents discussed how the town should move forward after a report by the Maine Youth Suicide Prevention Program suggesting that drugs and alcohol use and anti-social behavior in Winthrop exceed state averages.  Segal Dec., Ex. EE.

47.     The *Associated Press* newspaper article entitled "Cluster of youth suicides prompts local gathering" does not describe or reference student discipline, bullying or inter-student conflict at Winthrop High School.  Segal Dec., Ex. EE.

48.     The June 23, 2005 newspaper article in the *Kennebec Journal* by Chris Churchill entitled "A town asks why" describes the suicides of Jason Marston, Lee St. Hilaire, Bryant "Mox" Donovan, Troy Ellis and Chad Garwood between April 2003 and June 2005, the higher-than-average youth suicide rate in Maine, and the attempts by Winthrop school officials to address the problem.  Segal Dec., Ex. EE.

49.     The June 23, 2005 newspaper article in the *Kennebec Journal* by Chris Churchill entitled "A town asks why" does not describe or reference student discipline, bullying or inter-student conflict at Winthrop High School.  Segal Dec., Ex. EE.

<u>The False Statements About Shana Sandler</u>

50.     While a student at Maranacook Community High School in Readfield, Maine, Shana Sandler did not masturbate in public or in a women's restroom at the high school, nor did she knowingly expose her genitals at the high school in a manner likely to cause affront or alarm. Declaration of Shana Sandler in Support of Plaintiff's Memorandum in Opposition to Defendant Booksurge and Defendant Mars' Motions for Summary Judgment ("Sandler Dec.") ¶ 2.

51.     Shana Sandler was never caught masturbating "or fingering" herself at Maranacook Community High School while a bus waited for her.  Sandler Dec. ¶ 2.

52.     REDACTED REDACTED REDACTED REDACTED REDACTED REDACTE.

53.     REDACTED     REDACTED     REDACTED     REDACTED     REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED.

54.     REDACTED     REDACTED     REDACTED     REDACTED     REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED.

55.     Shana Sandler formed friendships with a number of students at Winthrop High School, including Michelle Perry, Dan Dumais, Matt McCarthy, Dan Lemhuere and Anne Norris among several others.  Sandler Dec. ¶ 5.

<u>Booksurge's Negligence in Publishing "<em>Help Us Get Mia</em>"</u>

56.     H. Allen Fernald is the Chairman of Down East Enterprise, Inc. and, from 1977 – 2002, served as the President and C.E.O. of Down East Enterprise.  He is also the Managing Director of Performance Media Group, LLC.  Declaration of Bernard J. Kubetz in Support of Plaintiff's Memorandum in Opposition to Defendant Booksurge and Defendant Mars' Motion for Summary Judgment ("Kubetz Dec."), Ex. 1.

57.     Prior to working at Down East Enterprise, Mr. Fernald spent nine years working for CBS, Inc. in various publishing divisions and groups.  Between 1970 and 1977, Mr. Fernald was the publisher of higher educational materials at CBS.  Kubetz Dec., Ex. 1; Ex. 3 at 16:24-25, 17:20-25, 18:1-5.

58.     Mr. Fernald started the book publishing operation at Down East Enterprise, which publishes 20 to 25 books a year.  Kubetz Dec., Ex. 3 at 24:20-24, 25:14-16, 26:9-11.

59. Mr. Fernald, in his report, stated that publishers have a responsibility to review manuscripts before publication to ensure that they are appropriate for publication. As the publisher of the book *"Help Us Get Mia,"* Mr. Fernald stated that Booksurge had a duty to review the manuscript prior to publishing it, to make sure it was suitable for publication and to check for factual accuracy before the manuscript was finalized. Kubetz Dec., Ex. 2; Ex. 3 at 54:20-25.

60. One of the considerations that could make a book inappropriate to publish, in a publisher's opinion, would be whether manuscript contained material that is libelous, scurrilous or objectionable. Kubetz Dec., Ex. 3 at 87:3-12.

61. Mr. Fernald testified that one of the minimum duties of a publisher is to review the manuscript to satisfy for itself that the manuscript does not contain libelous material as well as material that constitutes an invasion of privacy. Kubetz Dec., Ex. 3 at 87:20 - 88:5.

62. Mr. Fernald testified that if a publisher reviewed a manuscript and determined from it that it reflected one of the people in the book to have masturbated in the girls' room at school, fingered herself in the girls' room at school, and those types of statements, in his experience and opinion, those statements would raise the type of red flag that would merit a closer review of the manuscript. Kubetz Dec., Ex. 3 at 88:7-25.

Dated at Bangor, Maine, this 14th day of April, 2008.

PLAINTIFF, Shana Sandler,

By    */s/ Bernard J. Kubetz*
        Bernard J. Kubetz, Esq.
        Michael R. Clisham, Esq.
        EATON PEABODY
        P. O. Box 1210
        80 Exchange Street
        Bangor, Maine 04402-1210
        (207) 947-0111
        bkubetz@eatonpeabody.com
        mclisham@eatonpeabody.com

**CERTIFICATE OF SERVICE**

I, Bernard J. Kubetz, hereby certify that on April 14, 2008 I electronically filed the foregoing Plaintiff's Response to Defendant Booksurge's Statement of Material Facts and Plaintiff's Statement of Additional Material Facts with the Clerk of the United States District Court using the CM/ECF system, which will send notification of such filing to the following:

Bruce Mallonee, Esq.
Rudman & Winchell, LLC
P. O. Box 1401
Bangor, Maine 04402-1401
bmallonee@rudman-winchell.com

Steven P. Wright, Esq.
Kirkpatrick & Lockhart Preston Gates Ellis LLP
State Street Financial Center
One Lincoln Street
Boston, Massachusetts 02111-2950
steven.wright@klgates.com

Matthew J. Segal, Esq.
Stephen A. Smith, Esq.
Kirkpatrick & Lockhart Preston Gates Ellis LLP
925 Fourth Avenue, Suite 2900
Seattle, Washington 98104-1158
matthew.segal@klgates.com

J. William Druary, Jr., Esq.
Marden, Dubord, Bernier & Stevens
P. O. Box 708
Waterville, Maine 04903-0708
bdruary@mardendubord.com

Harold J. Friedman, Esq.
Friedman, Gaythwaite Wolf & Leavitt
P. O. Box 4726
Portland, Maine 04112-4726
hfriedman@FGWL-law.com

*/s/ Bernard J. Kubetz*
Bernard J. Kubetz