REDACTED

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE AT BANGOR

| | |
|---|---|
| SHANA SANDLER,<br><br>Plaintiff<br><br>v.<br><br>MIA CALCAGNI,<br>RALPH CALCAGNI,<br>MAUREEN CALCAGNI,<br>PETER MARS,<br>and<br>BOOKSURGE, LLC,<br><br>Defendants. | Case No. 1:07-CV-00029-GZS |

**BOOKSURGE, LLC'S REPLY MEMORANDUM FOR SUMMARY JUDGMENT ON PLAINTIFF'S CLAIMS**

Defendant BookSurge, LLC ("BookSurge") replies to Plaintiff Shana Sandler's ("Ms. Sandler's") Memorandum in Opposition to Defendants' Motions for Summary Judgment (Dkt. No. 129/132) ("Ms. Sandler's Response"). This case began with 45 allegedly actionable statements. BookSurge, LLC's Statement of Material Facts (Dkt. No. 102/106) ("BSMF") ¶ 96. In discovery, Ms. Sandler reduced this list to 12. BSMF ¶ 97.[1] Ms. Sandler's Response abandons an additional five statements, portions of others, and entire causes of action. None of the remaining statements should proceed to trial.

**A. Ms. Sandler Silently Concedes the Majority of BookSurge's Arguments.**

Ms. Sandler's Response fails to address multiple claims and issues on which BookSurge sought summary judgment (Dkt. No. 96/103) ("BookSurge's Motion").

[1] Declaration of Matthew J. Segal ("Segal Decl.") (Dkt. No. 98/105), Ex. F (Jan. 2008 Sandler Deposition ("Sandler Def. Dep. II") Ex. 8 (Ms. Sandler's list of 12 libelous and private facts statements)).



Dockets.Justia.com

- **Actual Malice:** Ms. Sandler failed to respond to BookSurge's motion for summary judgment on the issue of actual malice (BookSurge's Motion Section III.B.2; BSMF ¶¶ 69, 89 – 93); Plaintiff's Response to Defendant BookSurge's Statement of Material Facts (Dkt. No. 130/133) ("PRSMF") ¶¶ 69, 89 – 93.

- **False Light:** Ms. Sandler did not respond to BookSurge's motion for summary judgment on her false light claims. BookSurge's Motion Section III.E.

- **Punitive Damages:** Ms. Sandler did not respond to BookSurge's motion for summary judgment on her punitive damages claim. BookSurge's Motion Section III.G.; BSMF & PRSMF ¶¶ 157, 158.

- **Special Harm:** BookSurge is entitled to summary judgment on all of Ms. Sandler's libel claims because an actionable libel claim (as opposed to libel per se) requires that a plaintiff prove special harm. *See Rippett v. Bemis*, 672 A.2d 82, 86 (Me. 1996). Ms. Sandler offered no briefing on special harm and concedes she has suffered none. BookSurge's Motion Section III.D; BSMF & PRSMF ¶¶ 153-156.

- **Libel Statements:** Ms. Sandler did not respond to BookSurge's arguments that the following statements are not libelous (BookSurge's Motion Section III.C): religious epithets; "slut" epithet; most statements pertaining to her personality; piercings/tattoo statement; and the shoplifting statement. She also conceded many of the facts that supported BookSurge's arguments. BSMF & PRSMF ¶¶ 109, 112, 114-122.

- **Private Facts:** Ms. Sandler did not respond to BookSurge's arguments that the following passages or statements are not invasions of privacy (BookSurge's Motion Section III.F): myspace.com postings; religion; enrollment at High Point University; and

decision to seek psychological care during college. She also conceded many of the facts that supported BookSurge's arguments. BSMF & PRSMF ¶¶ 134-139, 142.

On these uncontested points, summary judgment is required (*see* FRCP 56(e)(2); LR 7(b)), reducing Ms. Sandler's case to portions of her claims for libel per se and private facts.[2] The remaining claims fail for the following alternative reasons.

**B. All of Ms. Sandler's Claims Fail Because BookSurge Was Not Negligent.**

Ms. Sandler failed to establish that BookSurge had a legal duty to review the content of *Help Us Get Mia*. Absent a legal duty, BookSurge cannot be negligent. All of Ms. Sandler's libel and privacy claims fail because negligence is an essential element of those claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Ms. Sandler's Response confuses issues of law and fact (Ms. Sandler's Response at 20-22). Whether BookSurge had a duty to read and review *Help Us Get Mia* for libelous statements or invasions of privacy is a question of law. *Reid v. Town of Mount Vernon*, 2007 ME 125, ¶¶ 14, 15, 932 A.2d 539, 544 ("The existence of a duty of care is a question of law[.]"); *see also Maynard*, *Maynard v. Port Publ'ns, Inc.*, 297 N.W.2d 500, 507 (Wis. 1980) (noting that its analysis of whether Port had a duty to read and review its publications was a question of law).

Ms. Sandler attempts to muddy the negligence analysis with discussions of public figures and public concern. Ms. Sandler's Response at 7-15. These issues have nothing to do with whether BookSurge had a duty to review for content. Ms. Sandler mistakenly asserts that BookSurge focused on its status as a print-on-demand ("P.O.D.") company—rather than her status as a private person—to argue for an actual malice fault standard.

[2] Updated Appendices A and B (attached) set forth the unopposed claims and those remaining for review.

*Id.* at 2, 9. BookSurge only argued that Ms. Sandler was required to show actual malice to overcome the public concern or fair report privileges, as an element of her false light claim, or to establish punitive damages. BookSurge argued that its role in the book-printing process demonstrates that it is not negligent as a matter of law because it has no duty to review content. BookSurge's Motion at 8-13. In other words, the imposition of a duty to review for content on a printer like BookSurge is contrary to Maine law and the First Amendment because it has the same effect as strict liability.

In making this argument, BookSurge relied on several cases that show that printers, distributors, and other analogous entities have no duty to review for content and cannot be negligent for not doing so. *Maynard*, 297 N.W.2d at 506-07; *Misut v. Mooney*, 475 N.Y.S.2d 233, 236 (N.Y. Sup. Ct. 1984); *Cubby, Inc. v. Compuserve, Inc.*, 776 F. Supp. 135, 139, 140-41 (S.D.N.Y. 1991); *Lunney v. Prodigy Servs. Co.*, 723 N.E.2d 539, 542 (N.Y. 1999). Ms. Sandler either ignores these cases altogether or attempts to dodge them on technical grounds.[3] BookSurge is aware of no Maine case authority at all on this issue, however, and Ms. Sandler offers no explanation why the reasoning of these four decisions is not persuasive.

Unable to identify any legal authority that would impose a duty on BookSurge, Ms. Sandler attempts to manufacture a duty through H. Allen Fernald's testimony. Ms. Sandler's Response at 21-22. Mr. Fernald's conclusory testimony cannot supplant the

---

[3] Ms. Sandler's Response does not address any of these cases. In her Reply Memorandum to Defendant BookSurge's Memorandum Opposing Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 140) ("Ms. Sandler's Reply") at 2-3, Ms. Sandler claims that this Court should ignore *Maynard* because it is a Wisconsin case, but fails to address the reasoning or analysis of the decision or explain why it is inconsistent with Maine law. Nor does Ms. Sandler address the reasoning of *Misut*, simply stating that it is "largely dicta". Ms. Sandler contends that *Cubby* is "superfluous" following passage of the Communications Decency Act. But the *Cubby* Court found no duty existed at common law, not under the CDA. 776 F. Supp. at 139.

Court's legal judgment as to whether a duty exists. *See* BookSurge, LLC's Reply Statement of Material Facts (Dkt. No. TBD) ("BRepSMF") ¶¶ 59-62; *Reid*, 2007 ME 125, ¶¶ 14, 15, 932 A.2d at 544 ("The existence of a duty of care is a question of law[.]"); *Poulis-Minott v. Smith*, 388 F.3d 354, 359 (1st Cir. 2004) ("an expert opinion must be more than a conclusory assertion about ultimate legal issues" (citing *Hayes v. Douglas Dynamics, Inc.*, 8 F.3d 88, 92 (1st Cir. 1993)). Regardless, Mr. Fernald has no basis to offer testimony regarding standards and practices in the P.O.D. industry. BRepSMF ¶ 59. The significant differences between P.O.D. companies like BookSurge and traditional publishers (BookSurge's Motion at 9-12, BSMF & PRSMF ¶¶ 14-20, 69-77, 89-90 (distinctions that stand undisputed in the record)) demonstrate differing standards and practices that apply to traditional publishers on one hand and to P.O.D. companies like BookSurge on the other.[4] Because there is no basis to impose a duty on BookSurge, summary judgment should be granted.

**C. *Help Us Get Mia*, Including the References to Ms. Sandler, Dealt With Matters of Public Concern, which Requires Dismissal of All Claims.**

**1. *Help Us Get Mia* Addresses Matters of Public Concern.**

Ms. Sandler's Response fails to overcome BookSurge's second alternative argument: all claims can be dismissed because *Help Us Get Mia* addressed matters of

[4] *See also* BookSurge, LLC's Memorandum Opposing Plaintiff's Motion for Partial Summary Judgment (Dkt. 110) ("BookSurge's Response") at 2-4, 9, 14-16; BookSurge's Additional Statement of Material Facts (Dkt. No. 111/112) ("BASMF") ¶¶ 3, 13-14, 16-23, 31-32, 35, 37-39, 40-45, 61-69. Moreover, the primary arguments Ms. Sandler made in arguing that BookSurge should be treated as a traditional publisher have evaporated. For example, Ms. Sandler's continued focus on the "publisher" reference on *Help Us Get Mia*'s copyright page (Ms. Sandler's Reply at 2) does nothing to refute BookSurge's demonstration that this copyright page was written by Ralph Calcagni, was never reviewed or seen by BookSurge, and was inconsistent with how BookSurge holds itself out to the public (BookSurge's Response at 15; BASMF ¶¶ 35-39). Ms. Sandler also does not refute the case law holding that a right to screen and reject submissions does not give rise to a duty to review content (BookSurge's Response at 9-11).

public concern,[5] and in the context of her libel claims, actual malice cannot overcome that privilege. *See* BookSurge's Motion Section III.B; Section A above.

Ms. Sandler does not dispute that the focus of *Help Us Get Mia*—the swastika incident and prosecution of Ms. Calcagni for that crime—was a matter of public concern to citizens of Winthrop and surrounding communities. *See, e.g.*, Segal Decl., Ex. I (Nov. 2007 Ralph Calcagni Deposition ("R. Calcagni Dep. I") Ex. 4 (containing *Capital Weekly* article about State charging Ms. Calcagni with a hate crime for swastika incident), Ex. 8 (containing *Kennebec Journal* article about same)). Ms. Sandler's contention that *Help Us Get Mia*'s limited distribution negates a public concern (Ms. Sandler's Response at 12-13) is contrary to precedent: "[T]he relevant community need not be very large and the relevant concern need not be of paramount importance or national scope. Rather, 'it is sufficient that the speech concern matters in which even a relatively small segment of the general public might be interested.'" *Levinsky's*, 127 F.3d at 132.

Ms. Sandler quotes isolated words from *Help Us Get Mia*—"Jew-Bag," "dirty Jew," "slut," "whore"—and suggests that they are not matters of public concern. Ms. Sandler's Response at 11. This tactic ignores the case law directive that context must inform public concern. *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 761 (1985). All of the issues raised in *Help Us Get Mia*—including the above words—were directly relevant to the Calcagnis' critique of the school, police, and attorney general investigations.[6] The Calcagnis questioned whether their daughter was

---

[5] This Court must determine as a matter of law that *Help Us Get Mia* pertains to matters of public concern. *See, e.g., Levinsky's, Inc. v. Wal-Mart Stores, Inc.*, 127 F.3d 122, 136 (1st Cir. 1997).

[6] Courts generally have held that speech regarding judicial proceedings and police, school, and governmental activities are matters of public concern. *See, e.g.*, *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974); *Fiacco v. Sigma Alpha Epsilon Fraternity*, 484 F. Supp. 2d 158, 168, 171 (D. Me. 2007); *Rankin v.*

unfairly prosecuted based on he-said/she-said accusations from high school students; in that discourse they discussed the following: (1) Ms. Sandler's and Ms. Calcagni's initial friendship; (2) the girls' falling out; (3) the disciplinary proceedings related to the girls' conflict; and (4) the recounting of the girls' conflict by other students in official records. *See, e.g.,* Segal Decl., Ex. E (Nov. 2007 Sandler Deposition ("Sandler Def. Dep. I") Ex. 4 ("*Help Us Get Mia*" at 22-24 (excerpt from school report regarding Ms. Calcagni's alleged participation in masturbation rumor, which *Help Us Get Mia* contends was fabricated), 55 (excerpt from high school student police statement that accuses Ms. Calcagni of calling Ms. Sandler a "whore").

The Calcagnis then used this discussion of the girls' friendship and conflict to argue that (1) the high school students' accusations in the police and attorney general records may have been unfounded, and (2) there was little proof beyond these high school students' accusations to show that Ms. Calcagni painted the swastikas near Ms. Sandler's house. *See Help Us Get Mia* at 22-27, 61-65, 81-96, 129-140. In other words, *Help Us Get Mia*'s discussion of Ms. Sandler's and Ms. Calcagni's friendship and conflict did not address "matters of only personal interest." *Levinsky's*, 127 F.3d at 132. All of the information about the girls' relationship was relevant to the Calcagnis' argument that the State's prosecution of their daughter was based on the statements of high school students who punished Ms. Calcagni for a conflict she had with Ms. Sandler.[7]

---

*Ind. Sch. Dist. No. I-3*, 876 F.2d 838, 843 (10th Cir. 1989); *Peckham v. Boston Herald, Inc.*, 719 N.E.2d 888, 894 (Mass. Ct. App. 1999).

[7] *See, e.g., Riley v. Harr*, 292 F.3d 282, 298-99 (1st Cir. 2002) (concluding, for invasion of privacy claim, that *A Civil Action*, addressing toxic tort litigation in Massachusetts, was a matter of public concern, and that a statement that the plaintiff "suffer[ed] from episodes of depression" was relevant to the purpose of chronicling "the devastating emotional toll of the litigation on many of the participants"); *Veilleux v. Nat'l Broad. Co.*, 206 F.3d 92, 132 (1st Cir. 2000) (concluding, for invasion of privacy claim, that trucking safety on public highways was a matter of public concern, which included publication of a particular truck driver's drug test results).

That the conflict between Ms. Sandler and Ms. Calcagni was relevant to the public's concern with the swastika incident is buttressed by independent press coverage of the swastika incident. R. Calcagni Dep. I, Ex. 4 (*Capital Weekly* article that addressed the hate crime charges against Ms. Calcagni, the Calcagnis' allegations that Ms. Calcagni was actually the victim of harassment, and their "shock[] and disgust[] (with law enforcement) to learn that their daughter was being accused of the vandalism"); *see also* BRepSMF ¶¶ 30-31, 39. This press coverage pre-dating *Help Us Get Mia* further establishes that the book's content was of concern to more than just "the parties directly enmeshed in the particular controversy." Ms. Sandler's Response at 13.

**2. Even if *Help Us Get Mia* Did Not Address Matters of Public Concern, This Would Not Entitle Ms. Sandler to Presumed Damages.**

Ms. Sandler wrongly claims that she is entitled to presumed damages as a private person when the challenged statements do not involve matters of public concern. Ms. Sandler's Response at 2, 22. This is a blatant misstatement of Maine law. Although the common law in some states has provided for private person recovery of presumed damages when a case does not involve a matter of public concern,[8] in Maine, presumed damages are allowed only if a challenged statement is libel per se (i.e., involves the plaintiff's business or profession, or an alleged criminal offense). *Haworth v. Feigon*, 623 A.2d 150, 156, 158-59 (Me. 1993) (statements about business/profession); *Rippett*, 672 A.2d at 86 (punishable offense); *see also Media Libel Law 2007-2008: MLRC 50-State Survey* ("*MLRC*") at p. 1322 (The Media Law Resource Center, Inc. ed., 2007)

---

[8] *See Dun & Bradstreet*, 472 U.S. at 763 ("[P]ermitting recovery of presumed and punitive damages in defamation cases absent a showing of 'actual malice' does not violate the First Amendment when the defamatory statements do not involve matters of public concern." (emphasis added)).

(attached as Appendix C). Even the case relied upon by Ms. Sandler in her response, *Galarneau v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, recognizes this limitation:

> The common law of defamation is an oddity of tort law, for it allows recovery of purportedly compensatory damages without evidence of actual loss. Under the traditional rules pertaining to actions for libel, the existence of injury is presumed from the fact of publication. Maine adheres to these traditional rules of defamation law <u>in certain contexts</u>.
>
> Under Maine law, defamatory words relating to profession, occupation or official station are libelous per se. <u>When [defamation] per se is established, a plaintiff need not prove special damages or malice in order to recover a substantial award.</u>

504 F.3d 189, 203 (1st Cir. 2007) (emphasis added) (internal quotations and citations omitted). Because Ms. Sandler concedes that she cannot demonstrate special harm (Section A above), she must prove that all of the remaining challenged statements are libel per se. This she cannot do.

**D. The "Whore" and Music Room/Masturbation Statements Are Not Libel Per Se and Are Not Capable of Defamatory Meaning as a Matter of Law.**

Ms. Sandler only claims that two of the remaining statements are libel per se: the "whore" statement and the music room/masturbation statements. Ms. Sandler's Response at 23-24. These limited remaining claims for libel per se must be dismissed because Ms. Sandler has failed to demonstrate as a matter of law that these statements pertain to her business or profession or allege a punishable criminal offense. *Haworth*, 623 A.2d at 156; *Rippett*, 672 A.2d at 86.[9] Ms. Sandler's attempt to argue that there are genuine issues of material fact with respect to the interpretation of the "whore" and music room/masturbation statements again improperly conflates fact and law. Courts must determine as a matter of law, based on context, whether challenged statements are

[9] Ms. Sandler attempts to argue that statements are libel per se if they accuse her of "sexual misconduct irrespective of whether the misconduct constitutes a criminal offense or whether it harms the other in his business, trade or profession." Ms. Sandler's Response at 23. No Maine case has adopted this position, and Ms. Sandler cites no cases to indicate that this principle is widely adopted elsewhere.

ordinarily capable of defamatory meaning. *Bakal v. Weare*, 583 A.2d 1028, 1030 (Me. 1990) ("Whether the statement complained of is capable of conveying a defamatory message at all is a question of law. We reject Bakal's approach that interprets the word 'threats' in the most negative possible way . . . ." (citations omitted)).

Ms. Sandler's argument that the "whore" and the masturbation/music room statements accuse her of punishable offenses fails because these statements, when read in context, do not accuse Ms. Sandler of committing any type of crime. The quotation of the "whore" statement from a police report makes it clear that no one—not the original speaker of the statement (Ms. Calcagni), the reporter of this statement to the police (Samantha Pietraszewski), or the authors of *Help Us Get Mia*—was accusing Ms. Sandler of "engaging in, or agreeing to engage in, or offering to engage in a sexual act or sexual contact, as those terms are defined in section 251, in return for a pecuniary benefit." 17-A M.R.S.A. § 851. The Winthrop Police Department did not consider this an accusation of criminal conduct because it conducted no investigation and brought no charges against Ms. Sandler for the obvious reasons: the statement was merely hyperbolic rhetoric.

This Court can determine as a matter of law that the "whore" statement was a nonactionable statement of opinion (*Caron v. Bangor Publ'g Co.*, 470 A.2d 782, 784-85 (1984) (whether a statement is a statement of fact or opinion is a question of law)) where: (1) Ms. Sandler's Response admits that the "whore" statement is an epithet (Ms. Sandler's Response at 17); (2) the context demonstrates that Ms. Pietraszewski told the police that she thought Ms. Calcagni painted the swastikas near Ms. Sandler's house based in part on Ms. Calcagni's use of the word "whore" as an epithet to describe Ms. Sandler [REDACTED] and (3) Ms. Sandler admits in her response to BookSurge's

Statement of Facts that she understood the "whore" statement to be an epithet, not an accusation of prostitution. *See* BSMF & PRSMF ¶ 111.

Similarly, the context of the masturbation/music room statements in *Help Us Get Mia*—the Calcagnis' attempt to show that the school had fabricated disciplinary records involving their daughter—also does not suggest in any way that Ms. Sandler engaged in a "sexual act"[10] in a public place, or "knowingly expose[d]" in a public place her "genitals under circumstances that in fact are likely to cause affront or alarm." 17-A M.R.S.A. § 854. Rather, the context of the fabrication discussion in *Help Us Get Mia* dictates as a matter of law that the music room/masturbation statement was not a statement of fact—let alone an accusation of the commission of a crime. *Schoff v. York County*, 2000 ME 205, ¶ 9 n.3 , 761 A.2d 869, 871 n.3 ("In determining whether a statement is defamatory, the statement must be interpreted in its context, which includes the entire publication and all extrinsic circumstances known to the recipient." (emphasis added)).

**E. The Fair Reports Privilege Provides an Alternative Ground to Eliminate Some of the Remaining Libel or Libel Per Se Claims.**

Even if the Court found the "whore" or music room/masturbation statements to be libel per se, Ms. Sandler's libel per se claims are still eliminated by the fair reports privilege.[11] Ms. Sandler's scant attempt to discredit the fair reports privilege under Maine law is baseless (Ms. Sandler's Response at 20), and Ms. Sandler's libel claims with respect to the music room, "whore," and "rumors" statements fail.[12]

---

[10] 17-A M.R.S.A. § 854(a) cross references 17-A M.R.S.A. § 251 for the definition of "sexual act." A "sexual act" must involve more than one person. 17-A M.R.S.A. § 251.

[11] Ms. Sandler does not argue that the "rumors" statement is libel per se (Ms. Sandler's Response at 19-24), but this statement also can be eliminated under the fair reports privilege. BookSurge's Motion Section III.C.4.b.

[12] Ms. Sandler does not even argue the elements of the fair reports privilege—a statement must be a fair abridgement of an official report on a matter of public concern. Restatement (Second) of Torts § 611. The

When sitting in diversity, this Court may resolve a state law issue even if not resolved expressly by the state's case law. *N. Am. Specialty Ins. Co. v. LaPalme*, 258 F.3d 35, 37-38 (1st Cir. 2001). This Court is on particularly firm ground regarding the fair reports privilege. Although the Maine Supreme Court has not yet had occasion to recognize the fair reports privilege explicitly,[13] that privilege, as expressed in the Restatement of Torts § 611, represents "'the prevailing, if not unanimous, weight of judicial authority.'" *Solaia Tech., LLC v. Specialty Publ'g Co.*, 852 N.E.2d 825, 842 (Ill. 2006) (quoting *Lulay v. Peoria Journal-Star, Inc.*, 214 N.E.2d 746, 748 (Ill. 1966)). Forty-nine states, the District of Columbia and three U.S. territories recognize the fair reports privilege. *See MLRC* at pp. 1316-19, 1326-27 (attached as Appendix C). Maine is the only state which has not yet addressed the fair reports privilege. *Id.* at 1317. Certifying this issue to the Law Court is an option, but it would be a waste of judicial resources because the Maine courts have adopted regularly the privileges recognized by the Restatement. *See Baker v. Charles*, 919 F. Supp. 41, 44 (D. Me. 1996). The Court should determine that the fair reports privilege applies to the music room, "whore," and "rumors" statements.

**F. The Remaining Contested Statements—"No Friends" and "Rumors"—Are Not Libelous As a Matter of Law.**

The libel claims based on the "had no friends in the new school" statement (Ms. Sandler's Response at 17) and "rumors" statement (Ms. Sandler's Response at 19) can be

---

public concern issue is resolved in Section C above. Ms. Sandler does not deny that the music room, "whore," and rumor statements are all directly excerpted from or described in police reports or attorney general, court, or school records. BSMF & PRSMF ¶¶ 110, 123-125, 127.

[13] The First Circuit did not "expressly refuse[] to recognize such a privilege in Maine law." Ms. Sandler's Response at 20. Rather, the Court merely stated that "Maine does not appear to have adopted the 'reporter privilege' to this date, and we will not speculate as to the future development of Maine law." *Penobscot Indian Nation v. Key Bank of Maine*, 112 F.3d 538, 561 n.30 (1st Cir. 1997).

dismissed because Ms. Sandler only claims presumed damages and does not argue these statements are libel per se. Alternatively, the Court should dismiss claims under these statements because they are not susceptible to defamatory meaning.

First, Ms. Sandler divorces "had no friends in the new school" from its context in in *Help Us Get Mia*: "She, obviously, had no friends in the new school." *Help Us Get Mia* at 7 (emphasis added). The "obviously" portion of the statement demonstrates that this statement was an opinion. *Caron*, 470 A.2d at 784 ("whether an allegedly defamatory statement is a statement of opinion is a question of law"). Furthermore, Ms. Sandler has now admitted that the other statements surrounding the "no friends" phrase were true. BSMF & PRSMF ¶¶ 115-118. Viewed in the context of these admissions, quibbling over whether Ms. Sandler had "no friends" (or the five friends she identifies) at Winthrop High School is not libelous. The "gist" or "sting" of an allegedly false statement must differ appreciably from the truth to be defamatory. *Picard v. Brennan*, 307 A.2d 833, 836 (Me. 1973); *Fiacco*, 484 F. Supp. 2d at 173. Even if the "no friends" statement was, in context, a statement of fact, its "sting" is not appreciably different than the truth.

Second, Ms. Sandler's attempt to show that there is a genuine issue of material fact on the "rumors" statement is based solely on the quibble that "rumors" is plural, and she only admits to starting one rumor about Ms. Calcagni. Again, however, Ms. Sandler cannot avoid summary judgment where the gist or sting of the challenged statement is true. *Id.* [redacted]

[redacted] She also admits that she sent an instant message asserting that Ms. Calcagni was expelled from school (BSMF & PRSMF ¶ 123) and that she stated to others that she believed Ms. Calcagni painted the swastikas near her house (BSMF & PRSMF ¶ 125; Ms. Sandler's Response at 19-20). The sting of the "rumors" statement is true.

**G. The Remaining Contested Statements Are Not Actionable "Private Facts".**

BookSurge moved for summary judgment on the "private facts" claim on two alternative grounds: (1) Ms. Sandler's rhinoplasty and the superintendents' agreement were known publicly prior to the publication of *Help Us Get Mia* (BookSurge's Motion Section III.F.2 & 3), and (2) the revelation of the rhinoplasty, superintendents' agreement, and psychological treatment during high school would not be highly offensive to a reasonable person (BookSurge's Motion Section III.F).

First, Ms. Sandler essentially concedes that the rhinoplasty and superintendents' agreement were publicly known. BookSurge's evidence that Ms. Sandler's rhinoplasty was known [redacted] is addressed by Ms. Sandler only with unsupported denials that fail to meet the burdens established by *Celotex*. [redacted] Ms. Sandler <u>admits</u> the very facts that BookSurge used to support its contention that the superintendents' agreement was publicly known prior to the publication of *Help Us Get Mia*. [redacted]

Second, Ms. Sandler makes no showing that revealing these facts would be highly offensive to a reasonable person. Ms. Sandler's Response fails to refute the record evidence [redacted] that revelation of Ms. Sandler's rhinoplasty and superintendents' agreement could not have been highly offensive to a reasonable person

because [redacted] undermines her assertion that their revelation in *Help Us Get Mia* would be highly offensive to a reasonable person. Ms. Sandler's Response at 26.

Finally, Ms. Sandler admits that she revealed to the entire world on her myspace.com webpage her decision to seek psychological care during college (BSMF & PRSMF ¶¶ 134-136, 142). Her comfort with revealing such decisions demonstrates that any similar revelations about high school would not be highly offensive to a reasonable person. Ms. Sandler has failed to demonstrate the essential elements of her private facts invasion of privacy claims.

**CONCLUSION**

BookSurge respectfully requests that the Court grant its motion for summary judgment on all grounds.

Respectfully submitted,

BOOKSURGE, LLC

By its attorneys,

/s/ Matthew J. Segal
Stephen A. Smith (Pro Hac Vice)
Matthew J. Segal (Pro Hac Vice)
Kari Vander Stoep (Pro Hac Vice)
K&L Gates
925 Fourth Avenue, Suite 2900
Seattle, Washington 98104-1158

Harold J. Friedman
Friedman, Gaythwaite, Wolf & Leavitt
P.O. Box 4726
6 City Center
Portland, Maine 04112

May 5, 2008

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE AT BANGOR

| | | |
|---|---|---|
| SHANA SANDLER, Plaintiff | ) | |
| v. | ) | Case No. 1:07-CV-00029-GZS |
| MIA CALCAGNI, RALPH CALCAGNI, MAUREEN CALCAGNI, PETER MARS, and BOOKSURGE, LLC, Defendants. | ) | |

**CERTIFICATE OF SERVICE**

I hereby certify that on May 5, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

/s/ Dawn M. Taylor______
Dawn M. Taylor, Legal Assistant