REDACTED

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE AT BANGOR

| | |
|---|---|
| SHANA SANDLER, ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | Case No. 1:07-CV-00029-GZS |
| ) | |
| MIA CALCAGNI, ) | |
| RALPH CALCAGNI, ) | |
| MAUREEN CALCAGNI, ) | |
| PETER MARS, ) | |
| and ) | |
| BOOKSURGE, LLC, ) | |
| ) | |
| Defendants. ) | |
| ) | |

**BOOKSURGE, LLC'S REPLY STATEMENT OF MATERIAL FACTS
AND MOTION TO STRIKE PLAINTIFF'S ADDITIONAL STATEMENT OF
MATERIAL FACTS PARAGRAPHS 59 - 62**

BookSurge, LLC ("BookSurge"), pursuant to LR 56(d), does hereby set forth its Reply Statement of Material Facts. Pursuant to LR 56(e), BookSurge moves to strike the statements of fact in Ms. Sandler's Statement of Additional Material Facts ¶¶ 59 – 62.

The Events at Winthrop High School

1. QUALIFIED. Ms. Sandler transferred to Winthrop High School in Winthrop, Maine from Maranacook Community High School in Readfield, Maine in March 2002, not March 2003. Declaration of Matthew J. Segal in Support of BookSurge, LLC's Motions for Summary Judgment (Dkt. No. 98/105) ("Segal Decl."), Ex. E (Nov. 2007 Sandler Deposition ("Sandler Def. Dep. I") at 10:16-25 – 11:1-8); Sandler Def. Dep. I Ex. 2 (incl. March 2005 Sandler Hate Crime Deposition ("Sandler Hate Crime Dep.") at 17:9-10); Segal Decl., Ex. Q at MCHS000006.

1

2. ADMITTED.

3. ADMITTED.

4. ADMITTED.

5. ADMITTED.

6. ADMITTED.

7. QUALIFIED: According to an attorney general interview of Michelle Perry, Mia Calcagni decided that she and her friends, Michelle Perry and Samantha Pietraszewski, should drive by Tyler Tripp's house to see if Shana was there and lying about being at Ryan LeClair's home. Segal Decl., Ex. H (Jan. 2008 Maureen Calcagni Deposition ("M. Calcagni Dep. II"), Ex. 15 at CAL000091-92).

8. QUALIFIED: According to attorney general interviews of Michelle Perry and Samantha Pietraszewski, upon driving past Tyler Tripp's house, Tripp and four other young men confronted Mia Calcagni, Michelle Perry and Samantha Pietraszewski. M. Calcagni Dep. II Ex. 15 at CAL000092; Segal Decl., Ex. T at 02613.

9. ADMITTED.

10. QUALIFIED: According to an attorney general interview of Michelle Perry, following the confrontation near Tyler Tripp's home, Tyler telephoned the police to complain that Mia Calcagni was harassing him. M. Calcagni Dep. II Ex. 15 at CAL000093.

11. ADMITTED.

12. QUALIFIED: According to an attorney general interview of Samantha Pietraszewski, Mia Calcagni gave the police a "lot of attitude" and her mother, Maureen Calcagni, told the officer to leave. Segal Decl., Ex. T at 02613.

13. QUALIFIED: According to attorney general interviews of Michelle Perry and Samantha Pietraszewski and Michelle Perry's testimony in the criminal mischief proceeding, after the trooper left, Mia Calcagni expressed her anger with Shana Sandler by referring to her as a "Jew," and by saying repeatedly that she would find a way to get her back for setting her up. M. Calcagni Dep. II, Ex. 15 at CAL000092; M. Calcagni Dep. II, Ex. 27; Segal Decl., Ex. T at 02613.

14. QUALIFIED: According to an attorney general interview of Michelle Perry, on the Tuesday following the Columbus Day Weekend in 2003, Mia Calcagni began verbally harassing Shana Sandler. M. Calcagni Dep. II, Ex. 15 at CAL000093.

15. QUALIFIED: According to attorney general interviews of Michelle Perry and Samantha Pietraszewski, Ms. Calcagni started rumors about herself being pregnant. M. Calcagni Dep. II, Ex. 15 at CAL000091, 000093; Segal Decl., Ex. T at 02612. In addition, deposition testimony [REDACTED] indicate that Ms. Sandler also made statements referring to Ms. Calcagni's alleged pregnancy. Sandler Def. Dep. I at 30-31, 43:4-18; Sandler Hate Crime Dep. at 26:22-25 – 27:1-19; [REDACTED]

██████████████████████████████████████

██████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

██████████████████████ Sandler Def. Dep. I Ex. 2 (incl. Oct. 2004 U.S. Dept. of Ed. Office of Civil Rights Decision ("OCR Decision") at 2, 3).

16. QUALIFIED: According to an attorney general interview of Samantha Pietraszewski, Mia Calcagni placed flyers on cars parked in the Hall-Dale High School parking lot indicating that one of the Hall-Dale students (Tyler Tripp) was going to be a father. Segal Decl., Ex. T at 02612.

17. QUALIFIED: According to Officer Lynne D. Doucette's police report, on November 22, 2003, Mia Calcagni, together with Ralph and Maureen Calcagni, came to the Winthrop Police Station. Maureen Calcagni claimed she knew her daughter's whereabouts on November 10, 2003, but Mia and Maureen disagreed about Mia's location on that evening. Segal Decl., Ex. Y at WPD000027.

18. QUALIFIED: According to Officer Lynne D. Doucette's police report, at the police station, Maureen claimed Mia was at a boy's house, while Mia disagreed. Maureen answered firmly that Mia was at a boy's house, at which point Mia capitulated and agreed that she was at a boy's house. Segal Decl., Ex. Y at WPD000027.

19. ADMITTED.

20. ADMITTED.

21. ADMITTED.

22. ADMITTED.

23. ADMITTED.

24. ADMITTED.

25. QUALIFIED: ████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
██████████████████████████
██████████████████████████
████████████████████████████████████
██████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████



### Ralph & Maureen Calcagni's Defense of Mia

26. ADMITTED.

27. ADMITTED.

28. ADMITTED.

29. ADMITTED.

30. QUALIFIED: The quoted letter was printed in the *Community Advertiser*. Sandler Def. Dep. II, Ex. 40. According to an April 23, 2004 article by Jenna Lookner in the *Capital Weekly*, this letter to the editor by Ralph Calcagni also was printed in the *Capital Weekly* on January 8, 2004. Jenna Lookner quoted the letter to the editor in her April 23, 2004 article about the attorney general's decision to charge Mia Calcagni with a civil hate crime. Segal Decl., Ex. I (Nov. Ralph Calcagni Deposition ("R. Calcagni Dep. I"), Ex. 4).

31. QUALIFIED: Although the Calcagnis' letter printed in the *Community Advertiser* and *Capital Weekly* did not mention Ms. Sandler by name, Ms. Sandler conceded in her deposition testimony that (1) students and parents in Winthrop and surrounding communities read the letter, and (2) those readers told her they

knew that the letter was referring to her. Sandler Def. Dep. II at 235:8-25 – 236:1-17, 238:14-25 – 239:1-21 & Ex. 40; *see also* Plaintiff's Response to Defendant BookSurge's Statement of Material Facts (Dkt. No. 130) ("PRSMF") ¶¶ 145-147. The letter described the "harassment of [Mia Calcagni] by a student at Winthrop High School, who attends our school from another town under a Superintendent's agreement" and stated that its purpose was to "publicly air problems created by the ineffective handling of this situation by school administrators." Sander Def. Dep. II, Ex. 40.

32. QUALIFIED: The Ralph Calcagni deposition excerpt cited by Ms. Sandler to support this assertion states that Mr. Calcagni wrote two or three letters to the editor, but does not state that these letters were "on the topic of the ongoing harassment between Shana Sandler and Mia Calcagni." Instead, Mr. Calcagni specifically explained that his other letters to the editor were focused on broader concerns with the school and police departments: "Q. As a general matter, you wrote at least three editorials to local newspapers discussing – or were prompted by harassment of Mia Calcagni by Shana Sandler? A. It might have been broader issues, too, and I'm not sure if it was two or three. It might have also been broader issues than solely Shana Sandler. It might have included our discontent with the police department, the school department. A. Were your discontent and/or concerns with the police department and the school department tied to harassment of Mia Calcagni by Shana Sandler? A. Yes. Q. And what was the relationship? A. Well, the harassment started the problems, but then the problems really became, in our opinion – in my opinion, the inability of the

school department to do anything about it, . . ." Declaration of Bernard J. Kubetz in Support of Plaintiff's Memorandum in Opposition to Defendant BookSurge and Defendant Mars' Motions for Summary Judgment (Dkt. No. 131) ("<u>Kubetz Opp. Decl.</u>"), Ex. 4 at 76:9-25. A collection of newspaper articles pertaining to the issues addressed in *Help Us Get Mia* demonstrate that only one letter to the editor written by Mr. Calcagni directly addressed the harassment between Ms. Sandler and Ms. Calcagni specifically. R. Calcagni Dep. I, Ex. 8. The other letters to the editor focused on broader concerns with the school and police departments.

33. ADMITTED.

34. ADMITTED.

35. ADMITTED.

36. ADMITTED.

Media Attention to the Hate Crime

37. ADMITTED.

38. ADMITTED.

39. QUALIFIED: Although the April 23, 2004 *Capital Weekly* story does not mention Ms. Sandler by name, the article quoted the letter to the editor written by Ralph Calcagni that referred to the alleged harassment between Ms. Sandler and Ms. Calcagni. R. Calcagni Dep. I, Ex. 4. Ms. Sandler admitted in her deposition that members of the community read this letter to the editor and knew that the letter to the editor was referring to her. Sandler Def. Dep. II at 235:8-25 – 236:1-17, 238:14-25 – 239:1-21 & Ex. 40; *see also* PRSMF ¶¶ 145-147.

### Media Attention to the Suicides of Five Winthrop Football Players

40. QUALIFIED: The *Sports Illustrated* article referenced in this contention is located at Segal Decl., Ex. DD. Otherwise, the statement of fact is admitted.

41. QUALIFIED: The *Sports Illustrated* article referenced in this contention is located at Segal Decl., Ex. DD. Otherwise, the statement of fact is admitted.

42. ADMITTED.

43. QUALIFIED: The newspaper article referenced in this statement of fact is located at Segal Decl., Ex. DD. In addition, the article did discuss student discipline and inter-student conflict at Winthrop High School as a potential explanation for the suicides among Winthrop High School students: "Moreover, 70 percent of the students surveyed reported having 'antisocial peers'—defined as peers who had been <u>suspended</u> or dropped out from school, carried a gun, sold drugs, stolen a car or been <u>arrested</u>. That compares with 50 percent of students statewide. In another category, just 45 percent of Winthrop students—nearly 20 percent points fewer than statewide averages—reported believing that <u>fighting</u>, stealing, cheating and <u>dishonesty</u> are wrong." Segal Decl., Ex. DD at C00787 ("Winthrop confronts youth suicides," by Chris Churchill) (emphasis added).

44. QUALIFIED: The newspaper article referenced in this contention is located at Segal Decl., Ex. DD. Otherwise, the statement of fact is admitted.

45. QUALIFIED: The newspaper article referenced in this contention is located at Segal Decl., Ex. DD. Otherwise, the statement of fact is admitted.

46. QUALIFIED: The newspaper article referenced in this contention is located at Segal Decl., Ex. DD. Otherwise, the statement of fact is admitted.

47. QUALIFIED:  The newspaper article referenced in this contention is located at Segal Decl., Ex. DD.  Otherwise, the statement of fact is admitted.

48. QUALIFIED:  The newspaper article referenced in this contention is located at Segal Decl., Ex. DD.  Otherwise, the statement of fact is admitted.

49. QUALIFIED:  The newspaper article referenced in this contention is located at Segal Decl., Ex. DD.  Otherwise, the statement of fact is admitted.

The False Statements About Shana Sandler

50. ADMITTED.

51. ADMITTED.

52. ADMITTED.

53. ADMITTED.

54. ADMITTED.

55. ADMITTED.

BookSurge's Negligence in Publishing "*Help Us Get Mia*"

56. ADMITTED.

57. ADMITTED.

58. ADMITTED.

**BookSurge's Motion to Strike:**

59. DENIED/MOTION TO STRIKE:  This statement of fact must be stricken because (1) Mr. Fernald is not qualified to testify on what "duties" or "responsibilities" apply to BookSurge, a print-on-demand ("P.O.D.") company, and (2) Mr. Fernald's testimony is a legal conclusion.

First, Federal Rule of Evidence 702(1) only permits expert testimony if the expert has "specialized knowledge" that "will assist the trier of fact" and if the testimony is supported by "sufficient facts or data." Mr. Fernald's testimony must be stricken because he admits that he has no experience or knowledge regarding the operation of P.O.D. companies like BookSurge. *See* Declaration of Matthew J. Segal in Support of BookSurge, LLC's Reply Memorandum for Summary Judgment on All Claims of Plaintiff Shana Sandler (Dkt. No. TBD) ("Segal Reply Decl."), Ex. A (Jan. 2008 Fernald Deposition) at 29:5-7 ("Q. Have you personally been involved in or overseen any print-on-demand work? A. No."), 36:5-11 ("Q. I think we've gone through your CV and your education. Do you have any experience in the fields of self-publishing or print-on-demand that we have not covered? A. No. I could add on the experience of rejecting books that were not commercial and referring them to a self-publishing operation."); 99:15-25 – 100:1-8 ("Q. Mr. Fernald, you don't have any specific personal knowledge of the practices or standards employed by print-on-demand firms, do you? A. Say it again. Q. Do you understand what I mean by print-on-demand firm? A. Yes. Q. Do you have any personal knowledge or experience with the standards employed at a print-on-demand firm? MR. KUBETZ: Objection as to form. A. No, only general. . . . Q. Generally, based on your experience that you've otherwise described in publishing? A. Well, print-on-demand – Kinkos – I'm aware of what Kinkos does. I'm aware of a number of publishing houses that do that sort of thing, short-run quick-turnaround books. Q. You're aware of their

existence, but you have not done any work with them personally? A. No. I've referred people to them.").

Second, the Court should strike the following assertion because Mr. Fernald offers only "conclusory assertion[s] about ultimate legal issues" (*Poulis-Minott v. Smith*, 388 F.3d 354, 359 (1st Cir. 2004)): "As the publisher of the book '*Help Us Get Mia*,' Mr. Fernald stated that BookSurge had a duty to review the manuscript prior to publishing it, to make sure it was suitable for publication and to check for factual accuracy before the manuscript was finalized."

This Court must determine as a matter of law whether BookSurge is a publisher and what duties apply to BookSurge:

> A prima facie case of negligence requires a plaintiff to establish four elements: duty, breach, causation, and damages. The existence of a duty of care is a question of law, while issues of the breach of a duty of care are usually questions of fact. Duty is a question of whether a defendant is under any obligation for the benefit of the plaintiff.

*Reid v. Town of Mount Vernon*, 2007 ME 125, ¶¶ 14, 15, 932 A.2d 539, 544 (citations omitted). Mr. Fernald's conclusions that BookSurge is a "publisher," that BookSurge had a "duty to review" and "check [*Help Us Get Mia*] for factual accuracy," and that the duties that typically apply to publishers also apply to BookSurge, are all part and parcel of the ultimate legal question that must be answered by the Court—what duty of care P.O.D. companies like BookSurge owe plaintiffs like Ms. Sandler. *Poulis-Minott*, 388 F.3d at 359 ("an expert opinion must be more than a conclusory assertion about ultimate legal issues" (citing *Hayes v. Douglas Dynamics, Inc.*, 8 F.3d 88, 92 (1st Cir. 1993)).

DENIED: Even if the Court concludes that this statement of fact should not be stricken, the record demonstrates that P.O.D. companies like BookSurge do

12

not and cannot assume a duty to read and review their customers' manuscripts in a manner similar to traditional publishers. *See* Declaration of David Symonds in Support of Motion for Summary Judgment by BookSurge, LLC (Dkt. No. 99) ("Symonds Decl.") ¶¶ 3-5; Declaration of David Symonds in Support of BookSurge, LLC's Memorandum Opposing Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 114) ("Symonds Resp. Decl.") ¶¶ 3-6; Declaration of Steve Weinberg in Support of BookSurge, LLC's Memorandum Opposing Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 116) ("Weinberg Decl.") ¶¶ 10-12.

60. DENIED/MOTION TO STRIKE: As stated in the preceding response to Plaintiff's Additional Statement of Material Fact ¶ 59, this statement of fact must be stricken because Mr. Fernald is not qualified to testify on whether the duties or "considerations" of "publishers" apply to BookSurge because he has no experience with P.O.D. companies and may not testify to whether a P.O.D. company's legal duties are the same as a "publisher's" duties.

    DENIED: Even if the Court concludes that this statement of fact should not be stricken, the record demonstrates that P.O.D. companies like BookSurge do not and cannot assume a duty to read and review their customers' manuscripts in a manner similar to traditional publishers, and therefore, they will not consider whether a manuscript has libelous, scurrilous, or objectionable material. *See* Symonds Decl. ¶¶ 3-5; Symonds Resp. Decl. ¶¶ 3-6; Weinberg Decl. ¶¶ 10-12.

61. DENIED/MOTION TO STRIKE: As stated in the preceding response to Plaintiff's Additional Statement of Material Fact ¶ 59, this statement of fact must

13

be stricken because Mr. Fernald may not make "conclusory assertion[s] about ultimate legal issues" (*Poulis-Minott*, 388 F.3d at 359) such as the duties that P.O.D. companies or publishers owe plaintiffs, because "[t]he existence of a duty of care is a question of law." *Reid*, 2007 ME 125, ¶¶ 14, 15, 932 A.2d at 544.

DENIED: Even if the Court concludes that this statement of fact should not be stricken, the record demonstrates that P.O.D. companies like BookSurge do not and cannot assume a duty to read and review their customers' manuscripts in a manner similar to traditional publishers, and therefore, they will not review a manuscript to determine if it contains libelous material or material that constitutes an invasion of privacy. *See* Symonds Decl. ¶¶ 3-5; Symonds Resp. Decl. ¶¶ 3-6; Weinberg Decl. ¶¶ 10-12.

62. DENIED/MOTION TO STRIKE: As stated in the preceding response to Plaintiff's Additional Statement of Material Fact ¶ 59, this statement of fact must be stricken because Mr. Fernald is not qualified to testify on whether certain passages of *Help Us Get Mia* that would have raised a "red flag" for a publisher would apply to BookSurge because he has no experience with P.O.D. companies and may not testify to whether a P.O.D. company's legal duties are the same as a "publisher's" duties. Furthermore, this specific testimony with respect to particular passages in *Help Us Get Mia* falls well outside the confines of Mr. Fernald's expert report. *See* Kubetz Opp. Decl. Ex. 2; *Poulis-Minott*, 388 F.3d at 358-59 (affirming district court's decision to exclude portions of expert affidavit in support of summary judgment motion as beyond the scope of expert designation and report). Counsel for BookSurge objected to and moved to strike

similar testimony during Mr. Fernald's deposition. Segal Reply Decl., Ex. A at 88:7-25 – 89:1-5.

DENIED: Even if the Court concludes that this statement of fact should not be stricken, the record demonstrates that P.O.D. companies like BookSurge do not and cannot assume a duty to read and review their customers' manuscripts in a manner similar to traditional publishers, and therefore, any "red flags" that would pertain to a traditional publisher would not pertain to BookSurge. *See* Symonds Decl. ¶¶ 3-5; Symonds Resp. Decl. ¶¶ 3-6; Weinberg Decl. ¶¶ 10-12.

Respectfully submitted,

BOOKSURGE, LLC

By its attorneys,

/s/ Matthew J. Segal
Stephen A. Smith (Pro Hac Vice)
Matthew J. Segal (Pro Hac Vice)
Kari Vander Stoep (Pro Hac Vice)
Kirkpatrick & Lockhart Preston
   Gates Ellis LLP
925 Fourth Avenue, Suite 2900
Seattle, Washington 98104-1158

Harold J. Friedman
Friedman, Gaythwaite, Wolf & Leavitt
P.O. Box 4726
6 City Center
Portland, Maine 04112

May 5, 2008

K:\2040741\00191\20743_KLV\20743P20G8

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE AT BANGOR

| | |
|---|---|
| SHANA SANDLER, )<br>)<br>Plaintiff )<br>)<br>v. )<br>)<br>MIA CALCAGNI, )<br>RALPH CALCAGNI, )<br>MAUREEN CALCAGNI, )<br>PETER MARS, )<br>and )<br>BOOKSURGE, LLC, )<br>)<br>Defendants. )<br>) | Case No. 1:07-CV-00029-GZS |

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 5, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

/s/ Dawn M. Taylor
Dawn M. Taylor, Legal Assistant