**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MAINE**

SHANA SANDLER                    )
                                 )
            Plaintiff,           )
                                 )
v.                               )          Docket No. 07-cv-29-GZS
                                 )
MIA CALCAGNI, et al.,            )
                                 )
            Defendants.          )
                                 )

**ORDER ON MOTIONS FOR SUMMARY JUDGMENT**
**REDACTED PUBLIC VERSION**

Before the Court are seven pending motions.  Before turning its attention to the

motions that require substantial discussion, the Court disposes of those motions that it

deems untimely.  Plaintiff has filed a Motion to Strike Defendants Ralph and Maureen

Calcagni's Motion for Summary Judgment on all Claims of Shana Sanlder [sic] (Docket

# 135) because the Calcagnis filed their Motion after the deadline.  The Court finds that

the Calcagni's Motion for Summary Judgment of Defendants Ralph and Maureen

Calcagni on all Claims of Plaintiff Shana Sandler, with Incorporated Memorandum of

Law (Docket # 126) was filed after the applicable deadline without leave of the Court.  In

addition, the Court finds that Defendant Peter Mars' Motion for Summary Judgment on

all Claims of Plaintiff Shana Sandler and Incorporated Memorandum of Law (Docket #

104) was also filed after the deadline.  The Court therefore GRANTS Plaintiff's Motion

to Strike Defendants Maureen and Ralph Calcagni's Motion for Summary Judgment

(Docket # 126) and sua sponte STRIKES Defendant Peter Mars' Motion for Summary

Judgment (Docket # 104).  Also before the Court is Defendant BookSurge's Motion for Oral Argument/Hearing (Docket # 101).  The Court DENIES the Motion and decides the matter after reviewing the parties' submissions.

Remaining before the Court are Plaintiff Shana Sandler's Motion for Partial Summary Judgment and Incorporated Memorandum of Law (Docket # 87) (Redacted), Defendant BookSurge, LLC's ("BookSurge") Motion for Summary Judgment on all Claims of Plaintiff Shana Sandler and Incorporated Memorandum of Law (Docket #96) (Redacted) and BookSurge's Motion for Summary Judgment on Cross-Claim of Defendants Ralph and Maureen Calcagni and Incorporated Memorandum of Law (Docket # 97).  After reviewing the parties' submissions, the Court DENIES Plaintiff's Motion and GRANTS Defendant BookSurge's Motion for the reasons explained below.

## I.      BACKGROUND

This case arises out of a conflict between two young women who attended high school together and the publication of a book, *Help Us Get Mia*, that detailed events surrounding the conflict.

## A.      The Parties

Plaintiff Shana Sandler ("Ms. Sandler") is a senior at High Point University in North Carolina.  Ms. Sandler graduated from Winthrop High School in Winthrop, Maine in June 2004.  Ms. Sandler is Jewish.

Defendant Mia Calcagni ("Ms. Calcagni") also attended Winthrop High School. Her parents, Defendants Ralph and Maureen Calcagni, live in Winthrop, Maine.

Defendant Peter Mars is a retired police officer and author from North Monmouth, Maine.

Defendant BookSurge is a company located in Charleston, North Carolina. BookSurge is now a trade name for On-Demand Publishing, LLC.

**B.        BookSurge and Print-on-Demand**

BookSurge is paid by self-publishing authors to print and bind PDF-formatted manuscripts using print-on-demand ("P.O.D.") technology.  P.O.D. generally refers to digital methods that allow printing and binding of a complete book in a very short period of time.  P.O.D. technology also facilitates production of books in very small lots, rather than hundreds or thousands at once.  BookSurge's "authors" and customers pay BookSurge to print their books.  According to Ralph Calgani's understanding, this differs from companies like Random House in that these companies pay the "authors" instead of the "authors" paying the company.

The transactions between BookSurge and its self-publishing authors – such as Ralph Calcagni – occur over the internet.  In general, potential BookSurge customers contact BookSurge by e-mail or through a web-landing page, and BookSurge salespeople follow up with phone calls or e-mails regarding BookSurge's services.  Self-publishing authors upload their manuscripts on BookSurge's website and pay BookSurge to transform those manuscripts into bound books or make them available in electronic format.  As a result, BookSurge's review of any manuscript is limited to a technical review of the computer file to ensure that it will be compatible with BookSurge's P.O.D. technology.

BookSurge does not review submissions for content.  BookSurge offers no fact-checking or similar editing services.  If a BookSurge author or customer wishes to purchase technical editing services, these services are outsourced and performed by

another, unaffiliated entity.  The outsourced editing or proofreading services provided are technical only (such as a review for grammar), and do not include a review of the content of a submission.

In 2007, BookSurge increased the titles it produced by 360,000 titles for a total of 480,000 titles in its inventory.  The sheer volume of new titles that BookSurge handles each year does not permit BookSurge to review the content of any publications.  If BookSurge were required to review the volume of submissions that it receives, it "would substantially limit the content [BookSurge] could accept or produce."  (BookSurge, LLC's Local Rule 56(c) Opposing Statement of Material Facts and Additional Statement of Material Facts ("BookSurge's ASMF") (Docket # 111) ¶ 17; Pl.'s Reply to Def. BookSurge's Additional Statement of Material Facts ("Pl.'s Reply to BookSurge's ASMF") (Docket # 141) ¶ 17.)  Unless a manuscript is not in a physical format that enables BookSurge to print it, BookSurge will print, publish and distribute any books submitted to it for publication.

## C.    The Conflict between Ms. Sandler and Ms. Calcagni

The Court delves into the conflict between Ms. Sandler and Ms. Calcagni only as necessary to provide context for the current Motions.  Ms. Calcagni and Ms. Sandler were classmates and cheerleaders at Winthrop High School.  Although Ms. Sandler lived nearby in Readfield, Maine in the Maranacook School District, she transferred to Winthrop High School in Winthrop, Maine, in March 2002, her sophomore year, under a superintendent's agreement.

Ms. Calcagni was a year behind Ms. Sandler in school.  The girls became friends on the Winthrop High School cheerleading squad.  Over the 2003 Columbus Day weekend, their friendship began to sour.

Prior to October 2003, Ms. Calcagni and Tyler Tripp, a student at Hall-Dale High School in Farmingdale, Maine, were involved in a romantic relationship.  Over the Columbus Day Weekend, Ms. Sandler and other students gathered at Mr. Tripp's house.  During the gathering, Ms. Sandler spoke with Ms. Calcagni and told Ms. Calcagni that she was at the home of another student, Ryan LeClair, but Ms. Calcagni did not believe Ms. Sandler and instead believed that Ms. Sandler was "setting her up."  (Pl.'s Statement of Additional Material Facts ("Pl.'s SAMF") (Docket # 130) ¶¶ 5, 6.)

After the 2003 Columbus Day weekend, Ms. Calcagni and her friends spread rumors about why Ms. Sandler had transferred from Maranacook High School to Winthrop.  They suggested that Ms. Sandler was teased at Maranacook **[REDACTED]**.  Ms. Calcagni and her friends apparently also used various epithets referring to Ms. Sandler's Jewish heritage.  At the same time, Ms. Sandler made statements at school that referred to Ms. Calcagni's alleged pregnancy.[1]

**[REDACTED]**  By November 2003, Ms. Calcagni had stopped attending school because the Calcagnis believed that the high school was not taking sufficient action to protect Ms. Calcagni.  The Calcagnis complained to school officials that Ms. Sandler's harassment of Ms. Calcagni was making it impossible for Ms. Calcagni to return to school.  **[REDACTED]**  The high school suspended both girls.  In addition to contacting school administrators, the Calcagnis and Sandlers also contacted the police on various

---

[1]     Plaintiff attempts to qualify this statement: **[REDACTED]**  A review of the record reveals that Plaintiff's qualification is not material and is partially unsupported by the record.

occasions, and the police issued anti-harassment/restraining orders to both Ms. Calcagni and Ms. Sandler.[2]  The Calcagnis also filed complaints with the U.S. Department of Education's Office of Civil Rights in Boston and the Maine Department of Education.

**D.      The Swastika Incident, Investigation and Prosecution**

[REDACTED]  Ms. Calcagni apparently concocted a plan to paint swastikas on road signs near Ms. Sandler's house in Readfield and on road signs on the route between Readfield and Winthrop.  Over the 2003 Veterans Day weekend, while driving around with other students, Ms. Calcagni and Shannon Thayer-Adams spray-painted swastikas on the road signs.  Ms. Sandler saw the swastikas and her family called the police.

Ms. Sandler told school administrators and police that she thought Ms. Calcagni painted the swastikas.  All of the students in the car that night, with the exception of one, accused Ms. Calcagni and Ms. Thayer-Adams of painting the signs.  While the police and attorney general's office investigated the swastika incident, the Calcagni family denied Ms. Calcagni's involvement, and Ms. Calcagni accused another student of painting the swastikas.

Ms. Calcagni and Ms. Thayer-Adams were charged with criminal mischief.  Ms. Calcagni was tried and convicted of criminal mischief.  An appeal was unsuccessful.

Before the criminal mischief case went to trial the Attorney General's office decided to prosecute a civil hate crime against Ms. Calcagni and Ms. Thayer-Adams. Ms. Calcagni agreed to a consent decree in the hate crime case.

**E.      *Help Us Get Mia***

After Ms. Calcagni was convicted of criminal mischief and agreed to the consent decree in the civil hate crime case, the Calcagnis wanted to tell their side of the story.  On

---

[2]          Plaintiff's qualification is not supported by a citation to the record.

January 5, 2004, Ralph and Maureen Calcagni published "A letter to the citizens of Winthrop and surrounding communities" in the Community Advertiser, a local newspaper, to "counter the lies that originated in school and were allowed to continue without intervention until our daughter's name is cleared and the truth is known."  (Pl.'s SAMF ¶ 30; BookSurge, LLC's Reply Statement of Material Facts and Motion to Strike Plaintiff's Additional Statement of Material Facts Paragraphs 59-62 ("BookSurge's Reply") (Docket # 147) ¶ 30.)  The January 5 letter discussed the harassment between Ms. Sandler and Ms. Calcagni, without naming Ms. Sandler.  The letter described "the harassment of our daughter by a student at Winthrop High School, who attends our school from another town under a Superintendent's agreement . . . ."  (Pl.'s SAMF ¶ 31; BookSurge's Reply ¶ 31.)

Ralph and Maureen Calcagni discussed the harassment of their daughter with several dozen individuals, including Andy and Claudia Pipes, who were friends of theirs. Andy and Claudia Pipes published two letters in a local newspaper on the topic of the perceived harassment of Ms. Calcagni.

In April 2005, the Calcagnis hired Defendant Peter Mars to help them put materials, including documents the Calcagnis had collected from the various school, police, attorney general investigations and court proceedings involving their daughter, into a book, *Help Us Get Mia*.

After failing to receive favorable responses from well-known publishing companies, Ralph Calcagni began to investigate companies that would "self publish" the book.  In other words, a company that would print the book for a fee and Ralph Calcagni would be responsible for distributing it.  Ralph Calcagni sought out BookSurge and

contacted the company on a web-landing page.  BookSurge employee Roy Francia responded to Ralph Calcagni's inquiry, and sold the process to Ralph and Maureen Calcagni.  Mr. Francia never saw, knew of, or read the contents of *Help Us Get Mia*.  He never discussed the contents of the book with Ralph Calcagni.

Ralph Calcagni's transaction with BookSurge is illustrative of a typical BookSurge customer experience.  Ralph Calcagni purchased a package from BookSurge known as "Author's Express PDF."  Under the "Author's Express PDF" package, the author uploads a completed copy of his or her work in PDF file format.  BookSurge then prints the file in a "book" format.  Here, Ralph Calcagni uploaded a PDF version of the manuscript to BookSurge's website.  BookSurge then converted a PDF computer file of the *Help Us Get Mia* manuscript into book format.  The total cost was $1499, which included 250 copies of the book.

Ralph Calcagni did not contract with BookSurge for any fact checking or editorial services, and he did not expect BookSurge to provide any.  BookSurge and its employees do not read or review the manuscripts they print, and BookSurge and its employees did not read or review the manuscript submitted to them by Ralph Calcagni.  Nor did BookSurge and its employees know anything about the substance of *Help Us Get Mia* or about the individuals involved with the events described in *Help Us Get Mia*. BookSurge and its employees had not received any information that would cause them to question the truth of any of the statements in *Help Us Get Mia*.[3]  BookSurge did not check any of the facts or attempt to verify any of the information contained in *Help Us Get Mia*.

---

[3]     Notably, Plaintiff admitted this statement in Plaintiff's Response to Defendant BookSurge's Statement of Material Facts and Plaintiff's Statement of Additional Material Facts and then denied it in Plaintiff's Reply to Defendant BookSurge's Additional Statement of Material Facts.

According to Maureen Calcagni, she and Ralph Calcagni hired Peter Mars to provide independent fact-checking services for *Help Us Get Mia*.  Mars did not dispute during his deposition that he left the Calcagnis with the impression that he would contact witnesses.

The copyright page of the book *Help Us Get Mia*, which was submitted by Ralph Calcagni as part of his PDF upload, identifies that the book was "Published by BookSurge, LLC" in 2006.  BookSurge did not draft or review the copyright page for *Help Us Get Mia* and the model copyright pages posted at that time did not state that BookSurge publishes any of the books it prints or distributes.  BookSurge provides copyright page samples on its website that do not label BookSurge as a publisher. Because BookSurge does not review any of the manuscripts that it receives for content, BookSurge did not read, could not edit, and did not alter the copyright page provided in Ralph Calcagni's PDF of *Help Us Get Mia*.[4]

The bound version of the book was available in September 2006.  Although some customers may purchase marketing materials from BookSurge, "[t]he marketing process is the responsibility of the author."  (BookSurge's ASMF ¶ 42.)  BookSurge "does not go out and attempt to persuade people to purchase books in its inventory by making sales calls."  (Id. ¶ 41.)  In general, BookSurge customers buy copies of their books from BookSurge and self-distribute to local bookstores, distributors, friends and family.

The Calcagnis eventually purchased 760 copies of *Help Us Get Mia* and gave copies away to friends and family.  Ralph Calcagni also sold the book to bookstores in

---

[4]     Plaintiff's denial of this statement is more appropriately a legal argument.  "Had BookSurge undertaken the reasonable duties incumbent upon a prudent publisher, it would have noticed that one of its authors was according its [sic] greater status in the publication than it was prepared to accept and removed or changed the offending material."  (Pl.'s Reply to Def. BookSurge's Additional Statement of Material Facts (Docket # 141) ¶ 39.)

Winthrop and surrounding communities through a Bangor, Maine distributor, Magazines, Inc.  In addition, the author can select whether he or she wants the book available through other distribution channels.  BookSurge's customers and authors have the option to list their book for sale on Amazon.com.[5]  BookSurge provides a feed that sends the title of the book and the information to distributor Baker & Taylor and to retailers Abebooks.com and Alibris.com.[6]  *Help Us Get Mia* was available for purchase through Amazon.com.   Approximately eighty copies were purchased on-line through Amazon.com and the BookSurge website.  In total, 840 copies of *Help Us Get Mia* were produced and sold to either Ralph Calcagni or on-line.  No other copies of the book were produced or sold.

## F.    Author Publishing Agreement

The book *Help Us Get Mia* identifies "Emet Gabar" as the author of the book. The agreement to produce the book was made between BookSurge, LLC and Ralph Calcagni.  The parties dispute whether there is a signed copy of the Author Publishing Agreement that controls the relationship.

In general, the "Author Publishing Agreement" grants BookSurge a non-exclusive license to "publish" the manuscripts uploaded by its customers.  The "Author Publishing Agreement" provides that BookSurge has the right "not to accept a submission upon receipt."  The Agreement also states that BookSurge "intends to market the WORK on its website, and make the WORK available for print-on-demand distribution in its various

---

[5]     A self-publishing author can also register independently as an author on Amazon.com.

[6]     Although the listing on Amazon.com is facilitated by an agreement between BookSurge and Amazon.com, Amazon.com offers self-publishing authors that do not print with BookSurge several options to sell their books through Amazon.com's website.  Any listing with Baker & Taylor, Abebooks.com, and Alibris.com is through an electronic feed and orders based on this electronic feed are sent back to BookSurge.

channels after receipt of all required materials relating to the WORK." (Pl.'s Statement of Material Facts (Docket # 88) ¶ 9; BookSurge's ASMF ¶ 9.)

BookSurge's posted terms and conditions provide only a non-exclusive license to its customers' books. Many BookSurge customers use BookSurge's printing services to create a product that they can send to traditional publishers for future publication through traditional channels.

## G.     The Litigation

On June 28, 2007, Plaintiff Shana Sandler filed her Amended Complaint (Docket # 24) naming Mia Calcagni, Ralph and Maureen Calcagni, Peter Mars and BookSurge as Defendants. Specifically, the Amended Complaint asserts causes of action against all Defendants for Libel (Count II), Libel Per Se (Count III), False Light (Count IV), Private Facts (Count V) and Punitive Damages (Count VI). In addition, the Amended Complaint asserts a cause of action against Mia Calcagni for Intentional Infliction of Emotional Distress (Count I). On November 9, 2007, Defendants Ralph and Maureen Calcagni filed a cross-claim for indemnity and contribution against BookSurge (Docket # 70).

On March 5, 2008, Plaintiff moved for Partial Summary Judgment against Defendant BookSurge (Docket # 87) (Redacted). On March 17, 2008, Defendant BookSurge filed a Motion for Summary Judgment on all Claims of Plaintiff Shana Sandler (Docket # 96) (Redacted). In addition, Defendant BookSurge filed a Motion for Summary Judgment on Cross-Claim of Defendants Ralph and Maureen Calcagni (Docket # 97).

## II.    STANDARD OF REVIEW

Generally, a party is entitled to summary judgment if, on the record before the Court, it appears "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A "material fact" is one that has "the potential to affect the outcome of the suit under the applicable law." Nereida-Gonzalez v. Tirado-Delgado, 990 F.2d 701, 703 (1st Cir. 1993).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). In determining whether this burden is met, the Court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. Santoni v. Potter, 369 F.3d 594, 598 (1st Cir. 2004). Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmoving party must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." Triangle Trading Co. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (citation and internal punctuation omitted); Fed. R. Civ. P. 56(e). "[A]s to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." In re Spigel, 260 F.3d 27, 31 (1st Cir. 2001) (citation and internal punctuation omitted).

III.    DISCUSSION

A.    Libel and Libel Per Se

In Counts II and III, Plaintiff asserts causes of action for libel and libel per se respectively.  To state a claim for defamation in Maine, a plaintiff must establish:

> (a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.

Lester v. Powers, 596 A.2d 65, 69 (Me. 1991) (quoting Restatement (Second) of Torts § 558).  Where plaintiff is able to prove that the defamatory statement related to his or her business or profession, imputed a disgraceful disease or alleged a publishable criminal offense, the plaintiff can establish defamation per se and thus need not show special harm.  Picard v. Brennan, 307 A.2d 833, 834 (Me. 1973); see also Rippett v. Bemis, 672 A.2d 82, 86 (Me. 1996).

Plaintiff's motion for partial summary judgment asks the Court to "determin[e] that BookSurge is the publisher of the book "*Help Us Get Mia*" and, as the publisher, is liable for any defamatory statements or invasions of privacy contained in the book . . . ." (Pl.'s Mot. for Partial Summ. J. and Incorporated Mem. of Law (Docket # 87) at 1.)  In its motion for summary judgment Defendant BookSurge argues that Plaintiff's claims must fail because liability cannot be imposed absent the requisite level of fault, negligence.

In defamation law, publication is a term of art.[7]  See Albert v. Loksen, 239 F.3d 256, 269 (2nd Cir. 2001) (construing New York defamation law and stating "publication

---

[7]    Publication in defamation law differs from the requirement of "publication" under the tort of publicity given to private life.  As the Restatement (Second) of Torts § 652D, comment a notes:

is a term of art"); <u>Piper v. Mize</u>, M2002-00626-COA-R3-CV, 2003 Tenn. App. LEXIS

429, at *19 (Tenn. Ct. App. June 10, 2003); <u>see also</u> Jack H. Simmons et al., Maine Tort

Law § 13.09 (LexisNexis 2004) (stating that "[p]ublication is a term of art in defamation

law[,]" and noting that "[t]he issue of publication has received limited attention from the

Maine Supreme Judicial Court.").   Indeed, "[t]he term 'publication' causes some

confusion in a libel case such as this because it is both a business term meaning printing

and distribution of written materials and a legal term meaning communication of libelous

matter to a third person."  <u>Piper</u>, 2003 Tenn. App. at *19.  Defamation law protects the

reputation of the person defamed and thus communication to a third person is necessary

to state a claim.  <u>Lester</u>, 596 A.2d at 69; Restatement (Second) of Torts § 558.  Further,

any repetition of the defamatory statement is a publication.  W. Page Keeton et al.,

Prosser and Keeton on Torts § 113, 799 (5th ed. 1984).  "Likewise every one who takes

part in the publication, as in the case of the owner, editor, printer, vendor, or even carrier

of a newspaper is charged with publication . . . ."  <u>Id.</u>  Nonetheless, simply because

Defendant BookSurge participated in the "publication" of *Help Us Get Mia* does not ipso

facto establish liability on the part of BookSurge.   Even assuming that BookSurge

"published" *Help Us Get Mia* in the legal sense, that does not establish liability for

defamation.

Rather, as the First Circuit has recognized, "Maine defamation law does not

recognize liability without fault; . . . as a predicate to recovery, Maine requires a

---

"Publicity," as it is used in this Section, differs from "publication," as that term is used in § 577 in connection with liability for defamation.  "Publication," in that sense, is a word of art, which includes any communication by the defendant to a third person. "Publicity," on the other hand, means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge.

<u>Id.</u>

defamation plaintiff to show that the defendant acted at least negligently." Levinsky's Inc. v. Wal-Mart Stores, Inc., 127 F.3d 122, 128 (1st Cir. 1997); see also Lester, 596 A.2d at 69; Restatement (Second) of Torts § 558. Maine law generally follows the Restatement (Second) of Torts. Both the Restatement (Second) of Torts and *Prosser and Keeton on Torts* analyze the fault requirement for those involved in the publication and distribution process by placing those entities into categories based on their level of participation in the process. "The category into which a participant belongs depends upon the extent to which he participates with an author . . . of the defamatory statement in its publication." Keeton et al., at § 113, 803. Thus, "one who only delivers or transmits defamatory matter published by a third person is subject to liability, if, but only if, he knows or has reason to know of its defamatory character." Restatement (Second) of Torts § 581; see, e.g., Dworkin v. Hustler Magazine, Inc., 611 F. Supp. 781, 785-86 (D. Wy. 1985). In contrast, those who are more intimately involved with bringing a work to fruition "are subject to liability . . . because they have the opportunity to know the content of the material being published . . . ." Keeton et al., at § 113, 810; see also Folwell v. Miller, 145 F. 495, 497 (2d Cir. 1906) ("[The managing editor] is liable equally with the proprietor when he has personally assisted in any manner in the preparation, revision, or otherwise of the publication of the libel."). As the court in a similar case stated, "the real test of responsibility for the tort [of defamation] turn[s] on the scope of the defendant's involvement in the defamation. This requisite involvement hinges on whether the responsibilities were such that the defendant knew or should have known of the libel." Maynard v. Port Publications, Inc., 297 N.W.2d 500, 506 (Wis. 1980); see also Lewis v. Time, Inc., 83 F.R.D. 455, 463 (E.D. Cal. 1979) ("The common thread in these cases is

that there can be no liability absent scienter.  The requirement of scienter comports with the traditional rule that a republisher cannot be held liable unless he had knowledge of the defamatory content, and satisfies the federal constitutional rule against liability without fault.").   Under this approach, the Court must undertake to determine the level of BookSurge's responsibilities.

The record on summary judgment reveals that BookSurge lies closer to that category of participant that has a minute level of involvement with the author of the alleged defamatory material.  The process utilized by BookSurge to transform a PDF manuscript into a finished book differs substantially from that used by a traditional publishing house and reveals negligible involvement with the author of the defamation.[8] First, BookSurge is paid by authors to print and bind manuscripts using POD technology. In contrast, a traditional publisher pays the author for the right to print a manuscript. Traditional publishers will review a manuscript when it is received to determine whether to accept the piece and pay the author.  After a manuscript has been accepted, the traditional publisher will edit and improve the manuscript in cooperation with the author. BookSurge, by contrast, will print any manuscript that is in a physical format that enables BookSurge to print it.  Thus, BookSurge admits that it will print, publish and distribute any manuscript submitted to it for publication.   Most importantly, once BookSurge undertakes to print a manuscript, there is no editing, no fact-checking and no review of the manuscript at all.  If a BookSurge author would like to have his or her work edited, he

---

[8]    In undertaking this analysis, the Court is aided by the statements of Professor Weinberg, a professor at the University of Missouri Journalism School and a full-time professional writer.  While Plaintiff attempts to qualify the statements of Professor Weinberg by asserting that his knowledge of traditional publishers is limited to his individual experience, she offers no evidence to counter that he speaks from an informed position and personal knowledge.  In addition, Plaintiff attempted to introduce the statements of H. Allen Fernald, Chairman of Down East Enterprises, Inc. and Managing Director of Performance Media Group, LLC.  Nonetheless, Mr. Fernald's statements are limited to legal conclusions about the perceived duties of a publisher.

or she can purchase those services, which are outsourced and performed by another, unaffiliated entity.

Thus, as the experience of Ralph Calcagni illustrates, there is little communal effort between BookSurge and the author in getting a manuscript ready for publication. Instead, the interactions between the author and BookSurge are limited: the author uploads his or her manuscript to BookSurge's website and then pays BookSurge to transform the manuscript into a book. There may be limited contact between a BookSurge employee and the author, as occurred between BookSurge employee Roy Francia and Ralph Calcagni, but there is no substantial review or editing of the work. This is highlighted by the fact that here, the Calcagnis hired Peter Mars to provide independent fact-checking services for *Help Us Get Mia*.

Plaintiff points to the copyright page of *Help Us Get Mia* to evidence BookSurge's role in the publication process. The copyright page, which was submitted by Ralph Calcagni, states: "Published by BookSurge, LLC." Nonetheless, the record on summary judgment shows that BookSurge did not review or draft this language and could not edit the page. On its website, BookSurge provides copyright page samples, none of which identify BookSurge as the publisher. As with the content of *Help Us Get Mia*, BookSurge did not collaborate with the author of the book in the creation of the copyright page.

Once a book has been published, the traditional publisher will actively market and promote a book. For a book published by BookSurge, it is the responsibility of the author to promote and market the book. Most authors who publish through BookSurge buy copies of their books and self-distribute to local bookstores, distributors, friends and

family.  While the general Author Publishing Agreement indicates that BookSurge intends to help market a work on its website and make the work available through various channels, it is still the author who bears the responsibility of marketing and distribution. BookSurge "does not go out and attempt to persuade people to purchase books in its inventory by making sales calls."  (BookSurge's ASMF ¶ 41.)  Here, the Calcagnis purchased 760 copies of *Help Us Get Mia*.  They gave the book away to friends and family and also sold *Help Us Get Mia* to bookstores in Winthrop and surrounding communities and through a Bangor distributor.  In addition, authors may elect to have books published through BookSurge available through online distribution channels. Here, eighty copies of *Help Us Get Mia* were purchased online.

The responsibilities that BookSurge undertakes align it with an entity that has minimal involvement with the author of the defamation.  Because BookSurge does not undertake to edit, review or fact-check any of its publications, it has no means or way of knowing whether defamatory material is contained within the works that it publishes. BookSurge maintained no editorial control over the works published.   The responsibilities of BookSurge, which are known to the authors of the works, indicate that it is not an active participant in the creation of any defamation.

Indeed, BookSurge is similar to Port Publications, Inc. in <u>Maynard v. Port Publications, Inc.</u>, 297 N.W.2d 500 (Wis. 1980).  In <u>Maynard v. Port Publications, Inc.</u>, Port Publications acted as a contract printer for a newspaper, receiving photographic negatives of the paper's layout and ultimately printing the material with no substantive review of the newspaper.  <u>Id.</u> at 502.  After noting that liability for defamation cannot lie without fault, the Supreme Court of Wisconsin stated that as the contract printer, Port

Publications, Inc. did not have actual knowledge of the defamation and "that Port Publications, as a contract printer independent from and exercising no control over the publication, has no duty to inspect for libelous content the material it contracts to print." Id. at 506-07.

Here, the Court acknowledges that as the company that published the book, BookSurge was a vital link in the process that resulted in the alleged defamation. Nonetheless, BookSurge as an independent company that transforms PDF documents into books with no editorial control and no communal process with the author, can only be found liable if it knew or had reason to know of the alleged defamation. See Restatement (Second) of Torts § 581; Keeton et al., at § 113, 810. Neither BookSurge nor its employees knew of the substance or the individuals involved in *Help Us Get Mia*, and neither BookSurge nor its employees had received any information to make it question the content and factuality of the manuscript. Thus, BookSurge lacked actual knowledge. Further, as the company that transformed the manuscript into the book with no control over the publication, BookSurge had no duty to inspect the work that came before it for defamation. With reasoning that applies equally to today's internet-based P.O.D. technology, the Supreme Court of Wisconsin stated:

> Port, like other contract printers, provides a quick and inexpensive printing service that by its low cost allows access to the print media by groups that would otherwise not find such access. If liability for failure to inspect were imposed on printers like Port, they would of necessity become censors and their services would become more expensive. Increased costs might preclude the publication of small, low-budget newspapers. Such potential liability might also deter contract printers from contracting to print material they consider to be controversial. All of this would have a deleterious effect on the free dissemination of information which is fundamental in our society.

Maynard, 297 N.W.2d at 507.  Indeed, BookSurge has indicated if it were required to review the volume of submissions that it receives, it "would substantially limit the content [BookSurge] could accept or produce."  (BookSurge's ASMF ¶ 17; Plaintiff's Reply to BookSurge's ASMF ¶ 17.)  In short, the Court finds that BookSurge neither knew nor had reason to know of the alleged defamation and therefore cannot be held liable for defamation.  Plaintiff has "fail[ed] to make a showing sufficient to establish the existence of an element essential to [her] case, and on which [she] will bear the burden of proof at trial."  Celotex Corp., 477 U.S. at 322.  Therefore, summary judgment in favor of Defendant BookSurge is appropriate as to Counts II and III.

## B.       False Light

Count IV asserts a claim for the tort of false light.  "One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability for invasion of privacy, if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other was placed."  Veilleux v. NBC, 206 F.3d 92, 134 (1st Cir. 2000) (applying Maine law); see also Restatement (Second) of Torts § 625E.  Plaintiff has failed to generate a genuine issue of material fact as to the claim for false light.  Instead, as previously discussed, the record on summary judgment reveals that BookSurge had no knowledge of any allegedly false statements and had no reason to question the truth of the statements within *Help Us Get* Mia.  BookSurge did not act in reckless disregard as to any potential falsity.  Therefore, summary judgment in favor of Defendant BookSurge is appropriate as to Count IV.

C.      **Private Facts**

Maine has adopted the Restatement (Second) of Torts for the tort of publicity given to private life.  The Restatement provides: "One who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter publicized is of a kind that (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public."  Restatement (Second) of Torts § 625D; see also Nelson v. Maine Times, 373 A.2d 1221, 1225 (Me. 1977) (adopting the Restatement (Second) of Torts § 652D).  The Law Court has noted that the publicity must be given to a matter that is truly private, rather than public.  See Nelson, 373 A.2d at 1225.

Plaintiff asserts that six categories of statements in *Help Us Get Mia* reveal private facts and constitute an invasion of privacy for which liability should attach. Specifically, Plaintiff alleges that the following reveal private facts: 1) excerpts and summaries from her myspace.com webpage; 2) three statements related to her Jewish ancestry; 3) her enrollment at High Point University; 4) two statements regarding Plaintiff's decision to seek professional psychological care or counseling; 5) Plaintiff's transfer from one high school to another under a superintendent's agreement; and 6) two statements regarding plastic surgery on Plaintiff's nose.  In responding to BookSurge's motion for summary judgment, Plaintiff did not contest that the statements related to the first three categories of statements were not private.  Indeed, Plaintiff admitted that her myspace.com webpage, her Jewish ancestry and her enrollment at High Point University were not private facts.  Thus, liability for publicity given to private life cannot lie as to the first three categories of statements.

In order to state a claim for public disclosure of private facts, the facts must not only be private, the matter revealed must be highly offensive to a reasonable person.

<u>Nelson</u>, 373 A.2d at 1225; Restatement (Second) of Torts § 652D.

> All are in agreement that the matter made public must be one which would be highly offensive and objectionable to a reasonable person of ordinary sensibilities.  The law is not for the protection of the hypersensitive, and all of us must, to some reasonable extent, lead lives exposed to the public gaze.  Anyone who is not a hermit must expect the more or less casual observance of his neighbors and the passing public as to what he is and does, and some reporting of his daily activities.

Keeton et al., at § 117, 857.  The Court will consider the last three categories of statement in turn.

Plaintiff alleges that the following statements regarding her decision to seek professional psychological care or counseling were private facts:

> 1) "Shana had issues and needed to seek professional help, as she did while she was a student at Maranacook, and as she would do again in the spring of 2005 while attending college in North Carolina."
>
> 2) "In her most recent page she writes: . . . 'I have been feeling depressed for the past 3-4 weeks.  Not good and I have NO idea why, so I am taking upon myself to do [sic] see the psyc doctor on campus.  At least I am addmitting [sic] that something is wrong and I need help to figure out why, I don't want to feel this way anymore, especially when I have no reason to be sad or have any idea why I am sad . . . .'"

The first passage appeared at pages 12 through 13 of *Help Us Get Mia* and the second passage appeared at page 46.  The Court notes that the first passage is ambiguous in that it does not reveal what type of professional help Plaintiff sought during her high school years.  Nonetheless, the Court will proceed assuming that the reader would construe this passage as referring to professional psychological help.

Plaintiff admits that she revealed her decision to seek psychological help during college on her publicly accessible myspace.com webpage.  As a result, the second

passage is not actionable as it does not reveal a private fact.  Furthermore, Plaintiff's choice to reveal to the public that she sought psychological help shows that she did not believe the disclosure of this fact to be highly offensive.  Because this statement was not highly offensive to Plaintiff, the Court is unwilling to find that the first passage regards a matter that would be highly offensive to a reasonable person of ordinary sensibilities.

Next, Plaintiff alleges that a statement regarding her transfer from Maranacook High School to Winthrop High School under a superintendent's agreement constitutes an actionable public disclosure of private matters.  Plaintiff, however, admitted that her transfer from Marancook to Winthrop was public information.  Thus, the Court is left to consider whether the disclosure that such a transfer occurred under a superintendent's agreement is highly offensive.  Plaintiff argues only generally that there are genuine issues of material fact as to whether the disclosure "of these private facts about Sandler would be highly offensive to a reasonable person."  (Pl.'s Mem. in Opp'n to Def.s' Mot. for Summ. J. (Docket # 129) at 26.)  This is insufficient to create a genuine issue of material fact.  Further, in arguing that the disclosure of the transfer is not a matter of legitimate public concern, Plaintiff states: "[a] student might be tuition-paying or live in a family situation (such as divorced or separated parents) that allows her to attend the school as a matter of right."  (Id.)  Without addressing whether these facts are a matter of legitimate public concern, the Court notes that no negative inference would attach from the circumstances that Plaintiff raises.  Similarly, Plaintiff has failed to alert the court to any negative inference that attaches to Plaintiff's attendance at a school under a superintendent's agreement.  The Court is therefore unwilling to find that the disclosure of this matter would be highly offensive.

Finally, Plaintiff alleges that two statements in *Help Us Get Mia* regarding plastic surgery on her nose are actionable invasions of her privacy.  The Law Court has noted that mere undesired publicity will not suffice.  <u>Nelson</u>, 373 A.2d at 1225.  First, the Court questions whether this matter is truly private: cosmetic surgery on one's face is by its nature exposed to the public eye.  "[S]he must expect the more or less casual observation of [her] neighbors as to what [she] does, and that [her] comings and goings and [her] ordinarily daily activities, will be described in the press as a matter of casual interest to others."  Restatement (Second) of Torts § 625D, cmt. c.  In addition, Plaintiff argues only generally that the disclosure of her plastic surgery would be highly offensive.  The Restatement notes that, "[t]he protection afforded to the plaintiff's interest in his privacy must be relative to the customs of the time and place . . . . Complete privacy does not exist in this world except in a desert, and anyone who is not a hermit must expect and endure the ordinary incidents of the community life of which he is a part."  <u>Id.</u>  In this day and age, the Court finds that Plaintiff has failed to generate a triable issue as to whether the disclosure was highly offensive.

Alternatively, the Court notes that BookSurge had no knowledge or reason to know that any of the facts contained within *Help Us Get* Mia revealed private matters that would be highly offensive to a reasonable person.  For the same reasons that BookSurge was protected from liability for defamation, BookSurge is protected from liability for publicity given to private matters.  To find otherwise would shield BookSurge from liability for libel but not for telling the truth.  Summary judgment in favor of Defendant BookSurge is appropriate on Count V.

**D.      Punitive Damages**

Under Maine law, punitive damages are not a separate and distinct cause of action.  Rather, it is a type of remedy.  See Southport Marine, LLC v. Gulf Oil Ltd. P'ship, 234 F.3d 58, 64 (1st Cir. 2000); Connors v. Town of Brunswick, 2000 U.S. Dist. LEXIS 12253, *40 (D. Me. Aug. 16, 2000) ("[A] claim for punitive damages does not constitute a separate and distinct cause of action and that the defendants are entitled to summary judgment as to Count VI on that ground alone.").  Because punitive damages do not constitute a separate cause of action, Defendant BookSurge is entitled to summary judgment on Count VI.

Therefore, the Court GRANTS summary judgment in favor of Defendant BookSurge on Defendant's Motion for Summary Judgment on all Claims of Plaintiff Shana Sandler and Incorporated Memorandum of Law (Docket # 96).

**E.      Cross-Claims of Defendants Ralph and Maureen Calcagni**

On November 9, 2007, Defendants Ralph and Maureen Calcagni filed a cross-claim for contribution and indemnity against Defendant BookSurge.  On March 17, 2007, BookSurge filed for summary judgment on the cross-claims asserting that it is not liable to the Calcagnis under either a tort or contract based theory of indemnification.  Emery v. Hussey Seating Co., 697 A.2d 1284, 1287 (Me. 1997) (setting forth the circumstances under which a joint tortfeasor's right to indemnification may arise).  In addition, BookSurge argues that the contribution claim fails because such claims are appropriate only where both tortfeasors share a common liability.  Thermos Co. v. Spence, 735 A.2d 484, 487 (Me. 1999)  ("A defendant in a contribution action cannot be required to contribute to damages owed by another tortfeasor unless the contribution defendant has

been found to have been a cause of the damages to the original injured party through the contribution defendant's own negligence.")

In responding to this Motion, the Calcagnis, in one sentence, adopt Section III (A) of Plaintiff's Motion for Summary Judgment.  Even assuming the Calcagnis adopted the entirety of Plaintiff's Motion for Partial Summary Judgment, it would be nonresponsive to BookSurge's Motion; Defendants Ralph and Maureen Calcagni have failed to respond to the sound arguments regarding indemnity and contribution made by BookSurge. Defendants Ralph and Maureen Calcagni have "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp., 477 U.S. at 322.  Accordingly, summary judgment is appropriate on Defendants Ralph and Maureen Calcagni's cross-claims.  Therefore, the Court GRANTS BookSurge's Motion for Summary Judgment on Cross-Claim of Defendants Ralph and Maureen Calcagni and Incorporated Memorandum of Law (Docket # 97).

## IV.   CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Partial Summary Judgment and Incorporated Memorandum of Law is DENIED (Docket # 87).  Defendant BookSurge's Motion for Summary Judgment on all claims of Plaintiff Shana Sandler is GRANTED (Docket # 96).  BookSurge, LLC's Motion for Summary Judgment on Cross-Claim of Defendants Ralph and Maureen Calcagni and Incorporated Memorandum of Law is GRANTED (Docket # 97).  BookSurge LLC's Motion for Oral Argument and Incorporated Memorandum of Law is DENIED (Docket # 101).  Plaintiff's Motion to Strike Defendants Ralph and Maureen Calcagni's Motion for Summary Judgment on all

Claims of Shana Sanlder [sic] is GRANTED (Docket # 135).  The Court STRIKES Motion for Summary Judgment of Defendants Ralph and Maureen Calcagni on all Claims of Plaintiff Shana Sandler with Incorporated Memorandum of Law (Docket # 126) and sua sponte STRIKES Peter Mars' Motion for Summary Judgment on all Claims of Plaintiff Shana Sandler and Incorporated Memorandum of Law (Docket # 104).  In accordance with these ruling, BookSurge is entitled to summary judgment in its favor on all claims and cross-claims asserted in this action.

**SO ORDERED.**

/s/ George Z. Singal
Chief United States District Judge

Dated at Portland, Maine, this 16th day of July, 2008.